# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ESTATE OF JAMES PURDY, by and through its personal representative Marilyn Purdy;
MARILYN PURDY, individually;
SCOTT PURDY, individually;
BROOKE GRENEMYER, individually; and
MATTHEW PURDY, individually,

      Plaintiffs,

v.

JEFFERSON COUNTY, COLORADO[1];
JEFFERSON COUNTY SHERIFF REGGIE MARINELLI, in her official capacity;
JEFFERSON COUNTY BOARD OF COUNTY COMMISSIONERS;
VITALCORE HEALTH STRATEGIES, LLC;
DETENTION SERVICES MANAGER POLLY ABERNATHY, LPC;
HEALTH SERVICES ADMINISTRATOR ESMERALDA ZIEGELMANN;
BRAYDEN SMITH, EMT;
MYRA BROCK, RN;
ADELE MANN, COUNSELOR;
CASEY CASTANEDA, LPN;
MICHELLE BARRON, MD;
KIM SANCHEZ, RN;
LAVINA BUSBY, RN;
MARSHALL MCCURDY, CP-C;
MONICA JARRELL, NP;
CURTIS MURPHY;

---

[1] "Jefferson County, Colorado," is the correct name of the governmental entity Defendant. There is a split of opinion among some judges in this district and elsewhere regarding the proper named municipal defendant when suing a County under Section 1983. Some judges require that plaintiffs name the Board of County Commissioners and/or the sheriff in his/her official capacity to name a Colorado county as a Section 1983 defendant. This is the intent of this civil rights action, to hold the County liable, however denominated. If the Court in this matter ultimately prefers or requires Plaintiffs to name as Defendants only the "Board of County Commissioners of Jefferson County" and/or "Sheriff Reggie Marinelli in her official capacity" to sue Jefferson County, or some other entity in order to obtain municipal liability against Jefferson County, Plaintiffs will substitute or voluntarily dismiss parties, and this shall serve as notice of the lawsuit and the factual and legal bases of the claims to those putative County municipality Defendants and their lawyers.

HUNAIF DAR, MD;
JERICA TALCOTT, RN;
CECELIA BARBEITE, RN;
BEVERLY CASAREZ, RN;
ANGEL VARGAS, LPN;
LILIA FERNANDEZ, RN;
BREANNA ANDREWS, RN;
MEGAN PAGE;
CATHERINE ROWE, RN;
ANIKA HENG, MA, LPC, LLC;
TAMMY POPE, MS, LAC;
EMILSA PEREDA, RN;
DEPUTY ROBERT DIEHL;
DEPUTY PETER NIELSEN;
DEPUTY KAITLYN TUEY;
DEPUTY SAMUEL VAN ALPHEN;
DEPUTY CHASE VAN WYK;
DEPUTY RICHARD VARGAS;
DEPUTY ALEX ESPARZA;
DEPUTY TINA MINDYKOWSKI;
INMATE SERVICES MANAGER SUSAN WISPELEARE;
DEPUTY ALLEN ERDMANN;
DEPUTY ARIC MEYER;
DEPUTY KIMBERLY JENSEN;
DEPUTY K'LEIGH THOMAS;
JOHN and JANE DOES No. 1-15;

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

       Plaintiffs, by and through counsel, Darold Killmer, Michael Fairhurst, and Madison Lips

of KILLMER LANE, LLP, respectfully allege for their Complaint and Jury Demand as follows:

### I.  INTRODUCTION

       1.     When seventy-six-year-old James Purdy was arrested and brought to Jefferson

County Detention Facility ("JCDF") on June 25, 2023, deputies and medical staff were aware of

his advanced Parkinson's disease and dementia. These complex conditions put Mr. Purdy at

great risk of falling and injuring himself due to the physical instability and mental confusion associated with Parkinson's, and also required a strict medication regimen.

2.    Despite knowing these risks, the Individual Medical and Deputy Defendants failed to provide a safe housing assignment for Mr. Purdy or to provide legally required accommodations for his several known disabilities, keeping him unsupervised in a jail cell with a raised bed and a toilet for the entirety of his detention. Predictably, Mr. Purdy proceeded to fall over seventy-five times[2] over the course of his detention, repeatedly and violently slamming his frail head and body onto the hard ground, toilet, and bed frame over and over again.

3.    Despite observing Mr. Purdy's increasingly serious injuries to his body, as well as his precipitously declining mental state, none of the Individual Medical or Deputy Defendants took appropriate measures to prevent further falls or to move Mr. Purdy to a safe environment. In fact, during significant periods of his detention, medical staff took Mr. Purdy *off* one of his critical Parkinson's medications with no reasonable medical justification. This alone caused a significant decline in Mr. Purdy's physical and mental capacity.

4.    Mr. Purdy was taken to the hospital on July 10, 2023, after one significant fall, but was returned to the exact same conditions that caused the fall the same day.

---

[2] Over seventy falls are documented on surveillance video between July 10 – July 18, 2023. The true number of times Mr. Purdy fell will never be known because Defendant Jefferson County destroyed the surveillance video from June 25 – July 9, 2023, which would have captured significantly more falls (only five falls were noted in medical/deputy reports prior to July 10, and despite the seventy falls caught on video, only four of those were noted in reports after July 10). The destruction of the video surveillance evidence of Mr. Purdy's incarceration from June 25 through July 10, despite a written request for production of such evidence on August 3, 2023, by counsel for the Purdy family (only four days after his death), raises a compelling inference that such video evidence would have supported even more indifference to the shocking conditions of confinement imposed on Mr. Purdy during his stay.

5.      On July 18, 2023, after painfully suffering physically and emotionally for over three weeks in plain view of Defendants and on video surveillance, Mr. Purdy violently fell once again and slammed his head, causing a substantial open head wound. He lay bleeding on the floor until staff found him and called an ambulance. He was transported to the hospital, but Mr. Purdy developed sepsis and meningitis from his wounds, and he died on July 30, 2023.

6.       If any of the Individual Medical or Deputy Defendants had initiated an appropriate medical intervention on behalf of Mr. Purdy, he would likely be alive today. He certainly would not have spent the last weeks of his life in pain, injured, disoriented, and utterly alone in a cell. Defendants' willful and deliberate indifference to Mr. Purdy's serious medical needs directly led to his torturous, easily preventable, and unjustifiable death.

7.      Defendants are liable for the death of Mr. Purdy under the Fourteenth Amendment to the United States Constitution based on their deliberate indifference to Mr. Purdy's obvious and serious medical needs and the imposition of unconstitutional conditions of his confinement. Defendants are also liable for violations of the Americans with Disabilities Act and the Rehabilitation Act and for wrongful death under Colorado state tort law, and the Individual Deputy Defendants are further liable under Colorado's Enhance Law Enforcement Integrity Act.

## II.  JURISDICTION AND VENUE

8.      This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and this case is brought pursuant to 42 U.S.C. § 1983. Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988. This Court has jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State of Colorado at all relevant times stated herein.

### III.    PARTIES

**<u>Plaintiffs</u>**

10.      At all times relevant to the subject matter of this litigation, the decedent, James Purdy, was a citizen of the United States of America and a resident of and domiciled in the State of Colorado. At all relevant times after his passing, Mr. Purdy's spouse Marilyn Purdy was the personal representative of the Estate of James Purdy.

11.      Plaintiff Marilyn Purdy was Mr. Purdy's wife. At all relevant times, Mrs. Purdy was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

12.      Plaintiff Scott Purdy was Mr. Purdy's son. At all relevant times, Scott Purdy was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

13.      Plaintiff Brooke Grenemyer was Mr. Purdy's daughter. At all relevant times, Brooke Grenemyer was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

14.      Plaintiff Matthew Purdy was Mr. Purdy's son. At all relevant times, Matthew Purdy was a citizen of the United States of America and a resident of and domiciled in the State of Texas.

**Defendants**

15. Defendant Jefferson County is a political subdivision chartered under the laws of the State of Colorado and is a "person" subject to suit under Title 42 U.S.C. Section 1983. Among other things, Jefferson County, through the Jefferson County Sheriff's Office ("JCSO"), operates the Jefferson County Detention Facility ("JCDF"), located at 200 Jefferson County Parkway, Golden, Colorado 80401.

16. Defendant Sheriff Reggie Marinelli is the elected Sheriff of Jefferson County, and is the final policymaker and decisionmaker in Jefferson County regarding policies, practices and customs pertaining to the operation of the JCDF.

17. Defendant Jefferson County Board of County Commissioners ("BOCC") act collectively as the governing board of the county. The BOCC manages the affairs of the county as authorized by the state. The BOCC determines and authorizes the budget for Jefferson County and its subordinate agencies.

18. Defendants Jefferson County, Sheriff Reggie Marinelli in her official capacity, and Board of County Commissioners are collectively referred to herein as "Jefferson County."

19. Defendant Jefferson County is responsible for the oversight, supervision, discipline, and training of the law enforcement personnel and for the provision of medical care to inmates at JCDF.

20. At all relevant times, Defendant Jefferson County had a nondelegable duty imposed by the Colorado and Federal constitutions to provide adequate medical care to inmates and detainees at JCDF. Jefferson County is liable under the nondelegable duty doctrine for the deliberate indifference of Defendant VitalCore Health Strategies, LLC ("VitalCore"), its agent

6

and contracted medical care provider, and its employees or contractors. By contracting with Defendant VitalCore, Defendant Jefferson County has adopted and is liable for VitalCore's deliberately indifferent policies, training, practices, habits, customs, widespread usages, and failures to adequately train and supervise their employees and contractors with respect to the serious medical needs of detainees like Mr. Purdy.

21.    Plaintiffs sent a timely notice of claim under the Colorado Governmental Immunity Act, C.R.S. § 24-10-101 *et seq*., to Jefferson County on or about December 20, 2023, providing notice of potential liability of Jefferson County and its employees arising from the facts of Mr. Purdy's death as described herein.

22.    Defendant VitalCore is a Kansas corporation with its principal address located at 719 SW Van Buren St., Suite 100, Topeka, Kansas 66603, and its registered agent in Colorado is Corporation Service Company located at 1900 W. Littleton Blvd., Littleton, CO 80120.

23.    At all times relevant to the subject matter of this litigation, VitalCore contracted with Jefferson County to provide medical services to inmates at JCDF. The initial contract between the parties is dated November 8, 2021, and it was renewed by Second Amendment signed and dated by Defendant Sheriff Martinelli on February 2, 2023, for another year, to cover all relevant times of Mr. Purdy's incarceration at the JCDF. At all relevant times, VitalCore was responsible for the oversight, supervision, and training of all of the medical staff at JCDF, including the Individual Defendants in this matter, and for the medical and mental health care of inmates housed at JCDF.

24.    At all relevant times, VitalCore was acting under color of state law and performing a central function of the state.

25.     Defendant VitalCore is a private corporation, and thus neither it nor any of its

employees or contractors are entitled to any immunity under the Colorado Governmental

Immunity Act on Colorado state law claims or qualified or any other immunity on the federal

law claims.[3]

26.     Defendant Jefferson County and Defendant VitalCore are collectively referred to

herein as the "Entity Defendants."

27.     At all times relevant to the subject matter of this litigation, Defendant Polly

---

[3] Plaintiffs contend that institutional standards of liability based on respondeat superior should apply to private entities, such as VitalCore, in §1983 actions, and that cases such as *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) are wrongly decided and should be modified or reversed. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional rights.") Applying the heightened standards of Monell – designed to protect governmental entities – to private corporate conduct is contrary to public policy, including policy concerns outlined by the Supreme Court in *Monell* and its progeny. Several district courts in the Tenth Circuit have acknowledged *Shields*'s criticism of the application of *Monell* to private corporations. *Sanders*, 138 F. Supp. 3d at n.3; *Khan*, 2021 U.S. Dist. LEXIS 5596 at *11 n.13; *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1341 (N.D. Okla. 2014). In *Herrera v. Santa Fe Public Schools*, the District Court of New Mexico discussed *Shields*, acknowledging that "[t]here is a fair question whether this is a wise rule." 41 F. Supp. 3d at 1179. In *Revila v. Glanz*, the Northern District of Oklahoma stated that *Shields*'s reasoning "provides potent arguments for *not* extending *Monell* to private corporations" but stated that it must follow Tenth Circuit precedent, which holds that "*Monell* extends to private corporations and thus [private corporations] cannot be held liable on a *respondeat superior* basis for their employees' conduct." 8 F.Supp.3d at 1341. While several opinions throughout the Tenth Circuit question the soundness of extending *Monell* to private corporations, these opinions also acknowledged that it currently remains settled law. *See Carr v. Elder*, 2022 U.S. Dist. LEXIS 247870, *19-*20 (D. Colo.). In any event, all Defendants in this matter are legally culpable, including VitalCore, whichever standard of institutional liability is applied.

Abernathy, LPC, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as the Detention Services Manager at JCDF, who was employed by, or an independent contractor for, Jefferson County.

28.     At all times relevant to the subject matter of this litigation, Defendant Esmeralda Ziegelmann was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as Health Services Administrator at JCDF, who was employed by, or an independent contractor for, VitalCore.

29.     At all times relevant to the subject matter of this litigation, Defendant Brayden Smith, EMT, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of their official duties and under color of state law in their capacity as an Emergency Medical Technician at JCDF, who was employed by, or an independent contractor for, VitalCore.

30.     At all times relevant to the subject matter of this litigation, Defendant Myra Brock, RN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at JCDF, who was employed by, or an independent contractor for, VitalCore.

31.     At all times relevant to the subject matter of this litigation, Defendant Adele Mann, Counselor, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Counselor at JCDF, who was employed by, or an independent contractor for, VitalCore.

32.     At all times relevant to the subject matter of this litigation, Defendant Casey
Castaneda, LPN, was a citizen of the United States and a resident of and domiciled in Colorado
and was acting within the scope of her official duties and under color of state law in her capacity
as a Licensed Practical Nurse at JCDF, who was employed by, or an independent contractor for,
VitalCore.

33.     At all times relevant to the subject matter of this litigation, Defendant Michelle
Barron, MD, was a citizen of the United States and a resident of and domiciled in Colorado and
was acting within the scope of her official duties and under color of state law in her capacity as a
Medical Doctor at JCDF, who was employed by, or an independent contractor for, VitalCore or
Jefferson County.

34.     At all times relevant to the subject matter of this litigation, Defendant Kim
Sanchez, RN, was a citizen of the United States and a resident of and domiciled in Colorado and
was acting within the scope of her official duties and under color of state law in her capacity as
Director of Nursing at JCDF, who was employed by, or an independent contractor for, VitalCore.

35.     At all times relevant to the subject matter of this litigation, Defendant Lavina
Busby, LPN, was a citizen of the United States and a resident of and domiciled in Colorado and
was acting within the scope of her official duties and under color of state law in her capacity as a
Licensed Practical Nurse at JCDF, who was employed by, or an independent contractor for,
VitalCore.

36.     At all times relevant to the subject matter of this litigation, Defendant Marshall
McCurdy, CP-C, was a citizen of the United States and a resident of and domiciled in Colorado
and was acting within the scope of his official duties and under color of state law in his capacity

10

as a Community Paramedic at JCDF, who was employed by, or an independent contractor for, VitalCore.

37.    At all times relevant to the subject matter of this litigation, Defendant Monica Jarrell, NP, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Nurse Practitioner at JCDF, who was employed by, or an independent contractor for, VitalCore.

38.    At all times relevant to the subject matter of this litigation, Defendant Curtis Murphy, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as Medical Staff at JCDF, who was employed by, or an independent contractor for, VitalCore.

39.    At all times relevant to the subject matter of this litigation, Defendant Hunaif Dar, MD, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as a Medical Doctor at JCDF, who was employed by, or an independent contractor for, VitalCore or Jefferson County.

40.    At all times relevant to the subject matter of this litigation, Defendant Jerica Talcott, RN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at JCDF, who was employed by, or an independent contractor for, VitalCore.

41.    At all times relevant to the subject matter of this litigation, Defendant Cecelia Barbeite, RN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a

Registered Nurse at JCDF, who was employed by, or an independent contractor for, VitalCore.

42.     At all times relevant to the subject matter of this litigation, Defendant Beverly Casarez, RN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at JCDF, who was employed by, or an independent contractor for, VitalCore.

43.     At all times relevant to the subject matter of this litigation, Defendant Angel Vargas, LPN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of their official duties and under color of state law in their capacity as a Licensed Practical Nurse at JCDF, who was employed by, or an independent contractor for, VitalCore.

44.     At all times relevant to the subject matter of this litigation, Defendant Lilia Fernandez, RN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at JCDF, who was employed by, or an independent contractor for, VitalCore.

45.     At all times relevant to the subject matter of this litigation, Defendant Breanna Andrews, RN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at JCDF, who was employed by, or an independent contractor for, VitalCore.

46.     At all times relevant to the subject matter of this litigation, Defendant Megan Page was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a

member of the Medical Staff at JCDF, who was employed by, or an independent contractor for, VitalCore.

47.     At all times relevant to the subject matter of this litigation, Defendant Catherine Rowe, RN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at JCDF, who was employed by, or an independent contractor for, VitalCore.

48.     At all times relevant to the subject matter of this litigation, Defendant Anika Heng, MA, LPC, LLC, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Detention Counselor at JCDF, who was employed by, or an independent contractor for, VitalCore.

49.     At all times relevant to the subject matter of this litigation, Defendant Tammy Pope, MS, LAC, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Mental Health Clinician at JCDF, who was employed by, or an independent contractor for, VitalCore.

50.     At all times relevant to the subject matter of this litigation, Defendant Emilsa Pereda, RN, was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at JCDF, who was employed by, or an independent contractor for, VitalCore.

51.     At all times relevant to the subject matter of this litigation, Defendant Robert Diehl was a citizen of the United States and a resident of and domiciled in Colorado and was

13

acting within the scope of his official duties and under color of state law in his capacity as a Deputy at JCDF, who was employed by Jefferson County.

52.    At all times relevant to the subject matter of this litigation, Defendant Peter Nielsen was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as a Deputy at JCDF, who was employed by Jefferson County.

53.    At all times relevant to the subject matter of this litigation, Defendant Kaitlyn Tuey was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Deputy at JCDF, who was employed by Jefferson County.

54.    At all times relevant to the subject matter of this litigation, Defendant Samuel Van Alphen was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as a Deputy at JCDF, who was employed by Jefferson County.

55.    At all times relevant to the subject matter of this litigation, Defendant Chase Van Wyk was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as a Deputy at JCDF, who was employed by Jefferson County.

56.    At all times relevant to the subject matter of this litigation, Defendant Richard Vargas was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as a Deputy at JCDF, who was employed by Jefferson County.

57.     At all times relevant to the subject matter of this litigation, Defendant Alex Esparza was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of their official duties and under color of state law in their capacity as a Deputy at JCDF, who was employed by Jefferson County.

58.     At all times relevant to the subject matter of this litigation, Defendant Tina Mindykowski was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Deputy at JCDF, who was employed by Jefferson County.

59.     At all times relevant to the subject matter of this litigation, Defendant Susan Wispeleare was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as Inmate Services Manager at JCDF, who was employed by Jefferson County.

60.     At all times relevant to the subject matter of this litigation, Defendant Allen Erdmann was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as a Deputy at JCDF, who was employed by Jefferson County.

61.     At all times relevant to the subject matter of this litigation, Defendant Aric Meyer was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as a Deputy at JCDF, who was employed by Jefferson County.

62.     At all times relevant to the subject matter of this litigation, Defendant Kimberly Jensen was a citizen of the United States and a resident of and domiciled in Colorado and was

acting within the scope of her official duties and under color of state law in her capacity as a Deputy at JCDF, who was employed by Jefferson County.

63.    At all times relevant to the subject matter of this litigation, Defendant K'Leigh Thomas was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Deputy at JCDF, who was employed by Jefferson County.

64.    Defendants JOHN and JANE DOES No. 1-15 are yet-to-be identified employees or agents of Defendants Jefferson County or VitalCore whose identities have not been provided to Plaintiffs or confirmed, but who are or should be known to Defendants Jefferson County and/or VitalCore, and who shall be identified and added herein upon discovery.

65.    All Individual Deputy Defendants and Individual Medical Defendants are collectively referred to herein as "Individual Defendants" or "Individual Jail Defendants" and "Individual Medical Defendants."

## IV.    FACTUAL ALLEGATIONS

### Jim Purdy was a beloved grandfather, father, brother, friend, and husband.

66.    Jim Purdy was born to James and Janet Purdy on March 21, 1947, and is survived by his wife Marilyn; brothers John, Jeff, and Steve; children Scott, Brooke, and Matthew; and his 7 grandchildren and other beloved family members.



67.    Mr. Purdy was a larger-than-life individual and an exceptional athlete. Throughout his life he was very active in sports and outdoor pursuits. He was well known for his precision, problem solving, and competitive nature. He had a zeal for adventure and tried his hand at a wide range of hobbies, and was skilled in all of them. Some of his favorite activities throughout his life were hockey, rowing, track and field, skiing, mountain climbing, football, camping, hunting, and motorcycling. Mr. Purdy even became a champion motorcycle racer, competing in and winning races all over the country.

68.    Mr. Purdy was close with his younger brothers Jeff, Steven, and John. As their father was an international businessman, Mr. Purdy often took on the role of father figure to his younger siblings. They saw him as a role model, mentor, and teacher. He bonded with his brothers over their shared love of the Cleveland Browns football team.

69.    Mr. Purdy spent four years serving his country in the Army during the Vietnam War. He was the top candidate graduate at his boot camp and top in the group of sharp shooters. Mr. Purdy took great pride in his service to the country and his veteran status.



70.     Mr. Purdy took after his father and was a successful businessman. Being a people-person allowed Mr. Purdy to excel in his salesman role in the fiber and concrete industry.  He introduced fiber-reinforced concrete in the western states area and grew it into a million-dollar territory. Mr. Purdy was an expert craftsman and was relied on often to be the family handy man.

71.     Mr. Purdy had a big, close-knit family who knew him to capture the room with a funny story or a lighthearted prank. Even while battling Parkinson's Disease later in life, Mr. Purdy was a gregarious character and was described as "the life of the party."

72.     Mr. Purdy showed up for his children no matter what. He went to his daughter Brooke's volleyball games, his son Scott's hockey games, and his son Matt's soccer games, even when they were out of town. He often took his kids camping and to Colorado Avalanche hockey games. Mr. Purdy valued being a present father and taught his children to never cut corners and

to lend a helping hand any chance they could.



*Mr. Purdy at the wedding of his daughter Brooke and son-in-law Dan, with his wife Marilyn.*

73.    Later in life, Mr. Purdy was diagnosed with Parkinson's Disease, and his wife
Marilyn was his primary caretaker. With the help of medication, he was able to move safely
about his home and was monitored closely by Marilyn. His diagnosis did not take away his
outgoing personality and desire to spend time with his children and loved ones. His family
members are saddened knowing that he had many good years left to live.

74.    Mr. Purdy was 76 years old when Defendants' deliberate indifference to his
medical needs at JCDF caused his death.

**Mr. Purdy was arrested and detained at Jefferson County Detention Facility.**

75.    Mr. Purdy was diagnosed with Parkinson's disease in 2011. Parkinson's disease is
a progressive neurogenerative disorder that causes a gradual loss of brain cells that produce
dopamine, a chemical necessary for movement. The disease also causes changes to several other

brain chemicals that can greatly affect a person's mental capacity. Dementia is frequently caused by Parkinson's disease.

76.     By 2023, Mr. Purdy's disease had progressed significantly, causing symptoms such as mental confusion, memory problems (dementia), and significant physical limitations including difficulty walking without staggering or falling. He was also taking high doses of several medications to treat his Parkinson's disease, which could cause side effects of further confusion and hallucinations.

77.     On April 9, 2023, Mr. Purdy was arrested by JCSO Deputies Aaron Smith and Casey Killion on charges arising out of an incident that occurred earlier that day. Mr. Purdy had interacted with a woman in a way that had apparently frightened her, but which was a manifestation of his disease and medication-induced symptoms of confusion and delusions.

78.     While being arrested at his home, Mr. Purdy expressed confusion and needed physical support from his wife and the deputies to put on shoes and pants. Mr. and Mrs. Purdy informed the deputies of Mr. Purdy's disease and his physical and mental limitations, and Mrs. Purdy informed deputies that Mr. Purdy required multiple medications every four hours.

79.     The deputies took Mr. Purdy to JCDF for a "book through," meaning he would be released the same day. Deputy Smith made the decision to do a book through because of Mr. Purdy's health risks and required prescription medications. During the book through, Deputy Smith documented Mr. Purdy's Parkinson's disease. Deputy Smith drove Mr. Purdy back to his home after the book through and released him to Mrs. Purdy's care.

80.     Deputy Killion noted in his report that Mrs. Purdy told him that this incident might be the impetus to place Mr. Purdy in an assisted living facility, due to the advanced stage

20

of his disease.

81.     On May 18, 2023, Investigator Elizabeth Gard completed a warrant for Mr. Purdy's arrest, which was filed with the Jefferson County Court on June 5, 2023. The warrant included details about Mr. Purdy's Parkinson's disease and the symptoms he suffered. The warrant was issued on June 13, 2023.

82.     Mr. Purdy was arrested on or around June 25, 2023, at his home, and brought to the Jefferson County Detention Facility.

**Jail medical staff placed Mr. Purdy in General Population despite his obvious serious medical needs.**

83.     The same day Mr. Purdy was booked at JDCF on June 25, 2023, Defendant Brayden Smith, EMT, completed a Medical and Behavioral Health Admission Care Screen at 6:22pm. Defendant Smith reported Mr. Purdy to be alert, and disclosed a history of stroke, low blood pressure, three heart surgeries, Parkinson's disease, spinal fusion and back, and two ruptured Achilles tendons. Defendant Smith documented that Mr. Purdy's medications included Carbidopa/Levodopa (to treat physical symptoms of Parkinson's, including shakiness, stiffness, and difficulty moving), doxycycline (to treat motor complications associated with the Carbidopa/Levodopa therapy), quetiapine (to combat psychosis in Parkinson's patients), escitalopram (brand Lexapro, to address depression caused by Parkinson's), and aspirin, but Defendant Smith failed to document the dosages, where prescribed, or the last dose taken on the form. For no apparent medically justifiable reason, Defendant Smith falsely noted "no health or behavioral health issues identified," and on that basis cleared Mr. Purdy to be housed in general population, despite the reported diagnosis of Parkinson's disease.

84.     Based on Mr. Purdy's complex medical history of Parkinson's and dementia

requiring critical medications every four hours, Defendant Smith should have immediately referred Mr. Purdy to a higher-level provider to evaluate his medical needs and develop a treatment plan while at the jail. Instead, he placed a frail and vulnerable man with Parkinson's and dementia, with all of the physical and mental risks associated with those diagnoses, in general population.

85.    Records by Defendant Myra Brock, RN indicate that she completed Mr. Purdy's Intake Health Assessment on June 25, 2023, but she did not document that assessment until more than two weeks later, July 12, 2023. Defendant Brock noted difficulty completing Mr. Purdy's assessment due to his "mental incapacity." Defendant Brock permitted Mr. Purdy to be placed in general population despite knowing that he was "mentally incapacitated."

86.    Defendant Smith's and Defendant Brock's decision to send Mr. Purdy, an obviously high-risk individual requiring major medical care and supervision, to be housed in general population was an unjustifiable and reckless decision, and demonstrated deliberate indifference to Mr. Purdy's known and serious medical needs. Defendant Smith and Defendant Brock knowingly put Mr. Purdy at great risk of serious harm in an unsupervised environment.

87.    At this early stage, VitalCore policy required consultation with the Detention Services Manager, Defendant Polly Abernathy, LPC, regarding housing assignments and transfer of inmates who are diagnosed as chronically ill, physically disabled, geriatric, seriously mentally ill, or developmentally disabled.

88.    Defendant Abernathy was interviewed for an internal JCSO investigation into Mr. Purdy's death on March 12, 2024, and stated that she had "no counseling concerns based on Mr. Purdy's initial booking intake screenings."

89. Defendant Abernathy acknowledged concerns regarding Mr. Purdy's general safety due to his dementia, but did not even direct Mr. Purdy's placement in the Medical Observation Unit until June 28, 2023, three days after his arrival at the jail. Defendant Abernathy never directed Mr. Purdy to be placed in a cell that accommodated his significant fall risk, even after she was later made aware of multiple falls causing injury.

90. At the outset, and certainly as Mr. Purdy's time in the jail progressed, Defendants Abernathy and Defendant Health Services Administrator Esmeralda Ziegelmann knew that JCDF could not safely accommodate a person with Parkinson's and dementia with a serious fall risk.

91. Defendant Ziegelmann was also interviewed for the internal JCSO investigation into Mr. Purdy's death on March 21, 2024, and stated that the Medical Observation Unit was the best place in JCDF to house an inmate with Mr. Purdy's conditions, despite the fact that it apparently had no cells without raised beds. She stated that inmates are only taken to the hospital if they have an immediate injury, and then they are returned to the jail.

**June 27, 2023: Mr. Purdy suffers his first documented fall in his cell**

92. On June 27, 2023, at 9:40am, Karina Rodriguez, LPN, documented verbal orders from a medical provider named "Fullmer" (no credential provided) for 10 milligrams of Lexapro for Mr. Purdy. At approximately 9:43am, Marilyn Purdy (Mr. Purdy's spouse) brought Mr. Purdy's Carbidopa/Levodopa medication to the jail for administration – this is a critical medication needed to treat physical symptoms of Parkinson's, including shakiness, stiffness, and difficulty moving.

93. On June 27, 2023, at approximately 3:51pm, Defendant Counselor Adele Mann evaluated Mr. Purdy and completed a "Jeffco Counselor Intake" form. She noted nothing

remarkable, despite Mr. Purdy's documented complex medical history. As a licensed counselor, Defendant Mann should have considered measures to accommodate Mr. Purdy's known disabilities and measures to mitigate the obvious risks present due to those disabling conditions. She should have been concerned about Mr. Purdy's placement in the jail, whether he was a fall risk, and whether he was getting his proper medications. Instead, she deliberately chose to ignore all of those obvious and serious risks.

94.     On June 27, 2023, at 11:30pm, Defendant Casey Castaneda, LPN reported that she witnessed Mr. Purdy falling from his bunk on to the cell floor at 9:57pm on the Medical Observation Unit ("MOU") camera feed,[4] and called in deputies to assist. Mr. Purdy had a visible laceration to the outer corner of his eyebrow, right side of his upper lip, torn skin on the top of his left hand, an abrasion on his left shin, and two abrasions on his right shin. She noted a risk of neurological impairment and risk of injury. Defendant Castaneda cleaned Mr. Purdy's wounds and stated "Pt not receptive to educations [sic] due to Dementia." She also ordered neurological checks twice a day for three days due to the witnessed fall.

95.     At this point, Defendant Castaneda *knew* that Mr. Purdy was unable to protect himself from falling, as his dementia was so advanced that he was "not receptive to education." Defendant Castaneda *knew* that Mr. Purdy faced the specific risk of hitting his head and suffering serious injury – which is in fact what ultimately happened to Mr. Purdy and caused his death at the end of July after scores of additional falls. Still, she deliberately permitted Mr. Purdy to remain in the exact same conditions that caused that risk.

---

[4] Recorded video surveillance footage of Mr. Purdy's incarceration at the jail from June 25 until July 10, 2023 was destroyed by the Sheriff's office, and was therefore not produced to the Purdy family who requested it in writing on August 3, 2023, only a few days after his death.

**June 28, 2023: Mr. Purdy falls again and sees Defendant Michelle Barron, MD, who is deliberately indifferent to Mr. Purdy's obvious serious medical needs.**

96.     On June 28, 2023, at 2:49am, Defendant Castaneda was called by radio to Mr. Purdy's cell where she found him face down on the floor with visible new abrasions to his left outer knee and right shin. Mr. Purdy stated that he fell on his left wrist and knees. Defendant Castaneda noted that Mr. Purdy was scheduled for neurological checks and wound care.

97.     Defendant Castaneda knew that "neurological checks and wound care" would do nothing to prevent further falls.

98.     Defendant Castaneda took no steps to accommodate Mr. Purdy's known disabilities or to mitigate the risks associated with the symptoms or manifestations of those disabling conditions.

99.     On June 28, 2023, at 6:46am, Defendant Director of Nursing Kim Sanchez noted that during the night of June 27, 2023, she and other nurses observed Mr. Purdy exhibiting concerning behaviors including confusion, crawling on the floor, and attempting to pick things up from the floor and at the outlet. She noted that Mr. Purdy believed he was in the military and was hallucinating pictures of his father. He was struggling to remember the names of people around him, and required long periods of time to understand and follow directions. She noted he had fallen twice after climbing onto "the slab," and only slept a total of approximately 45 minutes during the night. She placed an urgent mental health referral to further assess Mr. Purdy's mental health needs, and to develop a plan of care for his "several medical ailments."

100.    Thus, less than three days into Mr. Purdy's incarceration, Defendant Sanchez, the Director of Nursing, and the rest of the nursing and medical staff were already aware of Mr. Purdy's significant risk of falling and his declining mental state.

101.    On June 28, 2023, at 2:09pm, Mr. Purdy met with Defendant Dr. Michelle Barron, MD. This was the first time Mr. Purdy saw a medical doctor at the jail. Defendant Barron noted Mr. Purdy's history of Parkinson's disease and that she had been asked to see Mr. Purdy "due to falls." When she asked Mr. Purdy about the falls, according to her notes he "began with a story about a canyon on Easter Sunday in Morrison. Attempted to re-direct to current medical issues. He then started discussing the waitress and the manager. Refusing to put on L shoe." Defendant Barron noticed an abrasion on his upper lip and bruising to his right eye lid, as well as abrasions on his shins. She failed to conduct a physical examination of Mr. Purdy or to obtain vitals. She recommended that he "continue home meds." She discussed using a wheelchair with staff, but determined it was unlikely he would stay seated and the wheelchair would likely lead to more falls/tripping. She noted his dementia.

102.    Defendant Barron provided no recommendations or orders to ensure Mr. Purdy's medical safety or to treat his worsening condition, or to accommodate any of his known disabilities, and did nothing to create a plan of care for Mr. Purdy's safety and proper care. She failed to contact a healthcare or facility administrator about the serious risks to Mr. Purdy's health and safety at the jail due to his Parkinson's and dementia.

103.    Dr. Barron's failure to order or even advocate for Mr. Purdy's relocation to a safer and more suitable environment, or to take steps to accommodate his known disabilities or mitigate the risks of his known medical condition, was reckless and in conscious disregard of the continued significant risk of harm to Mr. Purdy about which she was aware. Dr. Barron knew patients like Mr. Purdy with Parkinson's disease and dementia are at high risk for mobility issues and falls and more likely than not would deteriorate in his condition during incarceration.

Defendant Barron's failure to develop an individual treatment plan to account for the strict medication regimen Mr. Purdy required was in conscious disregard to the significant risk of harm Mr. Purdy faced, as sparse and inconsistent administration of his medications contributed significantly to the rapid decline in Mr. Purdy's mental and physical capabilities while at the jail.

104.    After Defendant Barron's examination of Mr. Purdy, Defendant Director of Nursing Sanchez should have ensured the development and implementation of a plan of care, as she requested in her referral to Dr. Barron. When Mr. Purdy received a deliberately indifferent evaluation from Dr. Barron that failed to address the obvious serious risks he faced at the jail, Defendant Sanchez had a duty as Director of Nursing to address those risks herself. Instead, she allowed Mr. Purdy to remain in the exact same conditions that created those risks, which was a patently unreasonable approach to his care.

105.    On June 28, 2023, at approximately 9:20pm, Defendant Lavina Busby, LPN documented that Mr. Purdy rolled off his bunk and onto the floor. Defendant Busby reported that Mr. Purdy said his coccyx hurt, and noted he had bruising on his lower extremities and buttocks in various stages of healing; that he was recently agitated when given directions; and was delayed when being redirected. She also noted Mr. Purdy was approved for two mattresses for elevation. Defendant Busby wrote that vital signs were deferred. She also completed a Back Pain Nursing Clinical Guideline form and noted Mr. Purdy had a walker for ambulation. Despite her knowledge of Mr. Purdy's declining physical and mental state, Defendant Busby failed to accommodate his disabilities by placing him in a safe environment to protect him from the obvious and serious fall risk he faced in his cell. This denied Mr. Purdy meaningful access to the jail's programs and services.

106. During the radio call emergency for the fall at 9:24pm, on June 28, Defendant Paramedic Marshall McCurdy, CP-C noted that Mr. Purdy stated, "this Rio Grande-Denver junction sucks," believing he was at a railroad junction. It was obvious to Defendant McCurdy that Mr. Purdy was hallucinating, and sustaining injuries from the conditions of his confinement, but McCurdy deliberately failed to take measures to accommodate Mr. Purdy's disabilities or to mitigate the risks of further falls.

107. At approximately 10:11pm on June 28, Defendant Busby noted Mr. Purdy's apparent hallucinations and confusion – he was on the floor appearing to be looking for something and picking something up, but nothing was there. Defendant Busby continued to deliberately ignore the obvious and serious risk of substantial harm that Mr. Purdy faced in his cell as his mental state obviously continued to decline. Later, at approximately 11:33pm, Mr. Purdy began banging the door with his walker, which was ultimately taken away by detention staff. At that time, Mr. Purdy stated that he believed there was an emergency and told deputies to secure the perimeter, another manifestation of his profound mental disorientation. At the same time, Mr. Purdy reportedly refused his 11:00pm medications; however, he subsequently did take them at 1:10am on June 29, 2023, per the documentation by Defendant McCurdy CP-C.

108. On June 28, 2023, at 11:15pm, Defendant McCurdy completed a treatment refusal form for Mr. Purdy, acknowledging Mr. Purdy's Parkinson's disease, listing the oral medications he was prescribed, and indicating Mr. Purdy's refusal to take them. Mr. Purdy did not sign the document. Defendant McCurdy knew based on his previous interactions with Mr. Purdy that night that Mr. Purdy was deeply disoriented and exhibiting serious signs of dementia at the time he was asked to take his medications – he had no mental capacity to knowingly refuse them, as

corroborated by the fact that Mr. Purdy did not sign the refusal form.

### June 29, 2023: Defendant Jarrell, NP discontinues Mr. Purdy's critical Parkinson's medication with no justification.

109.    On June 29, 2023, at 5:39pm, Defendant Monica Jarrell, NP completed a medication review and documented that she was discontinuing Mr. Purdy's Carbidopa/Levodopa 48.75/195 mg. She gave no reason why she was discontinuing this crucial medication to treat Mr. Purdy's Parkinson's. Mr. Purdy's community neurologist had prescribed Carbidopa/Levodopa 48.75/195 mg two tablets six times a day.

110.    As a result of Defendant Jarrell's deliberate and reckless actions, Mr. Purdy did not receive his prescribed Carbidopa/Levodopa 48.75/195mg two tablets six times a day from June 29 through July 3, 2023. When he was finally restarted on the Carbidopa/Levodopa 48.75/195mg, the prescribed Carbidopa/Levodopa 25/100 mg was discontinued. He finally received both doses on July 6, 2023, *eight days* later. The medications were available onsite at the jail throughout this period of time.

111.    Defendant Jarrell's deliberate decision to discontinue Mr. Purdy's critical medications was reckless and in conscious disregard of Mr. Purdy's serious medical needs. Defendant Jarrell knew from her nurse education that a patient such as Mr. Purdy with serious diagnoses of Parkinson's disease and dementia requires the consistent administration of prescribed medications to control symptoms, including the symptoms of physical instability and mental disorientation that were placing Mr. Purdy at the most risk of falling and seriously injuring himself and that were being treated by Carbidopa/Levodopa.

112.    In addition, there is no mention in the medical records from late June to early July 2023 that any of the nurses administering medication to Mr. Purdy noticed that some orders for

chronic medications had expired. None of the nurses discussed this discontinuation with a provider, even though the documentation available to them indicated that prompt and regular administration of these medications was medically necessary to treat Mr. Purdy's serious conditions, and even though the nurses knew the necessity of his medication based on their training and experience. The Individual Medical Defendants were aware that Mr. Purdy had fallen multiple times by this point, and that discontinuing Carbidopa/Levodopa would significantly increase the risk of additional falls due to shakiness, stiffness, and difficulty moving (the symptoms addressed by the medication).

113.    The Individual Medical Defendants recklessly failed to administer the Carbidopa/Levodopa medications per the ordered six times per day on multiple days, including at least June 30, at 11:00am; July 4 at 4:00am, 9:00am, and 11:00am; July 12 at 4:00am; July 13 at 11am; July 14 at 4:00am; and July 15 at 9:00am. Also, on July 15 at 11:00am the MAR indicates that Mr. Purdy received double doses of both medications. In addition, many of the scheduled doses were not administered on time as ordered, with some being administered early and others being administered later than scheduled.

114.    The failure of the Individual Medical Defendants to properly administer Mr. Purdy's medications foreseeably and significantly exacerbated the effects of his Parkinson's disease, dementia, and related conditions and their manifestations, including the numerous injury-causing falls Mr. Purdy experienced.

**June 30 – July 1, 2023: Medical staff become aware of Mr. Purdy's alarmingly declining mental state and fail to adjust his treatment in any way.**

115.    On June 30, 2023, at approximately 1:30pm, Mr. Purdy was evaluated by Defendant Anika Heng, MA, LPC, LLC for a Behavioral Health Intake Assessment. This

evaluation was in response to a medical staff referral on June 29, 2023, stating that Mr. Purdy showed signs of severe sundowning. Mr. Purdy was described as becoming extremely agitated and confused after 11:00pm, being alert to person only, constantly moving around, and laying on the floor. It was noted that Mr. Purdy was "unable to provide self-care," and only slept 15 minutes at most on the night of June 28. Mr. Purdy's incontinence was reported. Mr. Purdy reported to Defendant Heng that he was having more frequent visual hallucinations of family and other people. Defendant Heng noted that Mr. Purdy was falling to his right side occasionally while speaking with her. Despite Mr. Purdy's recorded alleged refusal of medication on June 28, Defendant Heng reported "100% compliant with medication."

116.    Defendant Heng therefore either ignored or lied about Mr. Purdy's medication regimen by claiming he was 100% compliant. Despite the fact that Defendant Heng was purportedly reviewing Mr. Purdy's medications, she also failed to recognize or address that Defendant Jarrell had discontinued Mr. Purdy's Carbidopa/Levodopa medications without any legitimate justification and failed to consult a higher-level provider about his medication regimen. Defendant Heng knew from the records available to her and from her own recorded evaluation of Mr. Purdy that he was suffering from falls and other physical symptoms of Parkinson's that are treated by Carbidopa/Levodopa, and recklessly ignored the serious risk associated with an abrupt discontinuation of Mr. Purdy's strict medication regimen.

117.    Defendant Mental Health Clinician Tammy Pope, MS, LAC also completed a Behavioral Intake Assessment on Mr. Purdy on July 1, 2023, at approximately 12:26am. She found Mr. Purdy to have a slowed thought process and noted he was having visual hallucinations, seeing people that others did not see. His memory was somewhat impaired; he

complained of numb fingers from Parkinson's disease; and he disclosed multiple concussions over the years from playing sports. His diagnoses were listed as dementia, Parkinson's disease, depression ("provisional"), and anxiety ("provisional"). Defendant Pope's recommendation was to have Mr. Purdy remain on medical hold in the special housing unit (SHU). Despite Mr. Purdy's alarming mental decline, Defendant Pope failed to recognize or address that Defendant Jarrell had discontinued Mr. Purdy's Carbidopa/Levodopa medications without any legitimate justification and failed to consult a higher-level provider about his medication regimen. Defendant Pope also knew from the records available to her and from her own recorded evaluation of Mr. Purdy that he was suffering from falls and other physical symptoms of Parkinson's that are treated by Carbidopa/Levodopa, and ignored the serious risk associated with an abrupt discontinuation of Mr. Purdy's strict medication regimen.

### July 3, 2023: Defendant Dar, MD, examines Mr. Purdy and addresses the medication discontinuation but is deliberately indifferent to the obvious serious fall risk to Mr. Purdy in the jail.

118.    On July 3, 2023, at approximately 4:00am, Defendant Curtis Murphy, (no credentials noted), documented that Mr. Purdy reportedly "refused" his 0400 hours medications due to "agitation," after Mr. Purdy asked him to place the pills in his mouth and Defendant Murphy refused to assist Mr. Purdy. Defendant Murphy knew Mr. Purdy needed his medications to manage his serious medical conditions including Parkinson's disease and dementia, but deliberately refused to assist a vulnerable elderly man by placing pills in his mouth, and then claimed that Mr. Purdy "refused" his medication after Defendant Murphy had refused to help him. Defendant Murphy's deliberate indifference to Mr. Purdy's medication regimen placed Mr. Purdy at risk of further serious harm.

119.    On July 3, 2023, at approximately 11:38am, Defendant Dr. Dar evaluated Mr. Purdy in his cell for his Parkinson's Disease. He noted a review of Mr. Purdy's medications and documented that Mr. Purdy had been moving "more stiff and slowly" (sic). Defendant Dar also noted that Mr. Purdy's medication had been administered "lesser than on his home dose." Defendant Dar documented that Mr. Purdy was alert and oriented, his extremities had no edema, but he did have mild rigidity of the upper extremities. Dr. Dar failed to document the presence of bruises, lacerations or scabbing on Mr. Purdy's body. Dr. Dar's plan was to restart Mr. Purdy on his home regimen of Carbidopa/Levodopa six times a day. Dr. Dar noted that he would follow-up with the nurse "tomorrow" and Mr. Purdy's wife would bring in home medications.

120.    Defendant Dar knew that Mr. Purdy would continue to fall and injure himself in his jail cell, but failed to speak with the healthcare or facility administration about Mr. Purdy's condition, prognosis, inadequate medication application, or the medical and jail staff's obvious inability to care for him. Defendant Dar recognized the jail and medical staff's inability to treat Mr. Purdy, but declined or unnecessarily delayed referral to a provider who could adequately care for him. Dr. Dar did not take appropriate steps to accommodate Mr. Purdy's multiple disabilities under the circumstances.

121.    On July 3, 2023, at approximately 2:58pm, Defendant Jerica Talcott, RN documented that she pulled Mr. Purdy's bottle of Carbidopa/Levodopa 48.75/195 milligrams and placed it in the SHU med cart in accordance with Defendant Dar's new orders.

122.    A review of the Medication Administration Record (MAR) shows that Mr. Purdy was not offered his prescribed Carbidopa/Levodopa 48.75/195 mg from June 29, 2023, through July 3, 2023, at approximately 2:56pm when he was given a stat dose of both the 48.75/195 mg

and the 25-100mg Carbidopa/Levodopa medications. The MAR also indicates that when Mr. Purdy began to again receive his Carbidopa/Levodopa 48.75/195 mg prescribed medication on Defendant Dar's orders, the Carbidopa/Levodopa 25-100mg was no longer administered. There is no explanation for Defendant Dar's deviation from Mr. Purdy's community neurologist's orders. Documentation in the health record indicates that Mrs. Purdy had already brought her husband's medication to the facility on June 27, 2023. There is no medical justification or explanation offered for the jail's failure to administer Mr. Purdy's medication to him for days, even though the medication was on site at the jail, and there was apparently no prohibition on administering home-provided medications.

123.    The failure to maintain timely and accurate administration of Mr. Purdy's medication put Mr. Purdy at significant risk of harm because medications must be maintained at a therapeutic level in the blood in order to work as required. This is especially true for medications like Carbidopa/Levodopa that affect thinking, mobility, and other symptoms associated with Parkinson's disease and dementia.

**July 4, 2023: Defendant Castaneda again evaluates Mr. Purdy and identifies an obvious risk of serious harm, and is deliberately indifferent to that risk.**

124.    On July 4, 2023, at approximately 7:45pm, Defendant Casey Castaneda, LPN completed a weekly assessment of Mr. Purdy. She noted that Mr. Purdy was able to ambulate with assistance of the nurse and deputy; had skin that was in poor condition, related to multiple contusions to lower and upper extremities and coccyx in multiple stages of healing; had 3+ edema to lower extremities; had dementia and constant movement; and only had moments of lucidity. Defendant Castaneda recorded that it was her plan to monitor vitals and Mr. Purdy's dementia twice a day for five days with a referral to the provider. There is no evidence that Mr.

34

Purdy did see a higher-level provider as a result of this referral. Defendant Castaneda also

documented that she would continue to generally monitor Mr. Purdy.

125.    Defendant Castaneda *again* failed to take any action to protect Mr. Purdy from

further falls, which she *knew* were certain to continue, or to otherwise accommodate his known

disabilities and deteriorating medical condition. She had known since her visit on June 28, 2023,

that these continued falls put Mr. Purdy at serious risk of harm, including a serious and

potentially life-threatening head injury. In the six days between visits, Defendant Castaneda

observed substantial deterioration in Mr. Purdy's health caused directly by the falls he was

suffering, but she failed to take any steps to remove Mr. Purdy from the conditions causing the

risk or to otherwise take steps to mitigate against the known and obvious risks. She knew that the

jail and medical staff were unable to protect and treat Mr. Purdy, but she declined or

unnecessarily delayed referral to a hospital or other provider that could. Her response to Mr.

Purdy's obvious risk of serious harm caused by constant falls with a plan to merely "monitor"

him was patently unreasonable.

126.    Defendant Castaneda's unjustified and reckless failure to take steps to mitigate the

risks of additional falls caused further injuries, pain and suffering to Mr. Purdy during his

incarceration at the JCDF.

**July 6, 2023: Mr. Purdy falls again, and displays severe mental confusion and distress.**

127.    On July 6, 2023, at approximately 5:26pm, Defendant Director of Nursing Kim

Sanchez, RN obtained a verbal order from Defendant Dr. Dar to correct the Carbidopa/Levodopa

25/100 milligrams start date and Mr. Purdy received both the Carbidopa/Levodopa 48.75/195 mg

and the Carbidopa/Levodopa 25/100mg medications. That is the first documented time the jail

administered all these medications to Mr. Purdy in tandem, as had been prescribed, despite the fact that he had been in the jail for eleven days.

128.    On July 6, 2023, around 7:05pm, Defendant Deputy Robert Diehl and Defendant Deputy Peter Nielsen entered Mr. Purdy's cell because he said he had fallen and was asking for help. Defendant Cecelia Barbeite, RN, joined the deputies and they found Mr. Purdy on the floor, alert and oriented only to person, and confused. While placing him back on his bunk, from which they knew he was likely to fall again, Mr. Purdy, in his utter disorientation and panic tried to pull away from them and leave the cell. Defendant Diehl noted in his report that Mr. Purdy has dementia and often forgets where he is. He also noted that Mr. Purdy always appeared to have trouble walking and standing up from the ground. Defendant Barbeite documented that her assessment was cut short because Mr. Purdy became very agitated with staff and "would not obey commands." Mr. Purdy was ultimately assisted to his feet with the use of a gait belt, a walker, and three staff members.

129.    Deputy Defendants Diehl and Nielsen and Nurse Defendant Barbeite were aware that Mr. Purdy was entirely disoriented and that he had fallen from his bunk. They knew that he was certain to fall again, particularly in light of his dementia which made it impossible for them to tell him to stay put (or "obey commands"). Despite this knowledge, Defendants Diehl, Nielsen, and Barbeite recklessly failed to recommend that Mr. Purdy be placed in a cell without a raised bunk, or to recommend any further protective actions to any jail or medical staff to accommodate his known disabilities or to mitigate the obvious risks associated with his sick and debilitated condition.

130.     Defendant Diehl wrote in his report that later that same day at 11:38pm, Mr. Purdy had "actually fallen in the cell. (In the past he has just laid down on the ground)." This statement, implying that Mr. Purdy was faking his prior falls, indicates a shocking deliberate indifference to the obvious and substantial risk that Mr. Purdy, a visibly frail and elderly man with a known diagnosis of Parkinson's and dementia and with *visible injuries from his falls*, would continue to repeatedly fall and seriously harm himself absent some appropriate intervention. When Defendant Diehl and Defendant Deputy Kaitlyn Tuey entered the cell, Defendant Diehl reported that Mr. Purdy was making statements indicating he believed he was in his own garage. Despite these obvious signs of dementia, Defendant Diehl reported that medical staff could not complete an assessment of Mr. Purdy because "he refused" and all medical staff and deputies left Mr. Purdy alone. Defendant Diehl and Defendant Tuey knew that Mr. Purdy was suffering severe mental disorientation which made him more susceptible to harm (including falling) in his cell, but took no steps to treat Mr. Purdy or to accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the conditions of his confinement.

131.     Despite Mr. Purdy's obvious inability to comprehend medical advice due to his dementia, Defendant Beverly Casarez, RN completed a treatment refusal form on July 6, 2023. She indicated that she recommended to Mr. Purdy that she assess his vital signs and perform a physical assessment of his lower extremities, noting his Parkinson's, the visible swelling of his lower extremities, and his history of stroke, but that Mr. Purdy had refused. Mr. Purdy did not sign the document. This is the same visit during which Mr. Purdy stated he believed he was in his own garage – he was incapable of knowingly refusing treatment, but Defendant Casarez characterized her own failure to perform an assessment as Mr. Purdy's "refusal." Defendant

37

Casarez failed to treat Mr. Purdy, and declined to provide or unnecessarily delayed a referral to a
higher-level provider who could treat him.

### July 7, 2023: Defendant Jarrell *again* orders withholding
### Mr. Purdy's medication with no reasonable medical justification.

132.    On July 7, 2023, at approximately 5:40pm, Defendant Angel Vargas, LPN saw
Mr. Purdy because of his altered mental status and found him to be oriented to person only and
was following directions with great difficulty. Mr. Purdy was also hallucinating and seeing
people who were not there. Defendant Vargas, LPN spoke with Defendant Jarrell, NP and
received a verbal order to withhold the 1600-hour dose of Carbidopa/Levodopa 48.75/195 mgs
due to Mr. Purdy's altered mental status. Again, Defendant Jarrell withheld critical medications
from Mr. Purdy without medical justification, and did not order any kind of treatment or referral
to an appropriate medical provider to address Mr. Purdy's highly concerning mental and physical
state. Defendant Vargas acquiesced in this indefensible medical decision. Defendant Vargas and
Defendant Jarrell failed take further steps to treat Mr. Purdy or to accommodate his known
disabilities, or to mitigate the obvious risks of further injuries given the conditions of his
confinement.

### July 8-9, 2023: Mr. Purdy's physical and mental condition continues
### to deteriorate, and Defendants continue to fail to refer Mr. Purdy
### to a provider who could properly care for him.

133.    On July 8, 2023, at approximately 10:35am, Mr. Purdy was evaluated by
Defendant Lilia Fernandez, RN using a Clinical Close Observation End of Shift Documentation
form due to his altered mental status. She found Mr. Purdy laying on the floor with only his shirt
on, disoriented and speaking in "word salad." There were three food trays in his room, each of
which was intact. Mr. Purdy had visible signs of injury on both legs. Defendant Fernandez

helped Mr. Purdy put on a clean brief, cleaned his room, and gave him multiple cups of Gatorade. Defendant Fernandez also initiated a food log.

134.    Despite Mr. Purdy's obvious mental and physical deterioration, which now included multiple missed meals, and continuing physical injuries caused by falls which jail medical staff were aware of but clearly unwilling or unable to prevent, Defendant Fernandez declined or unnecessarily delayed a referral to a provider who could properly care for Mr. Purdy.

135.    On July 8, 2023, Defendant Cecelia Barbeite, RN, performed a SLUMS exam to test Mr. Purdy's cognition. He scored 17, which on the 1-30 scale indicates low functional ability indicative of dementia.

136.    On July 9, 2023, Defendant Talcott, RN, documented that Mr. Purdy was found on the floor incontinent of bowels and was assisted to his feet. Mr. Purdy was cleaned and given a new diaper and new clothing. Defendant Talcott noted Mr. Purdy had +2 and + 3 lower leg edema.

137.    Despite Mr. Purdy's obvious inability to care for himself or protect himself from falls and from defecating on himself, and despite the jail medical staff's inability or unwillingness to treat the underlying conditions putting Mr. Purdy at risk, Defendant Talcott declined or unnecessarily delayed referral to a provider who could properly care for Mr. Purdy.

**July 10, 2023: Mr. Purdy is taken to the hospital due to concerns of serious physical harm after falling.**

138.    July 10, 2023, is the first day of Mr. Purdy's incarceration that has video footage that was not destroyed by Defendants. Even though Defendants were put on notice to preserve evidence due to impending litigation on August 3, 2023, only four days after Mr. Purdy's death, Defendants destroyed all video footage from June 25 – July 9, 2023. Mr. Purdy is seen on camera

falling in his cell a total of at least 70 times between July 10 and July 18, 2023, when he was taken to the hospital and subsequently died due to injuries caused by a fall.

139.    Shockingly, the Individual Deputy and Medical Defendants only reported a total of five falls in their records between July 10 and July 18, 2023, despite video evidence of more than 70 falls. Between June 25 and July 9, 2023, nurses and deputies also only reported a total of four falls – Mr. Purdy undoubtedly fell far more than five times prior to July 10, but Defendants destroyed the video evidence that would have supplemented the sparse and incomplete documentation by the Individual Deputy and Medical Defendants.

140.    On July 10, 2023, at 2:54 am, video footage shows Mr. Purdy defecating on the floor and rubbing it on his legs. Defendant Breanna Andrews, RN, enters the cell with Defendant Deputy Diehl between 4:18-4:22am and shines a flashlight in Mr. Purdy's eyes while he lies on the floor. Defendants Diehl and Andrews do not help clean up the feces, do not provide Mr. Purdy with new clothes, and do not help him up off the ground. Defendant Diehl returns over an hour later, at 5:32am, with a box of food, and again does not assist Mr. Purdy in cleaning the feces off his body or helping him off the ground.

141.    At approximately 5:03am, Defendant Breanna Andrews, RN, documented that Mr. Purdy had been on the floor most of her shift. Mr. Purdy had been urinating and defecating on himself. Defendant Andrews told "command staff" her concerns about the health risks to Mr. Purdy given his falls and the fact that he was lying in his urine and excrement. But because of Mr. Purdy's alleged agitation, command staff *prohibited* further intervention due to patient and staff safety. Defendant Deputies Samuel Van Alphen, Robert Diehl, and Chase Van Wyk were on duty at the time and followed this instruction along with Defendant RN Andrews. All four

defendants were thus aware at this time that the jail and medical staff were unable to care for Mr. Purdy in his current physical and mental state, but declined or unnecessarily delayed referral to a provider who could properly care for Mr. Purdy.

142.    Defendant Andrews noted that she had suggested Mr. Purdy be placed in a cell without a bunk due to his fall risk. Defendant Andrews also documented that Mr. Purdy was not using his walker properly and, importantly, noted that the Health Services Administrator Defendant Esmerelda Ziegelmann had been notified of these ongoing concerns about Mr. Purdy.

143.    Defendant HSA Ziegelmann thus knew about Defendant Andrews' concern that Mr. Purdy could be seriously injured due to further falls and the atrocious conditions in his cell. She was consciously aware of a substantial risk of serious harm, and did nothing to provide safe housing conditions for Mr. Purdy during his detention, or take other measures to accommodate his known disabilities or to mitigate the obvious risks he confronted given the conditions of his confinement.

144.    On July 10, 2023, during morning headcount around 8:00am, Defendant Deputy Richard Vargas documented that Mr. Purdy was *still* lying on the floor in feces. Mr. Purdy had therefore been left lying on the ground in his feces and urine unaided since 2:54am, for roughly five hours. Defendant Vargas advised medical staff, and assisted Mr. Purdy to a shower. During the shower, medical staff noticed severe bruising on Mr. Purdy's right leg, hip, and right eyebrow. Due to these severe injuries, and believing that Mr. Purdy had broken his hip, Mr. Purdy was sent via ambulance to Centura St. Anthony Hospital.

145.    At the hospital, Mr. Purdy was examined by Michael Ruygrok, MD for a possible femur fracture, pelvic fracture, intra-abdominal injury, and hematoma/ecchymosis. X-rays and

CT imaging revealed no fractures, but Dr. Ruygrok did note extensive bruising on Mr. Purdy's right hip. Dr. Ruygrok noted Mr. Purdy's Parkinson's disease, and documented that Mr. Purdy reported "I fall every day" and that he had "pain everywhere." Despite the obvious substantial risk that Mr. Purdy would continue falling every day, with a significant risk of a fracture or head injury in the future, JCDF and VitalCore staff accepted Mr. Purdy's discharge back to the jail.

146.    At this point, Defendant HSA Ziegelmann and Defendant Director of Nursing Sanchez, knowing that JCDF and the VitalCore medical staff were unable or unwilling to safely manage and treat Mr. Purdy's mental and physical needs, should have refused to accept Mr. Purdy back to the jail.

147.    According to Defendant Detention Services Manager Polly Abernathy in an interview for JCSO's internal investigation into Mr. Purdy's death, jail and medical staff *can* place inmates in the hospital or hospice care if they are incapable of managing the inmate in the jail. Despite their knowledge that JSCO and VitalCore staff were unable or unwilling to treat and care for Mr. Purdy, Defendants Ziegelmann and Sanchez allowed Mr. Purdy to be returned to their care, and indeed there is no indication that they made any attempt whatsoever to place him in a safer environment, or to take steps to accommodate his multiple disabilities or to mitigate the obvious and known risks of falling and other injury or illness.

148.    Defendants Ziegelmann and Sanchez failed to even act upon Defendant Andrews' suggestion that Mr. Purdy be placed in a cell without a bunk upon his return to the jail. No steps were taken to improve Mr. Purdy's housing conditions to accommodate his Parkinson's and dementia.  Defendants Ziegelmann and Sanchez knew that Mr. Purdy would fall and injure himself again if placed back in the same conditions, but that is what they did, and they were

deliberately indifferent to those obvious risks.

149.    Mr. Purdy returned to the jail around 2:00pm on July 10, 2023. At 4:34pm, video footage shows Mr. Purdy falling off his bed and hitting his head on the ground hard. At 6:26pm, footage shows Mr. Purdy falling off the toilet and slamming his head against the table nearby. Other falls occurred throughout the day, and in the days thereafter.

**July 12, 2023: Video footage shows more falls and injuries.**

150.    On July 12, 2023, at 3:53am, Mr. Purdy takes a hard fall while struggling to pull up his diaper. At 4:09am, Mr. Purdy tries to stand up using the toilet as leverage, loses his grip, and falls backward hard into his walker and the wall. Later that day, he is guided by staff down the hall to use the phone and he is extremely unstable as he walks. At 8:06pm, Mr. Purdy is kneeling on one knee and struggling to stand. He tries to get up by using the sink as leverage, but takes a hard fall, landing on his right hip. At 11:06pm, Mr. Purdy tries to stand up off the floor but loses his balance and falls backward. At 11:36pm, he stands over the toilet and falls to the floor, landing on his knees. At 11:46pm, Mr. Purdy is standing then starts to fall, but braces the impact by catching himself on the table. He tries to get to his bed, but falls again. At 11:53pm, Mr. Purdy is standing and leaning on the table, and takes a big fall to the ground. Other falls occur throughout the day.

151.    All of these falls described herein from July 10 through his final transport to the hospital[5] were documented on video surveillance monitoring, known to both jail and medical staff. The very purpose of video monitoring of detainees in the Special Housing Unit is to

---

[5] All or most of his falls prior to July 10 were also captured on the JCDF's video monitoring system as well, but the jail destroyed that video footage within a week before or after his death.

provide for their safety and welfare and to provide necessary care and treatment to inmates with such needs, such as Mr. Purdy.

152.     On July 12, 2023, Defendant Myra Brock, RN, finally documented her Intake Health Assessment of Mr. Purdy that she conducted on June 25, 2023. (Although this encounter appears to be written on July 12, 2023, memorializing what she did on June 25, 2023, it contains information about events that occurred after July 12). Defendant Brock documented that Mr. Purdy was unable to answer questions due to impaired mental capacity. Defendant Brock listed Mr. Purdy's medications as verified, and per the Initial Health Assessment, she was required to refer the patient for a health care provider examination. Failing her gatekeeper responsibilities, however, she failed to make this required referral per the health record.

153.     Defendant Brock documented that Mr. Purdy was sent to the hospital for a fall in July 2023, had a chest X-ray scheduled on July 14, 2023, and a tuberculosis test was unable to be completed at the time of the assessment. She noted Mr. Purdy had weakness, and he again was unable to answer questions due to impaired mental capacity. Defendant Brock documented that Mr. Purdy required a special diet with enhanced protein and supplemental nutrition. Under mental health problems, she noted dementia, and that Mr. Purdy did not use the walker correctly. In addition, other problems documented included Parkinson's with impaired mobility; fatigue and inability to stand without assistance; edema in bilateral lower extremities; briefs in place for bowel and bladder incontinence; multiple areas of bruising and scabbing to bilateral legs related to falls; and memory loss.

154.     Defendant Brock did a physical evaluation and noted positive bruising to the right eyebrow and forehead. Defendant Brock further noted Mr. Purdy had decreased range of motion

of arms, +2 swelling and a decreased range of motion to legs, with overall impaired mobility. She noted multiple areas of bruising and wounds, including right hip, right forehead, bilateral arms and legs, and multiple areas of scabbing.

155.    Defendant Brock documented that she encouraged Mr. Purdy to sit or lay in bed instead of on the floor, and to use the walker when ambulating, despite his well-documented inability to use the walker correctly and safely and his known history of falling. Defendant Brock documented Mr. Purdy's chronic diseases as "Parkinson's dementia" and noted that he was a fall risk. She recommended Mr. Purdy be placed in medical observation with a lower level, lower bunk accommodation. However, she did nothing to follow up on that recommendation or otherwise provide accommodations to Mr. Purdy's disabilities or mitigate the known risks to him of further injury. Defendants Ziegelmann and Abernathy failed to act upon Defendant Brock's recommendation and no cell accommodations were made.

156.    On July 12, 2023, at approximately 2:39pm, Defendant Jarrell, NP, evaluated Mr. Purdy for a hospital follow up. She noted Mr. Purdy mumbled when asked questions and followed simple commands. Defendant Jarrell conducted a physical examination that only included observation of Mr. Purdy's respiratory effort (normal effort respirations) and an observation that he was "normocephalic." No evaluation of Mr. Purdy's hips, bruising, general condition of his body and neurological status was completed. Defendant Jarrell's diagnosis was Parkinson's Dementia, and her plan was to encourage fluids and food, continue to monitor, and "will consult management about placement." *Again*, Defendant Jarrell took the patently unreasonable approach to merely "continue monitoring" Mr. Purdy, which did nothing to prevent further falls or to accommodate his disabilities or change the conditions of his confinement. She

reported nothing about a consultation with management about placement. If such a consultation

occurred, Defendants Ziegelmann and Abernathy (and VitalCore and Jefferson County Sheriff's

Office, institutionally) failed to make any accommodations to prevent the obvious risk of

substantial harm to Mr. Purdy in his cell.

### July 13, 2023: Defendants continue to be deliberately indifferent as Mr. Purdy continues to suffer falls in his cell.

157.    On July 13, 2023, at 12:05am Mr. Purdy gets up from his bed and falls to the

floor. At 12:10am, Mr. Purdy is standing holding onto the sink, loses his grip, and falls on his

bottom. At 12:36am, a nurse and Defendant Deputy Alex Esparza enter the cell and put the

walker near Mr. Purdy, but when Mr. Purdy moves to grab it, he falls off his bed. Defendant

Esparza and the nurse do nothing to prevent the fall, and merely take the walker out of the cell.

Defendant Esparza only notes "On floor, naked" for his well-being check log (this proves that

the well-being check log format allowed deputies to write narrative observations of anything

noteworthy). Defendant Esparza takes no steps to treat Mr. Purdy or to accommodate his known

disabilities, or to mitigate the obvious risks of further injuries given the conditions of his

confinement. At 2:34am, Mr. Purdy is standing by the door and falls. At 3:00am, Mr. Purdy is on

all fours and topples over. There is a visible spot on the floor where he had been lying that is

either urine or feces – Mr. Purdy lies back on that spot. At 4:11am, Defendant Deputy Nielsen

enters the cell with a nurse, picks Mr. Purdy up off the floor, and places him on the bed. They are

in the cell for some time, but eventually leave, and Defendant Nielsen merely writes "OK" on the

well-being check log. Mr. Purdy is injured, sick, and decidedly not "OK," but Defendant Nielsen

takes no steps to treat him or to accommodate his known disabilities, or to mitigate the obvious

risks of further injuries given the conditions of his confinement. At 6:17am, Mr. Purdy abruptly

falls off his bed onto the floor on his hands and knees. At 8:41am, Mr. Purdy rolls out of bed and onto the floor. At 8:44am, he appears to be talking to no one and moving around, and bangs on the door. At 7:16pm, Mr. Purdy falls off his bed and lands on his hands and knees. At 8:04pm, Mr. Purdy is trying to move from standing to sitting on the ground, loses his balance, and takes a hard fall.

158.    At 8:07pm, Mr. Purdy topples over after trying to stand up. At 8:09pm, Defendant Deputy Tina Mindykowski enters the cell and assists Mr. Purdy back to bed, and writes "OK" in the well-being check log. Mr. Purdy is injured, sick, and decidedly not "OK," but Deputy Mindykowski takes no steps to treat him or to accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the conditions of his confinement. At 10:13pm, Mr. Purdy is sitting in bed and tips over, hitting his head on the table at the foot of the bed. He puts his hands on his head in pain. At 10:16pm, Mr. Purdy falls off his bed onto the floor. At 10:44pm, Mr. Purdy is standing near the toilet and looks like he is trying to figure out how to get on it – he pulls his diaper off, but leans against the wall and urinates on the floor. He eventually makes it to the toilet, but falls off at 10:50pm. Other falls occur throughout the day.

159.    On July 13, 2023, Defendant Susan DeWispeleare, Inmate Services Manager, emailed Jefferson County court officials stating that Mr. Purdy "is in our jail and is in horrible shape." She asked to move up his next court date, which was not done. She took no further steps to provide treatment to Mr. Purdy or to accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the conditions of his confinement.

**July 14, 2023: Defendants continue to be deliberately indifferent
as Mr. Purdy continues to suffer falls in his cell.**

160.    On July 14, 2023, at 12:05am Mr. Purdy is standing by the table at the end of his

bed and he takes a very hard fall to the ground and lands on his walker. When he comes up his

hand is on the back of his head. At 12:09am, Mr. Purdy is standing with his walker and takes a

second very hard fall to the ground. At 2:20am, Mr. Purdy takes another very hard fall when he is

standing and lets go of his walker. At 2:21am, Defendant Deputy Mindykowski enters the cell,

and eventually two other deputies join and take Mr. Purdy's walker away. Defendant

Mindykowski writes "OK" for his well-being check log even though he is not "OK" and instead

is badly injured, sick, in pain and suffering profoundly, mentally and physically. Deputy

Mindykowski again takes no steps to treat him or to accommodate his known disabilities, or to

mitigate the obvious risks of further injuries given the conditions of his confinement. At 4:02am,

Mr. Purdy is trying to seat himself on the toilet but misses completely and falls hard onto the

ground.

161.    On July 14, 2023, at approximately 8:15am, Mr. Purdy was found by Defendant

Megan Page (no credentials noted) halfway on the bed and halfway on the ground. With the

assistance of two deputies, Mr. Purdy was placed back in bed. Defendant Page evaluated Mr.

Purdy and documented extensive bruising in the right groin, flank and lower back, and she

outlined the area with a sharpie to aid in subsequent evaluations. She noted Mr. Purdy had many

scabs on his lower extremities; pitting edema 2 to 3 + on bilateral lower extremities with open

wounds on the right leg. Defendant Page took no steps to further treat Mr. Purdy or to

accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the

conditions of his confinement.

162.     At 11:26am, video footage shows Mr. Purdy rolls out of his bed onto the floor.

Defendant Deputy Vargas comes in less than a minute later with a cup of something. He sees Mr.

Purdy on the ground but leaves immediately after setting it down, without checking on him, and

writes "OK" in the well-being check log, which is plainly false – Mr. Purdy is lying on the floor

bleeding at this point. Deputy Vargas takes no steps to treat Mr. Purdy or to accommodate his

known disabilities, or to mitigate the obvious risks of further injuries given the conditions of his

confinement. At 1:13pm, Mr. Purdy moves back to his bed after lying on the ground, and a large

red gash can be seen on his forehead. Deputy Erdmann enters the cell with Defendant Page.

163.     At approximately 1:00pm, Defendant Page documents that deputies found Mr.

Purdy on the cell floor, and Defendant Page assessed Mr. Purdy as generally confused with a

scalp hematoma, abrasion and small skin tear to the right forehead, and she dressed the wounds.

Defendant Page failed entirely to seek higher level care to treat Mr. Purdy for a head injury or

other serious injuries, despite the obvious risk.

164.     After being minimally treated by Defendant Page, Mr. Purdy is brought to a new

call that has a bed as well as a small guard rail. At 3:14pm, Mr. Purdy attempts to walk to the

toilet. He puts his hand around the rim, but loses his balance and falls to the side of the toilet

onto his bottom and hits his back against the wall. Several officers come in and put him back on

his bed somewhat roughly. At 5:06pm, Mr. Purdy abruptly falls off his bed onto the ground, hard.

Defendant Deputy Vargas enters the cell with a nurse, and assists Mr. Purdy back to the bed. He

writes "OK" in the well-being check log. Mr. Purdy is not "OK." Deputy Vargas again takes no

steps to treat Mr. Purdy or to accommodate his known disabilities, or to mitigate the obvious

risks of further injuries given the conditions of his confinement. At 6:04pm, Mr. Purdy is on all

fours on the ground and tips over, falling hard onto the ground. At 6:36pm, Mr. Purdy falls off

his bed, hitting his head hard on the guard rail on the way down. He holds his head in his hands

on the ground in pain.

### July 15, 2023: Defendants stubbornly remain deliberately indifferent as Mr. Purdy continues to suffer falls in his cell.

165.    On July 15, 2023, at 12:07am Mr. Purdy is standing with his hands on the bed and

falls to the ground. An officer brings food at 5:26am. Mr. Purdy gets up at 5:54am and stumbles

around and spills the cup of coffee he is holding before falling hard on his hip. At 6:36am, Mr.

Purdy stands up from his bed and falls. He falls again while standing at 6:51am. He bangs on the

cell door at 7:21am. When the lights turn on at 8:24am, a puddle of urine becomes visible next to

the bed. At 8:28am, Mr. Purdy is moving around the room wiping the wall and messing with

some sort of switch. It is apparent that he doesn't know he is in a jail cell.

166.    On July 15, 2023, at approximately 1:51pm, Defendant Catherine Rowe, RN,

documented that Mr. Purdy was given his 0900 medications as scheduled, and Ensure and fluids.

She noted that no walker was in Mr. Purdy's cell, and with the help of Defendant Lilia

Fernandez, RN, and Defendant Deputy Erdman, she got new bedding on the bed, cleaned Mr.

Purdy, and attended to his right hip, where a reddened area was forming without skin breakdown

at that time. Defendant Rowe documented that Mr. Purdy had 2+ pitting edema to his left and

right legs, had numerous scabbed wounds, and had right knee and right elbow swelling from a

past fall. Defendant Rowe and Defendant Fernandez took no steps to further treat Mr. Purdy or to

accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the

conditions of his confinement. Shockingly, despite the several falls Mr. Purdy had taken that very

day, she notes "no falls at this time as of 1345." She noted Q MAP Brenda Armijo assisted Mr.

Purdy to eat.

167.    Around 1:36pm, video footage shows Mr. Purdy is brought to the visitation cell

for a phone call. At 2:23pm, Mr. Purdy is out of his wheelchair standing after the call and loses

his balance. He slips on his sock and falls hard to the tile floor. He appears to be in immediate

pain. An officer comes in less than a minute later and gets him back in the wheelchair and takes

him out. At 2:25pm, Defendant Deputy Allen Erdmann writes "OK" in the well-being check log,

despite the fact that he is not "OK," but rather injured, sick, and in significant physical and

mental pain. Deputy Erdmann takes no steps to treat Mr. Purdy or to accommodate his known

disabilities, or to mitigate the obvious risks of further injuries given the conditions of his

confinement. At 3:37pm, Mr. Purdy is standing at the door with his walker and folds it up. This

leads to him falling at 3:40pm.

168.    Defendant Rowe, RN reported that Mr. Purdy had an "unwitnessed fall" at

3:40pm and suffered a new abrasion on his right upper arm, which was cleaned and bandaged.

Defendant Rowe took no steps to accommodate Mr. Purdy's various known disabilities or to take

measures to mitigate the risks of further life-threatening falls.

169.    At 7:27pm, Mr. Purdy is up, about to use the bathroom with his pants pulled down

and as he tries to sit on the toilet he takes a very serious fall. His head hits the cell door hard on

the way down. A large bruise on his right arm is very dark and visible. Mr. Purdy makes it to the

toilet and puts his head in his hands and rubs his face and head. At 7:41pm, a nurse and

Defendant Deputy Mindykowski come in and talk with Mr. Purdy and then leave. At 7:52pm,

Defendant Mindykowski writes "OK" in the well-being check log, even though Mr. Purdy is not

"OK" but instead is injured, very sick, and in considerable physical and mental pain. Deputy

Mindykowski again takes no steps to treat Mr. Purdy or to accommodate his known disabilities,

or to mitigate the obvious risks of further injuries given the conditions of his confinement. Other

falls occur throughout the day.

### July 16, 2023: Defendants remain deliberately indifferent
### as Mr. Purdy continues to suffer even more falls in his cell.

170.    On July 16, 2023, at 11:02am Mr. Purdy is using his walker to be in a seated

position, with the rails under his armpits. He appears to get stuck, but a minute later he falls onto

his knees. At 2:04pm, Mr. Purdy loses his balance while standing and takes a hard fall to the

ground. He appears to be in immediate pain. An officer comes in with a wheelchair at 2:07pm

and helps Mr. Purdy into it. He takes him out of the cell and returns with him a few minutes later.

Defendant Deputy Erdmann writes "OK" in the well-being check log at 2:27pm even though he

was obviously injured and sick, and in considerable physical and mental pain, and decidedly not

"OK." Deputy Erdmann again takes no steps to treat Mr. Purdy or to accommodate his known

disabilities, or to mitigate the obvious risks of further injuries given the conditions of his

confinement. At 3:58pm, Mr. Purdy gets up from sitting on his bed and grabs something

underneath the wheelchair, but on his way back to sit on the bed he falls. At 5:12pm, Mr. Purdy

is milling about his room and messing with the wheelchair. He puts a blanket around his neck

and loses his balance. He falls hard into the wheelchair. Defendant Erdmann comes in to drop off

food and he removes the wheelchair. He helps Mr. Purdy up at 5:17pm. Mr. Purdy is unsteady

while holding hands with Defendant Erdmann and bumps into the wall. They appear to be

arguing with each other and Defendant Erdmann forces Mr. Purdy to the bed. Defendant

Erdmann leaves the cell. At 5:24pm, Defendant Deputy Vargas writes "OK" in the well-being

check log, which is obviously false for the same reasons previously detailed herein. Deputy Vargas again takes no steps to treat Mr. Purdy or to accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the conditions of his confinement. At 6:03pm, Mr. Purdy stands up from his bed using his walker. He sways and stumbles, eventually falling hard to the ground. He slams into the door on his way down. He grabs his food box off of the sink at 6:09pm and falls against the door again. Defendant Deputy Van Alphen and other deputies enter the cell at 7:33pm and load Mr. Purdy into a wheelchair. He is taken to the dayroom, and eventually wheeled back to the cell. Other falls occur throughout the day.

### July 17, 2023: Defendants remain relentlessly deliberately indifferent as Mr. Purdy continues to suffer falls in his cell.

171. On July 17, 2023, at 6:03am, Mr. Purdy is standing by the door and falls hard, tripping over the toilet and knocking down his walker on the way. At 7:45am, Mr. Purdy is seated by the door of the cell, and a large wound on the back of his head is very visible, and does not have a bandage on it. Defendant Deputy Aric Meyer and other unknown deputies enter the cell at 8:07am and move Mr. Purdy to the bed. A nurse tends to the large wound on Mr. Purdy's head, but does nothing further to investigate whether there are additional injuries, including internal head wounds or traumatic brain injuries. At 11:09am, Mr. Purdy is holding a bag of something and is walking back to his bed. He falls hard to the ground. At 11:18am, a box of food is put through the slit in the door. Mr. Purdy grabs it and starts to move toward his bed and takes a hard fall. He appears to hit his head on the wall. Two officers, including Defendant Deputy Meyer, and Defendant Talcott, RN, enter the cell at 11:21am, and by this point Mr. Purdy has gotten up and is standing at the door. They guide him to the bed. Defendant Meyer writes "OK" in the well-being check log, but Mr. Purdy is far from "OK." Deputy Meyer takes no steps to treat Mr.

Purdy or to accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the conditions of his confinement.

172.    Defendant RN Talcott documented the "unwitnessed fall" at approximately 11:20am. Per her report, the deputy heard what sounded like Mr. Purdy falling to the ground and found Mr. Purdy half sitting/half laying on the floor with his head leaning on the wall. Defendant Talcott noted a new abrasion to the top right side of Mr. Purdy's head, and it was cleaned with wound cleanser. Defendant Talcott failed to provide further medical treatment beyond the minimal treatment she administered. For instance, she failed to transfer Mr. Purdy to a hospital, despite her knowledge that Mr. Purdy could very likely have sustained a head injury based on the new abrasion. No efforts were made to accommodate Mr. Purdy's known disabilities nor steps taken to mitigate against the inevitability of further falls in his cell.

173.    Mr. Purdy's Public Defender Lindsay Stone visited Mr. Purdy around 2:29pm. Attorney Stone visually observed that Mr. Purdy had visible wounds on his forehead, purple bruising along the entire right side of his head, scabs up and down his arms, blood coming down his nose, a big gash on the back of his head that looked infected, an open wound on his right hand, blood on his pillow, blood smeared across the well next to his bed, scabs and open wounds across his feet, a swollen right bicep with a purple bruise, scraped knuckles, and blood in his mustache. His leg below his shin was swollen with no circulation. Ms. Stone expressed urgent concern to jail staff, but Mr. Purdy was not taken to the hospital or otherwise provided treatment for his obvious and serious injuries.

174.    At 6:15pm, Mr. Purdy moves to the side of his bed and reaches to move the box of food on the ground nearby. He moves to the ground but falls into his walker nearby. At

6:59pm, Mr. Purdy is wobbling about after using the toilet and picking things up off the ground. He loses his balance and falls against the cell wall a couple of times for the next few minutes. Two officers come in at 7:23pm and one of them points a flashlight to the open wound on the back of his head then they leave a bit later. Defendant Diehl notes in the well-being check log at 7:26pm that Mr. Purdy verbally refused the dayroom, and Defendant Deputy Kimberly Jensen writes "OK" at 7:27pm in the well-being check log, which is false. Mr. Purdy is not "OK," having suffered painful and life-threatening blunt force trauma over his entire body and head from repeated and relentless falls, as described herein. Defendant Jensen and Defendant Diehl knew about the open wound on the back of his head and his other injuries that were obvious and shocking to his public defender, a layperson. But Defendant Jensen and Defendant Diehl failed to alert medical staff, take him to the hospital, or otherwise address his obvious and serious injuries. Defendant Jensen and Defendant Diehl took no steps to treat Mr. Purdy or to accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the conditions of his confinement. Other falls occur throughout the day.

**July 18, 2023: Mr. Purdy suffers a major traumatic fall with head
trauma, and is taken to Lutheran Hospital.**

175.     On July 18, 2023, at 12:44am, Mr. Purdy loses his balance while standing with his walker and hits his back against the wall before falling to the ground. At 12:45am he takes a hard fall between the end of his bed and the wall. He tries to get up and falls again. While very unstable, he tries to remove the mattress from his bed and keeps falling backward into the wall at the foot of his bed and in the crevice. At 12:47am, Mr. Purdy trips and catches himself on his tipped over walker, but doesn't avoid falling completely, and he hits his back hard on the edge of his bed. At 12:47am, Defendant Deputy Diehl marks "OK" in the well-being check log, which is

false. Deputy Diehl takes no steps to treat Mr. Purdy or to accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the conditions of his confinement. An officer and nurse come in at 12:48am. They help Mr. Purdy to stand and a third officer comes in and they put the bed back in order. At 1:53am, Mr. Purdy is standing, trying to open his walker and takes a hard fall to the ground. An officer and nurse enter the cell at 1:57am and help him to his bed. Another nurse comes in and takes his blood pressure.

176.    On July 18, 2023, at approximately 1:54am, Defendant Curtis Murphy reports Mr. Purdy had another "unwitnessed fall." Mr. Purdy was seen on camera lying on the floor with the walker lying next to him. Mr. Purdy was assessed, and no new injuries were noted, though obviously his existing injuries were severe and numerous. Defendant Murphy failed to accommodate Mr. Purdy's obvious disabilities by, for example, failing to address the ongoing fall risk posed by his dangerous cell. He continued to be deliberately indifferent to the obvious risks of further injuries given the conditions of Mr. Purdy's confinement.

177.    At 2:57am Mr. Purdy is up using his walker. A small puddle appears on the ground next to him that looks to be urine, although he is fully dressed and does not look to pull down his pants. He walks in it several times. At 5:43am, Mr. Purdy is stumbling around his room and takes a very hard fall backwards to the ground. He rolls around on the ground in pain. At 6:10am, Mr. Purdy wobbles near the door and falls. He strikes his head hard on the wall behind him. At 6:49am, he tries to use his walker that is folded up and takes another very hard fall to the ground from a standing position, again striking his head on the wall on his way down. At 6:58am, Defendant Emilsa Pereda, RN, who was the charge nurse at the time, enters the cell and checks Mr. Purdy, who has clearly just fallen. He keeps touching the back of his head. As charge

nurse, Defendant Pereda was responsible for ensuring the safety and wellbeing of her patients, including Mr. Purdy. She failed to take any steps to prevent Mr. Purdy's fall causing injury to his head, or to address the many obvious injuries he already had for which he clearly needed to be taken to a hospital.

178.    On July 18, 2023, Defendant Deputy K'Leigh Thomas was serving as a module deputy for the Special Housing Unit. At around 7:00am, Defendant Thomas was escorting Defendant Charge Nurse Emilsa Pereda, RN, on medication rounds, when they found Mr. Purdy on the floor of his cell by the door. Defendant Thomas told Nurse Pereda, with shocking indifference, "that is normal behavior for him." Despite apparently knowing that Mr. Purdy was frequently on the floor, Defendant Thomas had taken no steps to seek treatment for Mr. Purdy or to accommodate his known disabilities, or to mitigate the obvious risks of further injuries given the conditions of his confinement. When she opened the cell door, they discovered blood smeared on the wall and blood pooling under Mr. Purdy's head.

179.    Defendant Pereda also reported that she noticed on camera that Mr. Purdy was on the floor and went to check on him. Mr. Purdy was found lying on the floor, supine, bleeding from the back of his head, and blood marks were noted on the wall. Mr. Purdy was alert but disoriented. He was brought to medical for further evaluation and the provider ordered Mr. Purdy be sent to the emergency department. Defendant Pereda's evaluation included that Mr. Purdy was unable to ambulate, had an unsteady gait, was confused, and had an approximately 2-inch diameter head wound "bulging out." Emergency Medical Services was called at 7:35am and arrived at 7:42am to transport Mr. Purdy to Lutheran Hospital emergency department. At 12:18pm, Defendant Director of Nursing Kim Sanchez documented that Mr. Purdy was admitted

to the neuro critical care unit for observation after being diagnosed with a brain bleed.

180.    On July 18, 2023, Mr. Purdy's public defender Lindsay Stone filed a motion for

emergency bond hearing to request that Mr. Purdy be released. In the motion, Attorney Stone

described in detail Mr. Purdy's injuries and many falls; his hospital visit; his blood-smeared cell;

his visible open wounds and bruising; his swollen legs, ankles, and feet; his incontinence; and his

strict medication regimen.

**July 18 – 30, 2023: Mr. Purdy develops sepsis and
meningitis caused by traumatic falls, and dies.**

181.    At Lutheran Hospital, Mr. Purdy underwent a trauma evaluation which revealed a

subdural hematoma (brain bleed), a lumbar spine compression fracture, and a rib fracture. Dr.

Shibana Shafi, MD, wrote that Mr. Purdy had advanced neurogenerative disease, Parkinsons' and

advanced dementia.

182.    On July 24, 2023, Mr. Purdy developed group A strep and staphylococcus.

Infectious disease doctor Arianna Edalla Kousari, MD, also noted on July 24 that Mr. Purdy had

sepsis with multiple sources likely from skin, with concern for possible underlying hematoma

with superinfection in the large ecchymosis on his right side.

183.    Photographs of his injuries and the battered condition of his body reflect the

obvious signs of physical distress and injury, including the following:













184.    Mr. Purdy was discharged to Collier Hospice Care on July 24, 2023. On July 25,

Eric Bryant, MD, noted that Mr. Purdy had a prognosis of hours to days to live.



**Defendants' deliberate indifference to his dangerous conditions of
confinement and to his obvious, serious medical needs
and/or negligence killed Mr. Purdy.**

185.    Mr. Purdy died on July 30, 2023. An autopsy was performed on August 1, 2023.

The cause of death was "sepsis and meningitis, complicating blunt force injuries from traumatic

fall, in the setting of dementia and gait instability due to Parkinson's disease."

186.    Mr. Purdy's death was directly caused by the traumatic falls he experienced over

and over again at JCDF. His physical injuries by the time he died were so obvious that any

layperson would have known he was at serious risk of death due to sepsis. It was increasingly

obvious throughout Mr. Purdy's detention that he was racking up injuries from falls that were

making him increasingly frail, and any layperson would have known that the near-constant physical and mental pain he was experiencing from these injuries was immense. As his mental capacity continued to decline, any layperson would have known that Mr. Purdy was exceptionally vulnerable to further injury, as he was entirely unable to protect himself from harm.

187.    All Defendants recklessly failed to monitor Mr. Purdy sufficiently closely, as he needed a much higher degree of constant supervision, evaluation, assessment, and care. Geriatric patients with Parkinson's disease and dementia at the advanced stage of Mr. Purdy obviously need constant supervision to prevent harm, and Individual Medical Defendants recklessly failed to provide any meaningful supervision to protect Mr. Purdy.

188.    All Defendants recklessly took Mr. Purdy off of one of his most critical Parkinson's medications early in his detention, which substantially contributed to Mr. Purdy's physical and mental decline. Carbidopa/Levodopa is an essential medication specifically for the physical effects of Parkinson's, and discontinuing it foreseeably and significantly exacerbated the effects of his Parkinson's Disease, Dementia, and related conditions and their manifestations. For example, the failure to administer necessary medication to Mr. Purdy foreseeably increased his risk of suffering falls, including the one on July 18, 2023, that led to his hospitalization and subsequent death.

189.    All Defendants recognized the need for a different placement for Mr. Purdy to reduce the risk of falling, but recklessly failed to provide a referral to a provider who could adequately treat and care for him. Such conduct constituted deliberate indifference to the obvious medical needs of Mr. Purdy.

190.     Defendants' failure to accommodate the known disabilities and medical needs of Mr. Purdy, and failure to take measures to ensure he was in a safe confinement environment, constituted deliberate indifference to known safety risks due to unsafe conditions of confinement, which led to injury, further sickness, physical pain, suffering, mental torture, and eventually his death.

191.     All Defendants recognized their inability to provide medications and other treatment to Mr. Purdy due to his level of cognitive decline, but recklessly failed to provide a referral to a provider who could adequately treat and care for him or to otherwise take actions to provide a safe environment for confinement and to mitigate the obvious risks of falls and further injuries.

192.     All Defendants recognized Mr. Purdy's significant fall risk and recognized the jail's inability to reduce that risk based on the facility's resources, but recklessly failed to transfer Mr. Purdy to a hospital or other site where he could be protected from falling.

193.     All Defendants recognized the deputies' inability to ensure Mr. Purdy's safety and wellbeing due to his level of cognitive decline, but recklessly failed to transfer him to a hospital or other site designed to protect and care for geriatric patients with Parkinson's and dementia.

194.     Had Defendants promptly and appropriately responded to Mr. Purdy's serious and obvious medical needs, he more likely than not would have survived.

**Defendants Jefferson County's and VitalCore's customs, policies, and/or practices of deliberate indifference to inmates' serious medical needs caused Mr. Purdy's death and the violation of his constitutional rights.**

195.     At all times relevant to the subject matter of this Complaint, Defendant Jefferson County contracted with Defendant VitalCore to provide medical care and services to detainees at

JCDF, as well as medical personnel.

196.    For at least ten years before the incidents at issue in this Complaint, and continuing through the present, Defendant Jefferson County has maintained such a contract with VitalCore or another private medical provider at the JCDF.

197.    Defendants Jefferson County and its private contracted medical providers have, with deliberate indifference to the rights of people who are incarcerated, persistently maintained constitutionally deficient policies, customs, and practices with respect to the provision of medical care at the JCDF.

198.    From 2016 to 2018, jails relying on one of the five leading jail healthcare contractors had higher death rates than facilities where medical services were run by government agencies. Privately run health care providers had death rates that were 18 to 58 percent higher than those of public providers.

199.    Defendants Jefferson County and VitalCore are part of this nationwide problem and knowingly maintained unconstitutional training, policies and customs by failing to provide higher-level health care in a timely manner.

**Jefferson County's contract with VitalCore financially incentivizes the denial of needed medical care, foreseeably resulting in the unconstitutional provision of medical care.**

200.    The contract between the Entity Defendants financially incentivizes reductions in the use of necessary off-site medical services for inmates, and as such, represents an unconstitutional policy, which gives rise to entity liability.

201.    Under the agreement, VitalCore is contractually obligated to pay up to a certain amount of expenses for off-site medical care for each inmate.

202.    Such a provision foreseeably invites reckless corner cutting and risk-taking to

save money—it expressly offers an incentive to deliberately disregard known and excessive risks to an inmate's health or safety—including the risk that they may die or suffer without timely off-site care.

203.     Jefferson County agreed to the contractual provisions that incentivize VitalCore to deny off-site medical care despite being aware that such provisions foreseeably lead to constitutionally inadequate medical care at the JCDF.

204.     Jefferson County agreed to these cost-saving provisions in its contract with VitalCore for its own financial reasons, obtaining lower contract costs by agreeing to allow VitalCore to cut corners and avoid off-site medical care and other accommodations and medical care for detainees so that VitalCore could operate with fewer expenses.

205.     The County had similar agreements with the contracted medical providers that preceded VitalCore at the JCDF, including but not limited to Correct Care Solutions, LLC (CCS) and its related or predecessor companies called Wellpath and CHC.

206.     CCS and those related entities have a notorious history of providing deficient medical care in scores of jails and prisons, including the JCDF (as demonstrated by numerous serious and meritorious cases arising out of the JCDF, such as those further described below).

207.     Defendant Jefferson County was aware of the serious medical care problems experienced at the jail under the contracts with prior medical care companies, but took no steps to ameliorate those problems or to avoid them when entering into subsequent contracts, including the contract with VitalCore.

208.     The sordid history of constitutionally infirm medical care provided by private companies like CCS and their related history was, in part, caused by contracts like the County's

contract with VitalCore, which incentivize the denial of off-site medical care.

209.    Providing constitutionally deficient medical care to inmates at the JCDF provides

a financial benefit for both the County and for the private medical care provider, in this case,

VitalCore, which is the reason the contracts are structured the way that they are. The jail inmates

foreseeably suffer serious injuries and death because of the structural deficiencies in the medical

care contracts.

210.    Despite being aware that financially incentivizing a private, for-profit medical

provider to cut costs by, among other things, denying offsite care foreseeably would lead to

unconstitutional medical care, Jefferson County deliberately indifferently agreed to do that very

thing with VitalCore.

211.    This was a moving force behind the constitutional violations Mr. Purdy suffered.

**JCDF staff, including Jefferson County's contracted private medical providers,
are trained and encouraged to take a foreseeably dangerous "wait and see" approach to
medical care at the jail.**

212.    The Entity Defendants failed to adequately train and supervise their medical staff

regarding the need to provide timely medical care provided by the appropriate-level medical care

providers, amounting to deliberate indifference to the serious medical needs of inmates.

213.    JCDF and VitalCore staff are trained to adopt a reckless "wait and see" approach

when a patient presents with serious and potentially emergent symptoms rather than provide

timely off-site care. Individual Defendants' deliberately indifferent failure to timely seek off-site

medical care for Mr. Purdy is a direct result of these customs and training.

214.    The policy and/or custom of deliberate indifference at the JCDF, manifested

through (among other things) staff taking a reckless "wait and see" approach to medical care, is

further shown by at least the following incidents at the JCDF.

215.    Since Mr. Purdy died, JCDF and VitalCore have continued to demonstrate a practice and policy of deliberate indifference to the serious medical needs of detainees at the jail. Ashley Jo Raisbeck had been incarcerated on a detox protocol for three days at JCDF when she died on December 16, 2023, due to dehydration and other withdrawal symptoms. VitalCore and JCDF staff failed to obtain emergency medical care in a timely manner, causing her needless death. Courtney Tinker died due to JCDF and VitalCore's deliberate indifference three months later on March 29, 2024, also while on a detox protocol. Doraine Stangel died on August 4, 2024, after a one-day incarceration at JCDF – she was never even put on detox protocol, and died due to lack of medical care for substance-related complications in her booking cell. Glenn Perdreaux died in JCDF custody on December 7, 2024, also due to lack of medical care while suffering substance-related health problems. Two other individuals, Justin Baxter-Sudds and Mattheui Esses-Blatnik, also suffered deliberate indifference to their serious medical needs while incarcerated at JCDF around September 2024. Baxter-Sudds complained of numbness on one side of his body for almost two weeks before he was finally taken to the hospital. Esses-Blatnik is diabetic, and had his insulin pump and glucose monitor removed by jail staff.

216.    JCDF also has a long history of deliberate indifference to the serious medical needs of its inmates prior to Mr. Purdy's death. On June 28, 2021, Abby Angelo died while incarcerated at JDCF at the age of 29, after exhibiting significant signs of illness and receiving minimal medical care. Ms. Angelo told jail staff that she was withdrawing from heroin, and that she was feeling ill. Over the course of a week, her blood oxygen levels continued falling precipitously and she struggled to breathe. Defendant Esmeralda Ziegelmann, RN, treated Ms.

Angelo and failed to escalate her care to a higher-level provider despite alarming vital signs. She prescribed withdrawal medications, but they were never administered to Ms. Angelo. Ms. Angelo died from tricuspid valve endocarditis (TVE), a heart infection often exhibited in intravenous drug users which can be treated with a course of antibiotics or surgery. This case is currently the subject of pending federal litigation against Jefferson County and its agents in *Est. of Angelo v. Bd. Of Cnty. Comm'rs*, 23-cv-01607-CNS-STV.

217.    On May 1, 2020, Paul Abeyta died while incarcerated at JCDF as a result of complications from opioid withdrawal. Mr. Abeyta informed the detention staff that he had been a daily heroin user for the past five years and he had been suffering from symptoms including fever, cough, and shortness of breath. Mr. Abeyta was transferred to the medical unit of the jail where he was supposed to be routinely observed. Mr. Abeyta's symptoms progressed due to his withdrawals. Mr. Abeyta died in his cell after not receiving adequate medical care in response to his obvious withdrawal symptoms while he was supposedly under "observation" in the medical unit of the jail.

218.    On March 28, 2019, John Kowalski also died from complications of opiate withdrawal due to JCDF and the staff of its private medical contractor deliberate indifference to his serious medical needs, while he was a pre-trial detainee at the JCDF. While in custody, Mr. Kowalski, suffering from opiate withdrawal, passed out and had a seizure in the shower. Mr. Kowalski's conditions were communicated to JCDF staff and the staff of its private medical contractor medical personnel responsible for caring for Kowalski. However, JCDF and the staff of its private medical contractor failed to provide adequate medical care nor life-preserving checkups on his condition. As a result, he became gravely ill and went into cardiac arrest. He

died a week later at the hospital

219.    From August 2019 to January 2020, JCDF defendant medical staff failed to
adequately address Ronald Rogacki's serious, chronic sinus infection by enabling him to receive
care they knew he needed from an off-site ENT provider. They instead deliberately indifferently
left him to suffer severe pain and other complications from the insufficiently treated infection
throughout his months-long incarceration at the Jefferson County jail. The case is currently the
subject of pending federal litigation against Jefferson County and its agents in *Rogacki v.
Wellpath*, *et al.*, 21-cv-02218-CNS-KAS.

220.    On March 2, 2015, Jennifer Lobato died as a result of dehydration stemming from
opiate withdrawal-related complications while being detained at JCDF. Soon after entering the
jail, Ms. Lobato began demonstrating clear signs of withdrawal from methadone, including
vomiting profusely. Ms. Lobato's symptoms progressively worsened. JCDF staff refused to
respond to provide Ms. Lobato with the medical care she needed. As a result, Ms. Lobato died
alone in her cell. Ms. Lobato's estate filed suit against several individual defendants, as well as
Jefferson County and Correct Care Solutions, LLC (CCS), its private medical contractor at the
time. Jefferson County and the deputy defendants settled with Ms. Lobato's estate for $2.5
million prior to trial and claims against the CCS defendants settled for a confidential amount.

221.    In 2013, Kenneth McGill sued Jefferson County and CCS (then known as CHC)
after he was denied medical treatment at JCDF while exhibiting obvious signs of a stroke in
September 2012. Mr. McGill complained JCDF staff of dizziness, slurred words, and difficulty
maintaining balance. JCDF and CHC staff, acting with deliberate indifference, failed to take Mr.
McGill to a hospital in a timely fashion where he could have received necessary emergency

medical care. This case went to trial and resulted in a plaintiff's verdict for approximately $11

million. The jury further found that CHC had constitutionally deficient training and supervision

of nurses in JCDF. Defendant Jefferson County also had judgment for deliberate indifference to

serious medical needs entered against it as a result of the jury's verdict because of its

nondelegable duty to provide constitutionally adequate medical care in its jail.

In November 2010, Robert Turley choked on some food, thereafter complaining of sharp pain

and throwing up blood. JCDF staff and CHC's medical staff were deliberately indifferent in

refusing his request to see a doctor and be transported to the hospital. Only once he was found

hypoxic and unconscious was he sent to the hospital, where he was found to have a perforated

esophagus requiring surgery. Although Mr. Turley survived, he had significant medical issues

that resulted from mistreatment.

### Defendant VitalCore has a custom, policy, and practice of responding with deliberate indifference to the serious and obvious medical needs of people who are incarcerated.

222.    Defendant VitalCore is a national company with a disgraceful history of failing to

provide constitutionally adequate medical care to inmates at correctional facilities with which it

contracts.

223.    Accordingly, there are an abundance of examples nationwide establishing that

VitalCore and the entities that employ it have policies, customs, and practices demonstrating

deliberate indifference to the medical needs and constitutional rights of inmates.

224.    Since 2015, Defendant VitalCore, its related entities, and its agents have been

sued many times for violating the constitutional and other rights of people who are incarcerated

in federal cases, including, but not limited to, the following: *Royal v. VitalCore* (W.D. Va.);

*Samuel v. Centene Corp.* (D. Del.); *Burke v. Punturi* (W.D. Va.); *Scriven v. VitalCore* (D. Kan.);

71

*National Federation of the Blind v. Va. Dept. of Corr.* (E.D. Va.); *Banks v. Charleston County Sherrif Office* (D. S.C.); *Cain v. Mann* (W.D. Va.); *Viilo v. Kent County* (W.D. Mich.); *Davis v. VitalCore* (D. S.C.); *Johnson v. Canyon County* (D. Idaho); *Scott v. Jackson County Sheriff's Department* (S.D. Miss.); *Cruse v. Miss. Dept. of Corr.* (S.D. Miss.); *Gleason v. Zmuda* (D. Kan.); *Medley v. Centene Corp.* (D. Del.); *Reddell v. Rankin Cty* (S.D. Miss.); *Vlasak v. Hall* (S.D. Miss.); *Villarreal v. VitalCore* (S.D. Miss.); *Balfour v. Jackson HMA* (S.D. Miss.); *Edwards v. Cain* (S.D. Miss.); *West v. Gobeille* (D. Vt.); *Placencia v. Hidalgo Cty Bd.* (D.N.M.); *Morefield v. VitalCore* (N.D. Ohio); *Higginbotham v. Madison Community Care Center* (S.D. Miss.); and *Clemmons v. Roberts* (D. Kan.).

225.     VitalCore became the contracted medical provider at the JCDF as of January 1, 2022. Since then, at least the following lawsuits have been filed in the United States District Court for the District of Colorado based on allegations of the plaintiffs receiving constitutionally inadequate medical care at the JCDF alone: *Henard v. Hebert, et al.*, 21-cv-3123-WJM-MDB; *Tibbels v. Marinelli*, et al., 22-cv-164-RMR-NRN; *Estate of Angelo v. BCC, et al.*; 23-cv-1607-CNS-STV; *Romero v. Wellpath, et al.;* 23-cv-00328-NYW-MDB; *Henard v. County of Jefferson*, 23-cv-1523-DDD-MDB; *Henard v. Carnahan et al.*, 23-cv-3069-DDD-MDB; and *Esses-Blatnik v Marinelli*, 24-CV-31200.

226.     Moreover, Jefferson County has received numerous notices of claims since 2022 based at least in part on the deficient medical care of VitalCore. These are in addition to other cases against Jefferson County and/or VitalCore discussed herein.

227.     They include but are not limited to notices of claim involving deficient medical care causing the wrongful deaths of Melissa Chavez and Sierra Sandoval, and notices of claim

related to deficient medical care causing significant injuries to Matthew Lowderback, Dustin

Remington-Peters, Martin Cabral, and Joshua Mondragon.

228.    Many of the cases described above involved the same or similar legal claims

against Defendant VitalCore, its related entities, and its personnel as those brought by Plaintiffs

in this case.

229.    Many included meritorious constitutional claims against the VitalCore and its

agents for deliberate indifference to the plaintiffs' serious medical needs.

230.    Moreover, the events in the many of those meritorious cases occurred before the

events underlying Mr. Purdy's case.

231.    Many of those cases had meritorious claims against VitalCore based, at least in

part, on the company, its staff, and/or the with whom the company contracts taking the reckless

"wait and see" approach to medical care described above, and/or claims based upon inadequate

or delayed medical care being provided by inappropriate medical care personnel under the

circumstances with which they were confronted.

232.    In other words, a common thread in many of these cases is that VitalCore ignored

obvious signs and symptoms to deny inmates access to necessary or appropriate offsite or other

medical care.

233.    Thus, VitalCore, like Jefferson County, was on notice before the events

underlying Mr. Purdy's case that it had an entrenched custom and practice of taking a wait and

see approach to medical that was unconstitutional, and which needed to be remediated

immediately.

234.    Yet, VitalCore deliberately indifferently allowed such a foreseeably dangerous

practice and custom to persist among its staff.

235.    This deliberately indifferent approach to medical care was a moving force

underlying the Defendants' violations of Mr. Purdy's rights.

**Defendant Jefferson County's decision to enter into and maintain a contract with VitalCore
further demonstrates its own deliberate indifference to the constitutional rights of people
who are in custody at the JCDF.**

236.    As discussed, Jefferson County has a longstanding custom and practice of taking

a constitutionally infirm approach to inmates' medical care based on the conduct of its own

employees, along with the conduct of its private medical providers with whom it has contracted.

237.    For well over a decade (at least), Defendant Jefferson has tolerated and condoned

the provision of medical care at the JCDF that fails to comply with the mandates of the United

States and Colorado Constitutions.

238.    Jefferson County has tolerated and condoned VitalCore's deliberately indifferent

approach to medical care since the effective date of the VitalCore contract, and previously with

other medical care companies, including well before the events underlying Mr. Purdy's case.

239.    Moreover, Defendant Jefferson County, in contracting with VitalCore to provide

medical care at the JCDF, knew or should have known of VitalCore's significant history and

pattern of serious deficiencies in providing medical services and care to detention facility

inmates, and refusals by VitalCore to correct such deliberately indifferent policies, practices, and

customs.

240.    Defendant Jefferson County is liable for the selection and ongoing retention of

VitalCore to provide medical services at JCDF despite such knowledge of its record and custom

of providing constitutionally inadequate medical care to jail inmates at facilities with whom they

have contracted.

241.    This demonstrates the County's deliberate indifference to the health and safety of JCDF inmates in its jail, given what it knew to be VitalCore's history of constitutionally inadequate medical care in correctional and detention facilities.

**Defendant Jefferson County is also liable for the conduct of VitalCore and its agents based on its nondelegable constitutional duty to provide constitutionally adequate medical care at the JCDF.**

242.    Defendant Jefferson County also had and has a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees. The County failed to comply with its constitutional duty when (among other things) VitalCore medical staff failed to provide Mr. Purdy the timely care that he needed to treat his serious medical condition, pursuant to the company's constitutionally infirm customs, policies, and practices.

243.    Defendant Jefferson County intentionally delegated final policy making authority related to the provision of medical care in its jail to a third party—namely, VitalCore and its related entities. Nevertheless, the liability for providing constitutionally deficient medical care to pretrial detainees is not delegable, and remains both with Jefferson County and also with VitalCore.

244.    Defendant Jefferson County is therefore liable for the unconstitutional actions of Defendant VitalCore (including its defective customs, policies, and practices described herein that were the moving force behind the violations of Mr. Purdy's constitutional rights) and its employees or contractors toward Mr. Purdy.

**Alongside their policy and custom of taking a dangerous, wait and see approach to medical care, the Entity Defendants were on notice that they had numerous additional policies and customs that were constitutionally infirm. These were also causes of Mr. Purdy's injuries.**

245.    At all relevant times, the Entity Defendants had numerous, constitutionally infirm policies, practices, and customs which, though possibly not formally adopted, had become so widespread, well-settled, and deeply embedded in their application, use, employment, and acceptance in the jail to have become the policies of the Defendants.

246.    The Entity Defendants were on notice that at least the constitutionally infirm polices, practices and customs described herein existed before Mr. Purdy suffered his injuries at the jail.

247.    With deliberate indifference, the Entity Defendants nonetheless permitted these polices, practices and customs to persist at all relevant times.

248.    Such unwritten policies, customs, and practices include but are not limited to the following:

    a.    Failure to properly screen inmates for medical issues upon admission to the jail;

    b.    Failure to properly screen inmates for mental health issues and ignoring or dismissing mental health symptoms presented by inmates and attributing them to behavioral issues rather than recognizing them as symptoms of underlying mental health conditions;

    c.    Inadequate and improper training in recognizing medical emergencies and mental health issues and responding to same;

    d.    Understaffing of mental health professionals;

    e.    Punitive responses to mental health symptoms. Instead of providing appropriate

medical treatment, staff responds punitively to inmates exhibiting symptoms of

pre-trial confinement;

f.   Ignoring medical complaints and medical emergencies;

g.   Lack of follow-up care after initial medical assessments to address ongoing

medical concerns;

h.   Failure to properly classify inmates;

i.   The chronic understaffing at the jail and hiring of jailers with little to no training

or supervision;

j.   Failing to conduct safety checks as frequently as constitutionally required;

k.   Failure to provide constitutionally adequate mental health treatment for inmates;

and

l.   Failure to take proper steps to accommodate the known disabilities and risks of

injury faced by employees with disabilities by providing a safe confinement

environment at the JCDF or elsewhere.

249.    The Entity Defendants also had defective training and supervision related to

neurological and movement disorders such as Parkinson's and dementia. These deficiencies

were, in general, a product of the *absence* of policy, training, and protocol designed to properly

address the circumstances present in cases like Mr. Purdy's.

250.    The Entity Defendants' deficient practices and policies surrounding the proper

way to manage inmates with neurological and movement disorders such as Parkinson's and

dementia included but were not limited to the following:

a.   Inadequate training and supervision regarding Parkinson's disease and dementia

in general,

b.  Inadequate training and supervision on how to appropriately interact with and
    care for those exhibiting symptoms of the same;

c.  Inadequate training and supervision for all jail and medical staff on mandatory
    reporting for at risk adults pursuant to C.R.S. 18-6.5-108, including who
    mandatory reporters are, what situations qualify, and where reports should be
    made, including penalties for failure to report;

d.  Inadequate training and supervision for jail medical intake personnel as to when
    an arriving inmate must be immediately referred to a medical provider for
    evaluation;

e.  Inadequate training and supervision for jail nurses as to the importance of
    correctly and timely delivering medication, and increased professional
    consequences for the failure to do so;

f.  Inadequate training and supervision for jail and medical personnel regarding
    proper measures to accommodate the disabilities of inmates or to assure safe
    confinement environment to mitigate the risks of injury or death from falling or
    facing other dangers during detention;

g.  Inadequate training and supervision for jail nurses regarding documentation of
    when and why medications are added to or discontinued from a patient's regimen,
    and verification that the same is appropriate via medical providers; and

h.  Inadequate training and supervision for jail nurses as to when they are required to
    escalate a medical situation to a doctor or other higher-level provider, particularly

78

related to falls by elderly and other inmates at increased risk of a fall.

251.     The need for such training and the probability that the failure to provide such training would cause a JCDF inmate like Mr. Purdy to be seriously injured or to die was so obvious that Entity Defendants' failure to do so constituted deliberate indifference to Mr. Purdy's serious medical needs.

252.     Jefferson County and VitalCore trained Individual Defendants to conduct themselves in the manner that they did with respect to Mr. Purdy, and these Defendants' actions – and Mr. Purdy's death—were pursuant to the training, customs, practices, and policies of Jefferson County and VitalCore.

253.     The Entity Defendants also lacked the following protocols during the events underlying Mr. Purdy's case, even though it was obvious that such protocols were warranted in order to adequately address the serious medical needs of certain inmates, including inmates with movement or balance disorders such as Parkinson's and dementia:

    a.   Specific housing protocols for inmates with Parkinson's, dementia, or other conditions that lead to disorientation or severe fall risks;

    b.   Requirement of frequent checks and/or sitters for severe fall risk patients;

    c.   Protocol by which medical personnel can evaluate and, if appropriately deemed by a physician, refuse entry of inmates with medical conditions for which the facility cannot adequately care;

    d.   Protocol whereby inmates can be transferred to other facilities with appropriate accommodations in coordination with jail command staff;

    e.   Requirement of a medical doctor's signature certifying that any patient arriving to

the jail from hospital or returning to the jail from hospital can be safely housed and treated at the jail;

f.  Requirement to document specifically that an inmate has "taken" their prescribed medication, as witnessed by a nurse or other medical professional, not simply "received" by the patient;

g.  Protocol to ensure inmates with Parkinson's and dementia are seen by seen by the same medical staff as much as possible, to build trust with the patient and help medical staff more actively monitor and track a patient's condition; and

h.  Protocol to mandate conferral and inclusion of a patient's primary caretaker with medical staff regarding the patient's known conditions and the best practices for handling the patient.

254.    Moreover, before and during the events underlying Mr. Purdy's case, the Entity Defendants failed to create a safe environment for inmates, even though it was obvious that such measures were warranted in order to adequately address the serious medical needs of certain inmates, including inmates with movement disorders such as Parkinson's and dementia.

255.    Before and during the events underlying Mr. Purdy's case, the Entity Defendants knew they should have, but did not, adequately invest in equipment and protective measures for patients at high risk of falls, including the establishment of particularized cells designed to accommodate inmates with fall risks.

256.    Examples of obviously needed safety measures the Entity Defendants failed to adequately provide include but are not limited to:

a.  Handrails in cells;

b. Bedrails that run the entire length of the bed;

c. Cells with access to sunlight and clocks;

d. Raised toilet seats;

e. Access to puzzles, books, games, and other forms of mental stimulation;

f. Appropriate social interactions and observation designed to accommodate the known mental and physical disabilities of inmates at the jail; and

g. Access to walkers that do not fold.

257. The Entity Defendants were on notice before the events underlying Mr. Purdy's case that they had the defective customs, policies, and practices described herein, including those designed to address neurological and movement disorders such as Parkinson's and dementia, and other similar conditions.

258. It was foreseeable that the jail would, at times, be asked to house individuals with Parkinson's and/or dementia or other similar conditions.

259. Accordingly, the Entity Defendants made a conscious and deliberate choice before the events underlying Mr. Purdy's case to have the defective customs, policies, and practices described herein, and to not take steps to ameliorate these deficiencies even when Mr. Purdy was confined at the jail, and both Entity Defendants knew about the need for such measures.

260. The policies, practices, and customs set forth in the preceding paragraph, as well as others that may come to light in the course of this litigation, resulted in numerous, repeated, and pervasive deprivations of Mr. Purdy's rights to reasonable, adequate and timely medical care.

261. With deliberate indifference to the health and safety of people who were confined,

Defendants established, tolerated and condoned, and/or acted consistent with and pursuant to customs, policies, and procedures that directly and proximately caused the deprivation of Mr. Purdy's constitutional rights as alleged herein.

262.    The Entity Defendants' deficient customs, policies, and practices were a moving force behind the constitutional violations Mr. Purdy suffered.

**Defendants Jefferson County and VitalCore have a custom, policy, and practice of failing to adequately investigate and discipline their agents.**

263.    The Entity Defendants also have a custom, policy, and/or practice of failing to adequately investigate and discipline their agents who fail to provide the medical care to inmates that the Constitution requires.

264.    None of the Individual Defendants nor any other VitalCore or JCDF employee received any discipline or follow-up training related to the treatment of or death of Mr. Purdy, demonstrating the determination by the Entity Defendants that their agents acted in conformance with the training, policies, and standard operating procedures of each of the Entity Defendants.

265.    Likewise, despite the unconstitutional delay and indifference in emergency medical treatment for Mr. Purdy, no VitalCore or JCDF employee, including Individual Defendants, was disciplined or counseled, or provided additional training, as a result of Mr. Purdy's death.

266.    The Entity Defendants' deliberately indifferent policy, custom, and/or practice of failing to discipline, and thereby condoning, encouraging, tolerating, rewarding and ratifying such deliberate indifference, has resulted in a custom or culture of inadequate medical care at JCDF.

267.    Jefferson County and VitalCore have explicitly or implicitly communicated to

staff, including Individual Defendants, that such lack of care is authorized and, indeed, expected, and when used will be defended by the supervisory and municipal apparatus of JCSO and/or VitalCore.

268.    Jefferson County conducted a cursory and patently inadequate investigation into Mr. Purdy's death, as is its custom, policy, and practice for instances of unconstitutional medical care at the JCDF.

269.    Esmeralda Ziegelmann, Health Service Administrator for VitalCore, told Jefferson County investigators that she did not believe the jail could have done *anything* better with respect to Mr. Purdy's medical care, despite the weeks of torture she knew that he endured at the hands of jail medical and security staff, and despite the fact that he died as a result of injuries suffered while incarcerated at the jail.

270.    Jefferson County investigators then went on to not only endorse but amplify Defendant Ziegelmann's obviously false narrative that everything was done as it should have been done at the jail with respect to Mr. Purdy.

271.    Defendant Ziegelmann has a history of consciously disregarding substantial risks of serious harm to incarcerated patients at JCDF. In 2021, Abby Angelo died as a result of the deliberate indifference of medical staff at JCDF, including Defendant Ziegelmann, who knew of Ms. Angelo's alarming symptoms but disregarded the risk by failing to proper treat her or refer her for emergency care. It seems that rather than facing discipline after the death of Ms. Angelo, Defendant Ziegelmann was promoted from Nurse to Health Services Administrator for VitalCore.

272.    Jefferson County, in its "Death Review" of Mr. Purdy, concluded as follows: "**It**

83

**appears as if all SHU staff handled Purdy appropriately and professionally. It also appears that the medical staff responded appropriately to him as well**." (emphasis added).

273.    The County's Death Review likewise stated, in closing, "**nor do I have any concerns with the SHU staff or medical unit in their response to Purdy while he was in the custody of the JCSO.**" (emphasis added).

274.    Unsurprisingly, then, the Entity Defendants entirely ratified and approved the conduct of Individual Defendants in how they treated (or did not treat) Mr. Purdy during his detention, and failed to discipline or counsel any of the Individual Defendants for their deliberate indifference to Mr. Purdy's serious medical needs.

275.    This approval demonstrates that their conduct was carried out pursuant to the customs, policies, practices, and regiment of training of Jefferson County and VitalCore, and that such conduct is customary with Jefferson County and VitalCore.

276.    Had such conduct not been customary and pursuant to approved policy, the Entity Defendants would have taken disciplinary or ameliorative action.

277.    The approval and defense by Jefferson County and VitalCore of deliberate indifference by JCDF medical staff sends a clear and unequivocal message to those employees—it *trains* them—that such deliberate indifference is acceptable, consistent with policy, and is approved practice, causing it to be likely or even inevitable in the future.

278.    In light of their knowledge of constitutionally deficient care, the Entity Defendants could have and should have changed their policies and/or pursued reasonable methods for training, supervising, and disciplining JCDF staff regarding meeting the serious medical needs of JCDF inmates, but the Entity Defendants made a conscious and deliberate

choice not to do so.

**The Entity Defendants violated Mr. Purdy's constitutional rights.**

279.    Mr. Purdy's injuries were the result of longstanding, known systemic deficiencies in the medical care provided to inmates by the Entity Defendants.

280.    The Entity Defendants' deficient policies, customs, or practices described above regarding providing medical care to inmates were the moving force and proximate cause of Individual Defendants' violating Mr. Purdy's constitutional right to be free from deliberate indifference to his serious medical needs.

281.    The aforementioned policies, customs, and practices, whether written or unwritten, were expressly announced, sanctioned, tolerated and condoned, and/or implemented by Defendant Sheriff Reggie Marinelli in her position as the final policymaker of the JCDF.

282.    The Entity Defendants' deficient policies, customs, and practices described above caused Mr. Purdy's substantial damages, including his prolonged torture at the Defendants' hands and his untimely and preventable death.

283.    Indeed, the Individual Defendants' violation of Mr. Purdy's right to be free from deliberate indifference to his medical needs, *standing alone*, supplies decisive evidence of the Entity Defendants' custom, policy, or practice of deliberate indifference to the safety of people incarcerated at the jail.

284.    That is because all Individual Defendants acted in essentially the same unconstitutional manner, each adhering to what he or she based upon training knew to be the Entity Defendants' standard operating procedure, policy, and customary practice.

285.    Based on the numerous incidents detailed above of constitutionally deficient

medical care and treatment provided by one or both of the Entity Defendants, and the absence of

accountability and adequate training and supervision, the Entity Defendants knew or should have

known that JCDF medical staff would display deliberate indifference to the serious medical

needs of JCDF inmates, including but not limited to the failure to obtain timely necessary off-site

care for obvious and serious medical conditions.

<b>V.     CLAIMS FOR RELIEF</b>

<b>FIRST CLAIM FOR RELIEF<br>
42 U.S.C. § 1983<br>
14th Amendment – Failure to Provide Adequate Medical Care<br>
and Treatment and Safe Conditions of Confinement<br>
(By the Estate of James Purdy Against All Defendants)</b>

286.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

287.     At all times relevant to the allegations in this Complaint, Defendants acted or

failed to act under color of state law.

288.     At all relevant times, the described conduct of the Individual Defendants was

taken within the course and scope of their official duties and employment.

289.     At all relevant times, Mr. Purdy was a pretrial detainee subject to the protections

of the Fourteenth Amendment to the United States Constitution.

290.     Mr. Purdy had a clearly established right under the Fourteenth Amendment to be

free from deliberate indifference to his known serious medical needs and to receive adequate

medical care and safe conditions of confinement while in the custody of Jefferson County.

291.     Each Individual Defendant knew or should have known of these clearly

established rights at the time of Mr. Purdy's arrival at JCDF.

292.    Defendants violated the clearly established constitutional rights of Mr. Purdy.

293.    Mr. Purdy was in obvious and serious need of medical care and treatment upon his arrival at JCDF. Individual Defendants failed to provide such medical care and safe conditions of confinement, and instead engaged in (or allowed others to engage in) deliberate indifference to his need for serious medical interventions as a result of his Parkinson's disease and dementia.

294.    Defendants also failed to take appropriate measures to ensure safe conditions of confinement for Mr. Purdy, especially to mitigate the obvious risks to his health and safety from repeated falls, of which all defendants knew.

295.    Over the course of his confinement at the jail, Individual Defendants were deliberately indifferent to Mr. Purdy's obviously worsening symptoms as Mr. Purdy's mental and physical state became increasingly perilous.

296.    The Individual Defendants made intentional decisions with respect to the conditions under which Mr. Purdy was confined. They deliberately and intentionally withheld the medical care he needed and placed him in a cell that they knew was excessively dangerous to Mr. Purdy, without taking steps to protect him against injury from his known risk of falling.

297.    These conditions put Mr. Purdy at a substantial risk of suffering serious harm.

298.    The Individual Defendants failed to intervene and/or take reasonable available measures to abate the serious and obvious risk to Mr. Purdy. A reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the Individual Defendants' conduct obvious.

299.    The Individual Defendants' conduct was objectively unreasonable. At all times

relevant to the allegations in this Complaint, each Individual Defendant knew of and disregarded the excessive risks associated with Mr. Purdy's serious and life-threatening medical condition.

300.    Even a layperson would have known, based upon the observable facts and condition of Mr. Purdy, that he had obvious, serious medical needs which were not being provided. Despite this, the Individual Defendants deliberately and/or recklessly failed to ensure that appropriate medical treatment and care was provided to him.

301.    With deliberate indifference to Mr. Purdy's constitutional right to adequate medical care for his known serious medical needs, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Individual Defendants knowingly failed to adequately and timely examine, treat, monitor, supervise, and/or obtain emergency care for Mr. Purdy's emergent medical needs, or to intervene to ameliorate the other defendants' deliberate indifference to the obvious serious medical needs of Mr. Purdy. They did so despite their knowledge of Mr. Purdy's serious medical needs and that he was repeatedly falling (and would continue to fall unless appropriate measures were taken), thereby placing him at risk of serious physical harm, including death.  Therefore, the Individual Defendants knew or were aware that Mr. Purdy faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

302.    By not taking such protective safety measures, the Individual Defendants caused Mr. Purdy's injuries and death.

303.    As described with particularity above, the Entity Defendants are liable for their deliberately indifferent policies, training, practices, habits, customs, widespread usages, and failures to adequately train and supervise their employees and contractors with respect to the

serious medical needs of detainees like Mr. Purdy. The Entity Defendants have a widespread pattern of deliberately indifferent medical care at JCDF and, as to Defendant VitalCore, other correctional and detention facilities at which it provides medical services.

304.    Defendant Jefferson County is directly liable for its own deliberately indifferent policies, customs, and practices that were moving forces in Mr. Purdy's constitutional injury, as well as its deliberately indifferent training and supervision of nurses, its own role in setting policy regarding medical care at JCDF, and for its own ongoing toleration and/or ratification of the widespread pattern and practice of deliberate indifference to JCDF detainees' known serious medical needs.

305.    Defendant Jefferson County is also liable under the nondelegable duty doctrine for the deliberately indifferent policies, customs, practices, training and supervision of the private companies with which it contracts to provide medical care to JCDF detainees, including VitalCore.

306.    As described in detail above, the Entity Defendants' deliberately indifferent policies, customs, practices, and/or failures to adequately train and/or supervise were moving forces in the violation of Mr. Purdy's constitutional rights.

307.    The Entity Defendants were on notice that their deliberate indifference would result and had resulted in a pattern of not providing desperately needed care to inmates with serious medical needs causing injury and death.

308.    The Entity Defendants' failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public and a moving force in the complained of injuries and death of Mr. Purdy.

309.    The Entity Defendants, through policy makers and final delegated decision-makers, ratified their employees' and subordinates' unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring inmates' serious and known medical conditions.

310.    The ratification of the conduct that caused the death of Mr. Purdy is not alleged as proof that ratification itself "caused" his death.  Rather, it evidences that the conduct that caused Mr. Purdy's death was engaged in pursuant to policy, custom, and practice of the Entity Defendants; had it been *outside* of policy, disciplinary or remedial action would have been taken.

311.    Ratification of *previous* instances of deliberate indifference to medical needs, however, was a causal factor in the subsequent use of excessive force or deliberate indifference to medical needs regarding Mr. Purdy, as the employees of the Entity Defendants are trained and taught that such conduct is acceptable and within policy when it happens and management takes no disciplinary and remedial action in response.

312.    Therefore, the Entity Defendants set in motion a series of events that they knew would cause a detainee in a similar situation as Mr. Purdy to be deprived of his constitutional right to adequate medical care for his known serious medical needs.  But for the above acts or omissions of the Entity Defendants, Mr. Purdy would not have been subjected to a violation of his constitutional rights, and such a deprivation was a natural and foreseeable consequence of these Defendants' acts and omissions.

313.    The Entity Defendants' policies, practices, habits, customs, widespread usages, and lack of adequate training and supervision that resulted in the failure to provide proper medical care to treat Mr. Purdy's known serious medical needs were not rationally related to a

legitimate nonpunitive governmental purpose, or were excessive in relation to that purpose.

314.    The herein described acts or omissions of each Defendant were the moving force and the legal and proximate cause of the violation of Mr. Purdy's constitutional right to receive adequate medical care for his known serious medical needs.

315.    The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Purdy's death, the physical and mental pain Mr. Purdy suffered before and during his death, the loss of Mr. Purdy's constitutional rights, loss of enjoyment of life, and other compensatory and special damages including but not limited to permanent lost earnings and earnings capacity of Mr. Purdy.

316.    The herein described acts and inactions were taken by the Individual Defendants and Entity Defendants in reckless and callous indifference to the federally protected rights of Mr. Purdy, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Purdy's constitutionally protected rights.

317.    The intentional actions or inactions of each Defendant as described herein intentionally deprived Mr. Purdy of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused other damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 12132, *et seq.*– Violation of Americans with Disabilities Act of 1990, as Amended**
**Unlawful Discrimination and Failure to Reasonably Accommodate**
**(By the Estate of James Purdy Against Defendants Jefferson County,**
**Jefferson County Sheriff Reggie Marinelli in her official capacity, and**
**Jefferson County Board of County Commissioners)**

318.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

319.    The Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and specifically 42 U.S.C. §§ 12131-12134, prohibits discrimination in public services on the basis of disability. 42 U.S.C. § 12132 provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

320.    The ADA defines a "public entity" to include any state or local government or any department, agency, special purpose district, or other instrumentality of a State or local government, 42 U.S.C. § 12131(1). Jefferson County and its Board of County Commissioners are a "public entity" within the meaning of the ADA.

321.    People with Parkinson's disease and dementia are "qualified individuals with disabilities" within the meaning of the ADA. 42 U.S.C. §§ 12102(1); 12131(2); 12210(b).

322.    At all relevant times, Mr. Purdy was a person with a disability, had a record of a disability, or was regarded as having a disability by Defendants and other Jefferson County and VitalCore personnel. Defendants were well aware of Mr. Purdy's disabilities.

323.    Mr. Purdy was qualified to participate in the services, programs, activities, and benefits provided to detainees at Jefferson County's detention facility within the meaning of Title II of the ADA.

324.    Defendants sued under this claim, directly and through their agents, discriminated against Mr. Purdy based on his disabilities and failed to reasonably accommodate his disabilities

despite knowing that he suffered from a number of disabilities, including Parkinson's disease, dementia, and related impairments and conditions. This violated clearly established law under Title II of the ADA and its implementing regulations.

325.     Defendants failed to provide Mr. Purdy with accommodations that were necessary to permit him to exist safely in JCDF on an equal basis as other inmates. In other words, Defendants violated the ADA by intentionally failing or refusing to provide reasonable accommodations and modifications to their policies, practices, and procedures, as more fully described above.

326.     Specifically, Mr. Purdy required additional supervision, housing modifications, and medical care in order to avoid serious injury and ultimately, death, as a result of risks caused by his disabilities.

327.     Additionally, Defendants, directly and through their agents, violated Title II of the ADA when they excluded Mr. Purdy from participating in JCDF's services, programs, and activities, and denied Mr. Purdy the rights and benefits accorded to other prisoners and detainees, solely by reason of Mr. Daves' disability. For example, Defendants' conduct deprived Mr. Purdy of meaningful access to religious programming and services in the jail, and prevented him from moving about the facility as freely and safely as he was legally entitled to do. Defendants had no legitimate basis for violating Mr. Purdy's rights conferred by the ADA. Reasonably accommodating Mr. Purdy's disabilities would not have posed an undue burden to Defendants.

328.     The actions and inactions of Defendants were objectively unreasonable in light of the circumstances confronting them.

329.     Defendants engaged in these actions intentionally, willfully, and wantonly.

330.     Defendants' actions and inactions are the proximate and legal cause of Mr. Purdy's injuries.

331.     Mr. Purdy has been damaged by Defendants' unlawful conduct under the ADA.

332.     Mr. Purdy's Estate is entitled to damages as may be proven at trial.

**THIRD CLAIM FOR RELIEF**
**29 U.S.C. § 794, *et seq.* ‑ Violation of Section 504, Rehabilitation Act of 1973**
**Unlawful Discrimination and Failure to Reasonably Accommodate**
**(By the Estate of James Purdy Against Defendants Jefferson County,**
**Jefferson County Sheriff Reggie Marinelli in her official capacity, and**
**Jefferson County Board of County Commissioners)**

333.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

334.     Defendants Jefferson County, Sheriff Marinelli in her official capacity, and Jefferson County Board of County Commissioners, upon information and belief, receive federal funding to support their programs and activities.

335.     The Rehabilitation Act, 29 U.S.C. §§ 701 et seq., and specifically 29 U.S.C. § 794 (known as Section 504), prohibits discrimination in programs or activities receiving federal financial assistance on the basis of disability. 29 U.S.C. § 794(a) provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705 (20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

336.     The Rehabilitation Act defines a "program or activity" to include "all of the operations of…a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b). The medical and safe housing needs of Mr. Purdy constitute "program[s] or activit[ies]" within the meaning of the Rehabilitation Act.

337.    People with Parkinson's Disease and dementia are "qualified individuals with disabilities" within the meaning of the Rehabilitation Act. §§ 705(20); 794(a).

338.    At all relevant times, Mr. Purdy was a person with a disability, had a record of a disability, or was regarded as having a disability by Defendants and other Jefferson County and VitalCore personnel. Defendants were well aware of Mr. Purdy's disabilities.

339.    Mr. Purdy was qualified to participate in the programs or activities provided to detainees at Jefferson County's detention facility within the meaning of the Rehabilitation Act.

340.    Defendants sued under this claim, directly and through their agents, discriminated against Mr. Purdy based on his disabilities and failed to reasonably accommodate his disabilities despite knowing that he suffered from a number of disabilities, including Parkinson's disease, dementia, and related impairments and conditions. This violated clearly established law under the Rehabilitation Act and its implementing regulations.

341.    Defendants failed to provide Mr. Purdy with accommodations that were necessary to permit him to exist safely in JCDF on an equal basis as other inmates. In other words, Defendants violated Section 504 by intentionally failing or refusing to provide reasonable accommodations and modifications to their policies, practices, and procedures, as more fully described above.

342.    Specifically, Mr. Purdy required additional supervision, housing modifications, and medical care in order to avoid serious injury and ultimately, death, as a result of risks caused by his disabilities.

343.    Additionally, Defendants, directly and through their agents, violated Section 504 when they excluded Mr. Purdy from participating in JCDF's services, programs, and activities,

and denied Mr. Purdy the rights and benefits accorded to other prisoners and detainees, solely by

reason of Mr. Daves' disability. For example, Defendants' conduct deprived Mr. Purdy of

meaningful access to religious programming and services in the jail, and prevented him from

moving about the facility as freely and safely as he was legally entitled to do.

344.    Defendants had no legitimate basis for violating Mr. Purdy's rights conferred by

the Rehabilitation Act. Reasonably accommodating Mr. Purdy's disabilities would not have

posed an undue burden to Defendants.

345.    The actions and inactions of Defendants were objectively unreasonable in light of

the circumstances confronting them.

346.    Defendants engaged in these actions intentionally, willfully, and wantonly.

347.    Defendants' actions and inactions are the proximate and legal cause of Mr.

Purdy's injuries.

348.    Mr. Purdy has been damaged by Defendants' unlawful conduct under the

Rehabilitation Act.

349.    Mr. Purdy's Estate is entitled to damages as may be proven at trial.

### FOURTH CLAIM FOR RELIEF
### C.R.S. § 24-34-802
### Violation of the Colorado Anti-Discrimination Act –
### Unlawful Discrimination and Failure to Accommodate
### (By the Estate of James Purdy Against Defendants Jefferson County,
### Jefferson County Sheriff Reggie Marinelli in her official capacity, and
### Jefferson County Board of County Commissioners)

350.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

351.    The Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-802, prohibits

discrimination by public entities on the basis of disability.  That section provides:

> An individual with a disability, as defined in section 24-34-301, must not, by reason
> of the individual's disability, be excluded from participation in or be denied the
> benefits of services, programs, or activities provided by . . . a public entity, as
> defined in section 24-34-301 … or be subjected to discrimination by any such . . .
> public entity. . .

352.    CADA defines a "public entity" to include any state or local government or any

department, agency, special district, or other instrumentality of a state or local government.

C.R.S. § 24-34-301(18). Jefferson County and its Board of County Commissioners are a "public

entity" within the meaning of CADA.

353.    People with Parkinson's disease and dementia are "qualified individuals with

disabilities" within the meaning of CADA. C.R.S. § 24-34-301(7) (incorporating by reference 42

U.S.C. § 12102 among other provisions).

354.    At all relevant times, Mr. Purdy was a person with a disability, had a record of a

disability, or was regarded as having a disability by Defendants and other Jefferson County and

VitalCore personnel. Defendants were well aware of Mr. Purdy's disabilities.

355.    Defendants discriminated against Mr. Purdy based on his disabilities and failed to

reasonably accommodate his disabilities despite knowing that he suffered from a number of

disabilities, including Parkinson's disease, dementia, and related impairments and conditions.

This violated clearly established law under CADA.

356.    Defendants failed to provide Mr. Purdy with accommodations that were necessary

to permit him to exist safely in JCDF on an equal basis as other inmates.

357.    Specifically, Mr. Purdy required additional supervision, housing modifications,

and medical care in order to avoid serious injury and ultimately, death, as a result of risks caused

by his disabilities.

358.    Defendants had no legitimate basis for violating Mr. Purdy's rights conferred by

CADA.

359.    The actions and inactions of Defendants were objectively unreasonable in light of

the circumstances confronting them.

360.    Defendants engaged in these actions intentionally, willfully, and wantonly.

361.    Defendants' actions and inactions are the proximate and legal cause of Plaintiffs'

injuries.

362.    Plaintiffs have been damaged by Defendants' unlawful conduct under CADA.

363.    Plaintiffs are entitled to damages as may be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Negligence Causing Wrongful Death**
**Colo. Rev. Stat. §§ 13-21-201 *et seq.***
**(By Marilyn Purdy, Scott Purdy, Brooke Grenemyer, and**
**Matthew Purdy, individually, against all Defendants)**

364.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

365.    At all times relevant, VitalCore was a private corporation that contracted with

Jefferson County to provide medical care and health services to inmates at JCDF, and VitalCore

is not entitled to immunity under the Colorado Governmental Immunity Act ("CGIA").

366.    At all times relevant, Individual Medical Defendants were private individuals

employed by VitalCore and thus not entitled to immunity under the CGIA.

367.    At all times relevant, CGIA immunity was waived under Colorado statutory law

by Jefferson County and Deputy Defendants for injuries resulting from wrongful actions by

public employees in the operation of a public jail, as described in Plaintiffs' notice of claim sent to Jefferson County on or about December 20, 2023.

368.    At all times relevant, Mr. Purdy was in the involuntary custody of JCDF, and under the medical responsibility, care and treatment of Individual and Entity Defendants.

369.    The Entity Defendants and Individual Defendants had a duty to provide reasonable medical care and treatment to detainees at JCDF, including Mr. Purdy.

370.    The Individual Medical Defendants had a medical provider-patient relationship with Mr. Purdy at all relevant times and were acting within the scope of their employment throughout the duration of that relationship.

371.    With respect to their care and treatment of Mr. Purdy, the Individual Medical Defendants owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.

372.    Jail Defendants owed Mr. Purdy a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of correctional officers and jail staff in similar situations.

373.    These duties of care are informed by state law. Under Colo. Rev. Stat. § 16-3-401, "[p]ersons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required medical treatment." The provision of adequate medical treatment and humane care is a statutory (as well as constitutional) obligation.

374.    The Individual Defendants breached their duty of care to Mr. Purdy and deviated from the standard of care they owed him when Individual Medical Defendants failed to provide him with reasonably obtainable and necessary medical assessment, safe housing, monitoring,

care, and treatment, and Deputy Defendants failed to reasonably attempt to obtain necessary

medical assessment, safe housing, monitoring, care, and treatment for Mr. Purdy.

375.    As a direct and proximate result of the Individual Defendants' breach of their duty

to Mr. Purdy, he suffered significant physical and mental pain and suffering and other damages,

and ultimately died.

376.    Entity Defendants are sued directly and indirectly for negligence, negligent

supervision, and negligent training of staff; for failing to ensure the provision of appropriate care

in the treatment of Mr. Purdy; for the acts and omissions of agents and/or employees; and for the

herein described acts by involved employees, agents, staff, and affiliates, who were acting within

the scope and course of their employment.

377.    Entity Defendants are vicariously liable for the negligent acts and omissions by

their agents and/or employees, including, but not limited to, those named individually herein, and

those directly liable for negligent failures in training, policies, and practices.

378.    Entity Defendants are directly liable for breaching their duty to exercise

reasonable care in its training and supervision of its employees and agents and JCDF staff in a

manner that provided JCDF detainees with reasonable medical care and treatment.

379.    Entity Defendants knew or should have known that the lack of adequate

supervision and training of their employees and agents and JCDF staff was likely to harm JCDF

detainees in need of medical care, like Mr. Purdy.

380.    In failing to exercise reasonable care in the training and supervision of their

employees and agents and JCDF staff, as it relates to their providing reasonable medical care and

treatment and/or obtaining reasonable medical care and treatment for inmates, Entity Defendants

negligently and proximately caused Mr. Purdy's death.

381.    The negligent acts and omissions by the Defendants were a substantial and significant contributing cause of Mr. Purdy's death, and it was reasonably foreseeable that these Defendants' negligence would cause the harm or a similar harm that Mr. Purdy and Plaintiffs have suffered and are and will continue to be suffering.

382.    As a direct and proximate result of the conduct of Defendants, Mr. Purdy suffered significant physical and mental pain and suffering and other damages, and ultimately died.

383.    As a result of these Defendants' negligence, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act and otherwise under the law.

384.    Plaintiffs suffered and continue to suffer economic and non-economic damages due to these Defendants' negligent conduct, including but not limited to economic damages for funeral expenses and financial losses, and non-economic damages for grief, loss of Mr. Purdy's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

385.     Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Mr. Purdy and Plaintiffs.

386.    Defendants' conduct as described herein constituted a felonious killing within the meaning of Colorado law.

387.    Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.[6]

**SIXTH CLAIM FOR RELIEF**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 20 and Colo. Const. Art. II, Section 25 Inadequate Medical and Mental Health Care and Treatment**
**(By Estate of James Purdy Against Defendants Diehl, Nielsen, Tuey, Vanalphen, Van Wyk, R. Vargas, Esparza, Mindykowski, Erdmann, Meyer, and Thomas)[7]**

388.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

389.    At all times relevant to the allegations in this Complaint, Deputy Defendants acted or failed to act under color of state law.

390.    Deputy Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

391.    At all times relevant to the allegations in this Complaint, Deputy Defendants knew of Mr. Purdy's life-threatening medical condition during his detention at JCDF and symptoms thereof that indicated Mr. Purdy was at significant risk of serious harm due to his condition.

392.    Deputy Defendants unreasonably failed to attempt to obtain appropriate treatment or help for Mr. Purdy's serious medical condition.

---

[6] Given the circumstances of malice and willful and wanton conduct surrounding Defendants' treatment of Mr. Purdy, Plaintiffs anticipate seeking exemplary damages for Defendants' negligence once Plaintiffs have established prima facie proof of a triable issue of exemplary damages.

[7] Plaintiff brings this claim for the express purpose of establishing the scope and meaning of C.R.S. § 13-21-131, the meaning of which has not been determined by the Colorado Supreme Court.

393.    Deputy Defendants provided medical care, treatment, and attention below the standards required by the Colorado Constitution to Mr. Purdy.

394.    In violation of Mr. Purdy's constitutional right to adequate medical health care, as provided by the Due Process Clause and/or Cruel and Unusual Punishments Clause of the Colorado Constitution, Deputy Defendants unreasonably failed to attempt to obtain for Mr. Purdy adequate treatment, monitoring, supervision, and/or care. They did so despite their knowledge or constructive knowledge of Mr. Purdy's serious medical health needs, thereby placing him at risk of serious physical harm, including death. Therefore, Deputy Defendants knew or should have known that Mr. Purdy faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

395.    Deputy Defendants unreasonably failed to adequately meet Mr. Purdy's obviously serious medical need and constitutional rights by unjustifiably failing to obtain medical treatment for him in a timely and appropriate fashion.

396.    All of the unconstitutional acts of each individual Deputy Defendant were conducted within the scope of their official duties and employment.

397.    Deputy Defendants are not entitled to qualified immunity under C.R.S. § 13-21-131 or any other statutory or common law immunities.

398.    The acts or omissions of Deputy Defendants were the legal and proximate cause of Mr. Purdy's injuries and death.

399.    The acts and omissions of each individual Deputy Defendant caused Mr. Purdy damages in that he suffered extreme physical and mental pain and death while he was in Defendants' custody.

400. The intentional actions or inactions of each individual Deputy Defendant as described herein intentionally deprived Mr. Purdy of due process and of rights, privileges, liberties, and immunities secured by the Constitution of Colorado, and caused Plaintiffs damages, including compensatory, economic, consequential, and special damages, along with loss of enjoyment of life, loss of companionship and association with family members, suffering, emotional distress, mental anguish, inconvenience, and loss of income.

401. Plaintiffs are entitled to punitive damages against the individual Deputy Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Mr. Purdy and/or Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment for the Plaintiffs and against each of the Defendants, and award them all relief as allowed by law and equity, including, but not limited to the following:

(a)    Declaratory relief and injunctive relief, as appropriate;

(b)    Economic losses on all claims allowed by law in an amount to be determined at trial;

(c)    Compensatory and consequential damages, including, but not limited to those for past and future losses, damages for emotional distress, loss of enjoyment of life, funeral and related expenses, and pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

104

(e)     Attorneys' fees and costs associated with this action, including expert witness fees,

on all claims allowed by law;

(f)     Pre- and post-judgment interest at the highest lawful rate; and

(g)     Any further relief as justice requires and that this Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 20th day of February 2025.

KILLMER LANE, LLP

*s/ Darold W. Killmer*
_____
Darold W. Killmer
Michael Fairhurst
Maddie Lips
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
dkillmer@killmerlane.com
mfairhurst@killmerlane.com
mlips@killmerlane.com

ATTORNEYS FOR PLAINTIFFS

## **<u>CERTIFICATE OF REVIEW</u>**

This is to certify that undersigned counsel has conferred, pursuant to Colo. Rev. Stat. § 13-20-602, with a medical professional who has expertise in the areas of alleged negligence and deliberate indifference to serious medical needs as set forth in the above Complaint; that this professional has reviewed the known facts, including such records, documents, and other materials relevant to the allegations of negligent acts and omissions; and they have concluded that the filing of these claims do not lack substantial justification within the meaning of Colo. Rev. Stat. § 13-17-102(4).

*<u>s/ Darold W. Killmer</u>*
Darold W. Killmer
