# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00556-SKC-TPO

ESTATE OF JAMES PURDY, et al.,

    Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF JEFFERSON COUNTY, et al.,

    Defendants.

---

## SHERIFF DEFENDANTS' MOTION TO DISMISS COMPLAINT [ECF 1]

Under FED. R. CIV. P. 12(b)(5), the Board of County Commissioners of Jefferson County, Sheriff Marinelli, Mann, De Wispeleare, Abernathy, and Deputies Diehl, Nielsen, Tuey, Van Alphen, Van Wyk, Vargas, Esparza, Mindykowski, Erdmann, Meyer, Jensen, and Thomas[1] move to be dismissed.[2]

## Background

On June 25, 2023, James Purdy ("Purdy") was booked into the Jefferson County Jail (the "Jail") on felony kidnapping charges. [ECF 1, ¶¶ 77, 81.] Within 48 hours, staff had moved Purdy to the medical observation unit ("MOU") to better oversee his medical conditions, which included Parkinson's and dementia. [ECF 1, ¶¶ 84, 94; *contra id.*, ¶ 89.] He remained there, closely monitored by medical contractor VitalCore and its staff, throughout his incarceration. [ECF 1, ¶¶ 96-127 (documenting medical contacts).] Following a July 10, 2023 fall, VitalCore sent Purdy to St. Anthony Hospital, which assessed and discharged him later that day. [ECF 1, ¶ 144, 149.] On

---

[1] These defendants are individually referenced by last name. The deputy sheriffs as a group are the "Deputies" and collectively with non-officer staff, the "Sheriff Employees." The county entity defendants are the "Board" and the "Sheriff," respectively. Undersigned refers to her client group as the "Sheriff Defendants."

[2] The parties attempted to resolve these issues but were unable to reach a resolution, including through amendment of the Complaint. *See* SKC CIV. PRACT. STAND. 7.1B(b); *contra* SKC CIV. PRACT. STAND. 1.1(b)(3); D.C.COLO.LCivR 7.1(b)(2).

July 18, 2023, 23 days into his incarceration, Purdy suffered a head injury caused by an unwitnessed fall, which prompted VitalCore to once again send him to the hospital, where he remained until his July 30, 2023 death from sepsis and meningitis. [ECF 1, ¶¶ 179, 185.] This lawsuit followed.

The Complaint alleges six claims against various medical and detentions staff, as well as the Board, the Sheriff, and the Sheriff's medical contractor, VitalCore. Specifically, the Estate alleges (1) a Fourteenth Amendment deliberate indifference claim against all defendants (Claim 1); (2) ADA, Rehabilitation Act, and Colorado Anti-Discrimination Act ("CADA") claims against the Board and Sheriff (Claims 2-4 (the "Disability Claims")); and (3) a state constitutional claim pursuant to COLO. REV. STAT. § 13-21-131 ("Section 131") against the Deputies (Claim 5). Purdy's family also alleges a state wrongful death claim against all defendants pursuant to COLO. REV. STAT. § 13-21-201 (Claim 6).

## Standard of Review

To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citation omitted). Nor, in this context, does "[p]lausible" mean "likely to be true"; rather, plausibility "must refer to the scope of the allegations in the complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quotations omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders

naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

Argument

## I.    The Board is not the proper party for the Estate's claims.

The Court should dismiss the Board because it is not the correct entity for jail medical care claims. The Colorado Constitution establishes that the Sheriff is the separately elected county officer responsible for the Jail. *See* COLO. CONST. Art. 14, § 8; COLO. REV. STAT. §§ 30-10-501 to -527 (statutory powers of county sheriff). Notwithstanding COLO. REV. STAT. § 30-11-105, a sheriff may be – and frequently is – sued independently from a county board, COLO. REV. STAT. § 30-10-522 (discussing "an action . . . against a sheriff for an action done by virtue of the sheriff's office").

Critically, given Plaintiffs challenge the medical care Purdy received in jail, the Sheriff, not the Board, is the Jail custodian and responsible for the individuals incarcerated therein. COLO. REV. STAT. §§ 30-10-511 ("[T]he sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails . . ."); 17-26-102 ("The sheriff of the county . . . shall be the keeper of the county jail. He shall be responsible for the manner in which the same is kept."); *Est. of Angelo v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, No. 1:23-CV-01607-CNS-STV, 2024 WL 2274080, at *17 (D. Colo. May 20, 2024) (dismissing board in jail medical case); *Est. of Burgaz v. Bd. of Cty. Comm'rs for Jefferson Cty.*, Civ. Act. No. 1:19-cv-01383-SKC, 2021 WL 168441, at *3 (D. Colo. 2021), *aff'd*, 30 F.4th 1181 (10th Cir. 2022) (quoting *Est. of Blodgett v. Correct Care Solutions, LLC*, Civ. No. 17-cv-2690-WLM-NRN, 2018 WL 6528109, at *8 (D. Colo. Dec. 12, 2018),  in holding "[u]nder Colorado law, a board of county commissioners and a sheriff in the same county are *distinct public entities* . . . a board of county commissioners has no control over the sheriff's employees and is not liable for negligent acts of the sheriff's employees") (emphasis added); *Frazier v. Jordan*, No. 06-1333, 2007 WL 60883, at *6 (10th Cir. Jan. 10, 2007) ("Colorado state law does

3

not hold the [county board] responsible for the acts of the sheriff or staff of a detention center in its county.") (citations omitted). Simply put, the Board is not authorized to and does not exercise control over the Jail – a prerequisite for recovery on any theory of liability. Because Colorado law tasks the Sheriff with ensuring that inmates receive appropriate medical care, the Court must dismiss the Board as an inappropriate party.[3]

## II. The Estate's constitutional claims (Claims 1 and 2) fail because no Sheriff Employee was deliberately indifferent to Purdy's serious medical needs.

The gravamen of the Estate's state and federal constitutional claims is that every individual who encountered Purdy should have known he needed additional medical care, regardless of that individual's medical knowledge (or lack thereof), the point during Purdy's incarceration that a particular individual encountered him or the duration or context of such encounters.[4] Because neither Supreme Court nor Tenth Circuit jurisprudence supports such wide-reaching imposition of constitutional liability, the Court must dismiss the Sheriff Employees.[5]

---

[3] While undersigned counsel makes all subsequent arguments on behalf of the Sheriff, those arguments apply equally to the Board should the Court decline to dismiss it.

[4] Abernathy and De Wispeleare never interacted with Purdy.

[5] Given the relative novelty of state constitutional claims brought pursuant to COLO. REV. STAT. § 13-21-131, the Court should analyze the Estate's state constitutional claim against the Deputies consistent with well-established federal jurisprudence. *Amparan v. Lake Powell Car Rental Co.*, 882 F.3d 943, 947 (10th Cir. 2018) ("When the federal courts are called upon to interpret state law, the federal court must look to rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule.") (citation omitted); *Woodall v. Godfrey*, 553 P.3d 249, 256 (Colo. App. 2024) (applying *Graham v. Connor*, 490 U.S. 386 (1989), to Section 131 excessive force claims); *People v. Dunaway*, 88 P.3d 619, 630 (Colo. 2004) ("Where the analogous federal and state constitutional provisions are textually identical, we have always viewed cases interpreting the federal constitutional provision as persuasive authority.").

Prison officials violate the Constitution when they act with "deliberate indifference to an inmate's serious medical needs." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). The contours of constitutional liability under the deliberate-indifference standard consist of both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[T]he focus of the objective component is the seriousness of the plaintiff's alleged harm, while the focus of the subjective component is the mental state of the defendant with respect to the risk of that harm." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022).

Regarding the objective prong, the Sheriff Defendants do not dispute that Parkinson's and dementia are serious medical conditions. *See Farmer*, 511 U.S. at 834; *Est. of Taylor v. Denver Health & Hosp. Auth.*, No. 1:23-CV-02355-CNS-KAS, 2024 WL 3874954, at *10 (D. Colo. Aug. 20, 2024) ("While his death demonstrates the seriousness of his condition, preventing death is not the standard for assessing whether the care was adequate."). However, the constitutional question is whether, in the face of VitalCore's assurances they could handle Purdy's medical needs, those needs were nevertheless so obvious that the Sheriff Employees, none of whom have specialized medical training, would have known that they exceeded the scope of the Jail's medical providers to address them. *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1265 (10th Cir. 2022) (citing case holding prison officials may generally rely on medical personnel's advice and course of treatment).

The subjective prong requires a plaintiff to establish a prison official's culpable state of mind: deliberate indifference means "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The existence of a known risk is insufficient to impose liability: "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they

responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844; *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023) ("The inquiry under a gatekeeper theory is not whether the prison official provided some care but rather whether they fulfilled their sole obligation to . . . afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises.") (citation omitted).

Overarchingly, the Complaint relies on impermissible collective allegations against "Defendants." *Shero*, 510 F.3d at 1200 (the *Iqbal/Twombly* standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation") (citation omitted); *Robbins*, 519 F.3d at 1250 (emphasizing importance in Section 1983 claims "that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations") (emphasis original, citation omitted). More than half of the Sheriff Employees appear in a single substantive paragraph and those paragraphs do not allege constitutionally violative conduct. [*See e.g.,* ECF 1, ¶¶ 99 (Mann evaluated Purdy on June 27, when he was already housed in MOU); 130 (Tuey entered cell and observed Purdy once); 141 (Van Wyk was on duty once and did not enter Purdy's cell); 157 (in single incident Esparza failed to prevent a fall and then removed walker); 159 (De Wispeleare emailed judicial staff seeking to move Purdy's court date up); 171 (Meyer moved Purdy from floor to bed and later guided him to bed); 174 (Jensen documented observing Purdy once); 178 (Thomas told nurse that being on the floor was Purdy's "normal behavior").] The Complaint fails to establish constitutional violations against these Sheriff Employees and the Court must dismiss them.

Even for those Sheriff Employees for whom the Complaint alleges more substantial individualized allegations, those allegations are still not sufficient to demonstrate that these individuals knew of and disregarded a substantial risk of

medical harm to Purdy, who was under close medical supervision in MOU within 48 hours of entering the Jail. [ECF 1, ¶¶ 83 (Purdy undergoes intake screenings on the evening of June 25); 94 (Purdy housed in MOU by June 27)]; *accord Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1154 (10th Cir. 2022) ("[B]ecause none of the Individual Defendants were medical professionals, we instead focus on the second type of conduct—that of 'gatekeepers.' When prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment," they may be liable for deliberate indifference. In other words, a jail official's delay or refusal to obtain medical care for an inmate may constitute deliberate indifference.") (internal citations, quotations omitted).

Regarding these defendants, the Complaint makes the following allegations:

- Abernathy, the Detentions Services Manager, stated she did not have counseling concerns based on Purdy's intake screenings, did not direct his placement in MOU until June 28, and never directed that he be housed in a cell to accommodate his significant fall risk. [ECF 1, ¶¶ 87-89; *contra id.*, ¶¶ 94, 155, 156 (within 48 hours of intake, Purdy already housed in MOU, which was an accommodation for his medical issues, including his fall risk).] Abernathy allegedly knew throughout Purdy's incarceration that the Jail could not safely house him but failed to place him in the hospital or hospice care. [*Id.*, ¶¶ 90, 147; *contra* ¶¶ 144-45 (July 10 hospital transport); 179 (July 18 hospital transport).]

- Diehl interacted with Purdy on July 6, July 10, and the evening of July 17 into the early morning of July 18. On July 6, Diehl allegedly responded with Nielsen and medical staff after Purdy reported a fall. [*Id.*, ¶¶ 128-29.] When Diehl and Nielsen placed Purdy back on his bed, Purdy became increasingly agitated and "tried to pull away from" them and leave his cell, which required staff to cut his medical assessment short. [*Id.*, ¶ 128.] Diehl and Nielsen, who are not medically trained, responded with medical staff but allegedly should have recommended medical accommodations for Purdy following this incident. [*Id.*, ¶¶ 129, 130 (Diehl documented Purdy's refusal to engage with medical staff, who decided not to assess him at that time).] On July 10, Diehl followed unidentified command instructions not to interact with Purdy – including to assist him in showering off urine and feces – while Purdy was agitated. [*Id.*, ¶¶ 140-41.] Diehl also interacted with Purdy on July 17, documenting that he declined dayroom time when Diehl allegedly knew Purdy was suffering various injuries, including an open head wound. [*Id.*, ¶ 174.] Finally, Diehl allegedly falsely documented that Purdy was "ok" on his welfare log shortly after midnight on July 18. [*Id.*, ¶ 175.]

- Erdmann entered Purdy's cell on July 14 with medical staff [*id.*, ¶ 162], conducted cell checks throughout the day on July 16, in which he logged Purdy as "ok" [*id.*, ¶¶ 167, 170], and "force[d]" Purdy to the bed after Purdy was unsteady on his feet and bumped into the cell wall [*id.*, ¶ 170].

- Mindykowski assisted Purdy back to bed after a fall on July 13 [*id.*, ¶158] and entered his cell after falls on July 14 and July 16. [*Id.*, ¶¶ 160, 169.] In each instance, Mindykowski logged Purdy as "ok" in his welfare log. [*Id.*, ¶ 158, 160, 169.]

- Nielsen entered Purdy's cell on July 6 with Diehl and medical staff. [*Id.*, ¶¶ 128, 129.] Nielsen also assisted Purdy to his bed after a July 13 fall and logged Purdy as "ok" on his welfare log. [*Id.*, ¶ 157.]

- Van Alphen interacted with Purdy on July 10, when the Complaint alleges that he followed unidentified command instructions not to interact with Purdy – including to assist him in showering off urine and feces – while Purdy was agitated. [*Id.*, ¶141.] On July 16, Van Alphen transported Purdy via wheelchair to the dayroom and back to his cell. [*Id.*, ¶ 170.]

- Vargas interacted with Purdy on July 10, 14, and 16. [*Id.*, ¶¶ 144, 164, 170.] On July 10, Vargas observed Purdy lying in feces and urine, notified medical staff, and assisted Purdy to shower. On July 14, Vargas observed an "abrupt" fall by Purdy and responded with medical staff, and on July 16, Vargas conducted and documented a cell check on Purdy, indicating Purdy was "ok" when he was not.

Because they are not medical professionals, the Sheriff Employees' conduct must be assessed under the gatekeeper theory, which requires the Estate to show that a particular Sheriff Employee delayed or denied Purdy medical care. *Paugh*, 47 F.4th at 1154. And, because Purdy was housed in MOU and seen multiple times a day by trained medical staff presumably utilizing their medical judgment regarding how to best address his complex medical conditions and needs, the Estate cannot establish that the Sheriff Employees in any way inhibited his access to medical care, knew that jail medical staff care was inadequate to meet his complex medical needs, or disregarded an obvious risk. The Court must therefore dismiss the Sheriff Employees because there are not plausible constitutional claims against them.

## III. The Sheriff Employees are entitled to qualified immunity against the federal constitutional claim (Claim 1).

Even if the Court finds any Sheriff Employee violated Purdy's constitutional rights, it must dismiss them from Claim 1 based on qualified immunity. Qualified immunity protects government officials from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The doctrine protects 'all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Once a defendant asserts qualified immunity, a plaintiff faces a "heavy two-part burden," *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001), to show that "(1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right." *Reavis ex. rel Est. of Coale v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020) (quotation omitted).

Here, it is not enough for the Estate to show that incarcerated individuals have a general entitlement to medical care. Rather, the Estate must – and cannot – show that non-medical detentions staff's reliance on trained medical professionals' care of a medically complicated patient-inmate constitutes deliberate indifference. *Contra Paugh*, 47 F.4th at 1154 (assessing non-medical staff deliberate indifference through a "gatekeeper" analysis focused on whether such individuals denied or delayed care); *Harrison v. Wellpath, LLC*, No. 21-CV-00395 KWR/JFR, 2024 WL 2185587, at *11 (D.N.M. May 15, 2024) (dismissing non-medical defendant where plaintiff "has not argued or demonstrated that the course of treatment, diagnosis, or medical advice was so unreasonable that the individual correctional officers should have disregarded it and not relied upon medical [staff] decisions"); *Cordova v. Kautz*, No. 23-CV-00081-PAB-KAS, 2024 WL 4008709, at *7 (D. Colo. Aug. 12, 2024), *report and recommendation adopted*, No. 23-CV-00081-PAB-KAS, 2024 WL 4008219 (D. Colo. Aug. 30, 2024) (dismissing deliberate indifference claim against non-medical

employee where complaint lacked plausible allegations that defendant knew the severity of plaintiff's injury or that emergency medical care was necessary and deliberately disregarded those risks). The Sheriff Employees deferred to and relied on trained medical staff, who saw Purdy multiple times a day, to exercise their medical decision-making with a medically complex patient. Because it is not clearly established that doing so would constitute deliberate indifference, the Court must dismiss the Sheriff Employees.

## IV.    The Deputies are entitled to common law public official immunity against the state constitutional claim (Claim 3).

The Court must also dismiss the Estate's Section 131 claim because the Deputies are entitled to common law good faith immunity. Colorado courts recognize a common law-based good-faith immunity for public officials' exercising discretionary functions. *See Trimble v. City & Cnty. of Denver*, 697 P.2d, 716, 728-29 (Colo. 1985). As one state trial court has already concluded, Section 131 did not alter the availability of common law immunities for public officials such as the Deputies. *See* **Exhibit A**,11.12.23 Boulder District Court Order (examining and applying common law public official immunity to Section 131 claims).

Public officials, including peace officers, are entitled to official immunity for (1) discretionary acts; (2) which were not "malicious" in nature or that such official knew "[would] cause illegal injury" – *i.e.*, when the official acted in good faith. *Trimble*, 697 P.2d at 728-29 (recognizing but denying a public hospital director official immunity as to claims for fraudulent inducement and intentional tortious interference with contract). This common law immunity stems from the idea that immunity for public officials is appropriate to encourage them in the administration of their duties and to protect them from harassing and embarrassing litigation for decisions made while performing those duties. *Flournoy v. McComas*, 488 P.2d 1104, 1106 (1971) (citations omitted).

The year after issuing *Trimble*, the Colorado Supreme Court applied public official immunity in the police setting in *Leake v. Cain*, 720 P.2d 152, 163-64 (Colo. 1986). There, the Supreme Court granted official immunity to officers who had released, rather than arrested, an intoxicated teen at a party after which the teen drove and killed people in a vehicular accident. The Supreme Court concluded that because the officers were exercising discretion in their determination to take an individual into protective custody, official immunity protected them from subsequent claims. *Id.*; *see also Navratil v. Parker*, 726 F. Supp. 800, 804 (D. Colo. 1989) (citing *Leake* and contrasting pre-CGIA "Colorado common law immunity with the CGIA's statutory immunity for public officials). In the years following *Trimble* and *Leake*, appellate decisions focused on the Colorado Governmental Immunity Act's broader statutory immunity as it applied to all actions, whether discretionary or not. *See, e.g., Moody v. Ungerer*, 885 P.2d 200, 204-05 (Colo. 1994); *Jarvis ex rel. Jarvis v. Deyoe*, 892 P.2d 398, 401-02 (Colo. App. 1994). However, no appellate decision eliminated the common law public official immunity.

As originally introduced, Section 131(2)(b) would have prohibited public official good faith immunity. It provided: "Neither qualified immunity nor a defendant's good faith but erroneous belief is the lawfulness of his or her conduct is a defense to liability pursuant to this section." (See **Exhibit B**, introduced version of SB20-217 (emphasis added).) In all subsequent versions of the bill, Section 131(2)(b) was cut down to its current language – "Qualified immunity is not a defense to liability pursuant to this." (See **Exhibit C**, June 8, 2020 version of SB20-217.) This change preserved the good faith immunity defense.

As discussed in Subsection II, *supra*, the Complaint fails to put forth plausible – as opposed to conclusory or speculative – factual averments to show that the Deputies acted in bad faith or with malice towards Purdy. Rather, the Complaint

establishes that they deferred to trained medical staff to address Purdy's complex medical needs. This is simply insufficient to state a claim.

## V.    The Complaint fails to plausibly allege a *Monell* claim.

The Court must dismiss the Sheriff because the Complaint's policy or custom allegations fail to establish either an underlying constitutional violation or that any Sheriff policy or custom was moving force behind such violation. *Accord Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002). At most, the Complaint alleges negligence and/or medical malpractice. However, even assuming any Sheriff Employee's conduct rose to the level of deliberate indifference, such a showing is still insufficient to impose liability on the Sheriff.

Government entities can be sued only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694. A colorable municipal liability claim requires that a plaintiff (1) "identify a government's policy or custom" and (2) "show 'that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.'" *Cacioppo v. Town of Vail*, 528 F. App'x. 929, 931 (10th Cir. 2013) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013)).

A plaintiff may show the existence of a policy or custom by showing the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the

decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval;[6] or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation, alteration omitted). Moreover, to succeed, a plaintiff must identify a particular municipal liability theory. *Cacioppo*, 528 F. App'x at 934 (declining to recognize "amorphous hybrid theory" of municipal liability). Here, the Estate bases its *Monell* claim on allegations that the Sheriff had two informal customs amounting to widespread policies that violated Purdy's rights: including incentives to delay necessary outside medical care in the VitalCore contract [ECF 1, ¶¶ 200-11], and the decision to contract with VitalCore or any third-party medical contractor *at all* [*id.*, ¶¶ 236-41], as well as a practice of failing to train staff [*id.*, ¶¶ 248-256]. This Court should join other courts in this district that have routinely dismissed nearly identical official capacity claims. *See, e.g., Est. of Angelo*, 2024 WL 2274080, at *18 (D. Colo. May 20, 2024).

To raise a *Monell* claim based on the existence of an official policy, "a plaintiff should [identify and] set out the text of that policy." *Leonhard v. Correct Care Sols., LLC*, No. 19-cv-00600-PAB-STV, 2020WL1694377, at *8 (D. Colo. Apr. 7, 2020) (citing *Sandberg v. Englewood*, 727 F. App'x 950, 964 (10th Cir. 2018)). Under such a theory, municipal deliberate indifference requires a plaintiff to establish: (1) an official policy

---

[6] The Estate's ratification theory, to the extent that it asserts one, consists of conclusory allegations that the Sheriff and VitalCore "ratified and approved the conduct of the Individual Defendants." [ECF 1, ¶¶ 274, *and see id.,* 304, 309-11.) Failure to discipline is not sufficient to establish a *Monell* claim based on ratification. *See, e.g. Erickson v. City of Lakewood*, 489 F. Supp. 1192, 1207 (D. Colo. 2020) (citing cases, including *Jack v. Cty. of Stanislaus*, 2017 WL 4123930, *7 (E.D. Cal. Sept. 15, 2017) ("Ratification is more than acquiescence, and a mere failure to discipline does not amount to ratification.")). The Court must summarily dismiss the Estate's policy or custom claim based on ratification.

or custom, (2) causation, and (3) state of mind. *Schneider*, 717 F.3d at 769 (citation omitted).

Establishing municipal deliberate indifference based on a failure to train theory is even more demanding; as the Supreme Court has observed, "a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citation omitted); *Okla. City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] policy of inadequate training is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.") (citations, quotations omitted); *City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (observing that a less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities"). To establish a failure to train claim, the Estate must show: (1) the training was inadequate; (2) the Sheriff was deliberately indifferent in adopting her training program; and (3) inadequate training directly caused the constitutional deprivations in question. *See Montoya v. Newman*, 115 F. Supp. 3d 1263, 1283 (D. Colo. 2015) (citations omitted). It is not enough to show "merely that additional training would have been helpful in making difficult decisions" or "that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" to establish a failure-to-train claim. *Connick*, 536 U.S. at 68 (citing *Canton*, 489 U.S. at 391). Rather, because an individual's "shortcomings may have resulted from factors other than a faulty training program," "the focus must be on adequacy of the training program in relation to the tasks the particular [individual] must perform." *Erickson*, 489 F. Supp. 3d at 1208 (citing *Canton*, 489 U.S. at 390-91).

Here, the Estate concludes – but does not plausibly plead – that the Sheriff's policies, practices, and failure to train resulted in Purdy's death. The Court should reject these conclusory legal allegations as substitutes for plausible factual

allegations. *See Iqbal*, 556 U.S. at 678 (rejecting "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements"). Specifically, the Estate alleges:

- The Entity Defendants "have, with deliberate indifference to the rights of people who are incarcerated, persistently maintained constitutionally deficient policies, customs, and practices, with respect to provision of medical care" at the Jail. [ECF 1, ¶¶ 197, *and see* ¶¶ 245-62 (generalized allegations claiming Sheriff and VitalCore failed to adequately train staff).]

- The JeffCo Defendants' contract with VitalCore "financially incentivizes reductions in the use of necessary off-site medical services for inmates, and as such, represents an unconstitutional policy which gives rise to entity liability" because the contract obligates VitalCore to "pay up to a certain amount . . . for off-site medical care for each inmate." [*Id.*, ¶¶ 200-01 (allegations identical to those in *Est. of Angelo*, No. 23-cv-01607-CNS-STV, except for change in medical contractor).][7]

The only factual allegations offered to support these conclusions are that 13 individuals over a 14-year period between 2010 and 2024 had medical issues while incarcerated at the Jail and 8 of those individuals died. [ECF 1, ¶¶ 215-21.[8]] None of the incidents the Estate attempts to rely upon involved Parkinson's or dementia, Purdy's underlying medical issues, or bacterial infection, the ultimate cause of Purdy's death. Rather, the Estate uses a handful of dissimilar adverse medical events

---

[7] In relying on the cost-allocation provision of the Sheriff's contract with VitalCore as a basis for its constitutional claims, the Estate overlooks that one purpose of contracts is to allow the bargaining parties to "enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining." *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000) (*en banc*).

[8] The Complaint also cites the filing of lawsuits alleging deficient medical care during VitalCore's tenure as the Sheriff's medical contractor. [*See* ECF 1, ¶ 225]; *contra Est. of Angelo*, 2024 WL 2274080, at *19 (D. Colo. May 20, 2024) ("[A]llegations of lawsuits, absent an allegation of whether the municipality was found to have violated any rights, does not indicate that constitutional violations are a plainly obvious result of the decision to contract with [VitalCore] sufficient to establish notice."). The filing of other notice is insufficient to establish notice.

in the Jail as improper shorthand for plausibly pleading deliberate indifference instead of recognizing that these are rare occurrences indicative only of the fact that incarcerated individuals, like the rest of our community, may have health issues with significant and even fatal outcomes regardless of the medical care they receive. It is especially worth noting that of the incidents upon which the Estate seeks to rely, the circumstances of the deaths of Raisbeck, Tinker, Stangel, Perdreaux, and Abeyta have not been litigated [*id.*, ¶¶ 215, 217]; Angelo's death and Rogacki's medical claims are currently subject to litigation based on disputed allegations about which no conclusions can be drawn [*id.*, ¶¶ 216, 219]; the litigation related to Kowalski's and Lobato's withdrawal deaths did not result in any finding of deliberate indifference and involved different medical issues [*id.*, ¶¶ 218, 220]; McGill's non-fatal stroke occurred a decade prior to Purdy's death and involved a different jail medical provider and a dissimilar medical issue [*id.*, ¶ 221]; Turley's choking incident is even more remote in time and dissimilar in nature [*id.*]. As a result, the Estate's reliance on these incidents is insufficient to demonstrate that the Sheriff was on notice of the need for more or better training or supervision in circumstances like those surrounding Purdy's death. *See Leonhard*, 2020 WL 1694377, *9 ("Plaintiffs' list of other lawsuits brought against various CCS entities is insufficient to allege that any CCS entity or Sheriff Shrader was on notice of the need for more or better training.").

As in *Leonhard*, the Estate's failure to train and/or supervise theory fails because: (1) none of the cited cases are similar to these facts, as is required to put a party on notice that more or different training was needed; (2) allegations from complaints filed against VitalCore defendants, whether in the Jail or elsewhere, do not put the Sheriff on notice that the Jail's training is deficient regarding handling Parkinson/dementia-related fall risks; and (3) the only case that resulted in a jury verdict, *McGill v. Corr. Healthcare Cos.*, No. 13-cv-1080-RBJ-BNB, 2014 WL 5423271 (D. Colo. Oct. 24, 2014), involved a stroke, and those allegations do not plausibly

establish that the Sheriff was on notice that the employees of its current medical contractor, VitalCore, were likely to fail to adequately address Parkinson/ dementia-related fall risks. *Leonhard*, 2020 WL 1694377, at *9 (citations omitted).

Simply put, conclusory allegations that 13 individuals received insufficient medical care over a period of nearly 15 years in factually distinguishable circumstances do not establish that the Sheriff, either directly or through her contractual relationship with VitalCore, established an official policy (either via an actual policy or custom or by failing to train or supervise) that caused Purdy's death and did so with "deliberate indifference to an almost inevitable constitutional injury." *Cacioppo*, 528 F. App'x at 931 (quoting *Schneider,* 717 F.3d at 769). Because the Estate's conclusory allegations do not plausibly establish its Fourteenth Amendment claims on any theory of *Monell* liability, the Court should dismiss them. *See Leonhard*, 2020 WL 1694377, at *9 (rejecting unconstitutional policy and failure to train claims against Sheriff based on prior lawsuits factually distinguishable from in-custody suicide death); *Sexton v. City of Colo. Springs*, 530 F. Supp. 3d 1044, 1070 (D. Colo. 2021) ("The Court finds that two alleged incidents . . . are insufficient to show a practice so permanent and well settled that it constitutes a custom or usage with the force of law."); *Est. of Reat v. Rodriguez*, No. 12-cv-02531-REB-MEH, 2013 WL 3010828, at *5 (D. Colo. June 17, 2013) (three instances over twenty years insufficient to allege pattern); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) ("[T]hree incidents" in four-year period "were too few to indicate that the City had a widespread custom of which City policymakers had reason to be aware."); *Abila v. Funk*, No. CV 14-1002 JB/SMV, 2016 WL 9021834, at *19 (D.N.M. Dec. 14, 2016) (citing cases that "two or three instances will not suffice" to establish practice or custom).

Just as the Estate fails to plausibly establish an official Sheriff policy or custom related to Purdy's medical issues, it cannot establish the Sheriff caused Purdy's alleged injuries or was deliberately indifferent to an almost inevitable danger that he

would not receive appropriate medical care for his Parkinson's and dementia. Because the Estate failed to demonstrate that Purdy's death went beyond any VitalCore employees' medical malpractice in assessing or treating him or to provide specific facts or sufficient factual enhancement to plausibly allege any widespread Sheriff policy or custom demonstrating deliberate indifference to Purdy's medical treatment, the Court should dismiss this claim against the Sheriff.

**VI.    The Estate's non-delegable duty theory fails because it has not plausibly alleged that the Sheriff delegated VitalCore final policy making authority, its allegations rely on vicarious liability theory, and the non-delegable duty doctrine is not controlling or persuasive.**

The sum total of the Estate's non-delegable duty allegations are that the Sheriff had "a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees" and is therefore "liable for the unconstitutional actions of Defendant VitalCore (including its defective customs, policies, and practices described herein that were the moving force behind the violations of Mr. Purdy's constitutional rights) and its employees or contractors towards Mr. Purdy." [ECF 1, ¶ 2424, *and see id.*, ¶ 243 (alleging Sheriff "intentionally delegated final policy making authority related to" jail medical care to VitalCore).] However, the Estate has not made any plausible allegation that the Sheriff delegated final policymaking authority to VitalCore, which is the defining element of liability based on a non-delegable duty theory. Further, the Estate seeks to impose liability on the Sheriff based only on allegations of a principal-agent relationship with VitalCore – that is, on an improper vicarious liability theory. Finally, neither the Supreme Court nor the Tenth Circuit has adopted the non-delegable duty theory.

**A.    The Estate has not alleged that the Sheriff delegated final policymaking authority to VitalCore, a prerequisite for a non-delegable duty claim.**

The few trial court decisions within the District of Colorado that have entertained the non-delegable duty theory have recognized that the doctrine may be

applicable if "the government delegates final policy making authority to the third party." *Estate of Walter v. Corr. Healthcare Cos.*, 323 F. Supp. 3d 1199, 1215-16 (D. Colo. 2018); *McGill*, 2014 WL 5423271; *Estate of Lovern v. Correct Care Solutions, LLC*, No. 18-cv-2573-KLM, 2019 WL 2903589 (D. Colo. July 3, 2019). Notably, neither the Tenth Circuit nor the Supreme Court has recognized the doctrine. *See* Section (VI)(C), *infra*.

The instant Complaint is entirely devoid of allegations that the Sheriff delegated final policy making authority to VitalCore. Specifically, while the Complaint makes conclusory allegations that the Sheriff's contract with VitalCore was the driving force in Purdy's constitutional injuries and that the Sheriff is liable for VitalCore's policies, it wholly fails to assert that the Sheriff allowed Wellpath to make final decisions regarding the **Sheriff's policies**. [ECF 1, ¶ 243.] The Estate has therefore failed to allege any facts that would allow for a VitalCore policy to be imputed to the Sheriff and the non-delegable duty theory cannot support a claim against the Sheriff.

### B.    The Estate's non-delegable duty theory is impermissible vicarious liability.

Under the doctrine of vicarious liability or *respondeat superior*, a principal is liable for the acts of its agent committed within the scope of its employment. *See Taylor v. Phelan*, 912 F.2d 429, 433 (10th Cir. 1990). Although some caselaw from this district has distinguished non-delegable duty liability from vicarious liability, *see, e.g., McGill*, 2014 WL 5423271, federal courts regularly equate a non-delegable duty theory based on a principal-agent relationship with a theory based on vicarious liability, *see, e.g., Yucsi v. Sears Outlet Stores, LLC*, 813 F. App'x 780, 785 (3d Cir. 2020) (plaintiff can establish vicarious liability of an employer for the acts of an employee under state anti-discrimination law by demonstrating the employee violated a non-delegable duty of the employer); *Randle v. Crosby Tugs, L.L.C.*, 911

F.3d 280, 287 (5th Cir. 2018) (where shipowner owed non-delegable duty to provide adequate medical care to its seamen, it "would be vicariously liable if it had 'delegated performance of the duty' to an agent and the agent acted negligently in carrying out the duty") (emphasis added); *Civil Rights Ed. & Enforcement Ctr. v. Hospitality Props. Trust*, 867 F.3d 1093, 1105 (9th Cir. 2017) ("Nondelegable duty is a tort concept associated with vicarious liability theories. . . . [I]t means that an actor 'will be vicariously liable for the contractor's tortious conduct in the course of carrying out the activity.'"); *M.J. ex rel. Beebe v. U.S.*, 721 F.3d 1079, 1085 (9th Cir. 2013) ("We reject Plaintiffs' argument that the non-delegable duty doctrine is not a theory of vicarious liability."); *Ring v. Lexington Apartments & Motor Inns-Okla.*, 3 F. App'x 847, 850 (10th Cir. 2001) (because business invitors have a non-delegable duty to provide reasonably safe business premises, "[t]he business invitor 'may be held vicariously liable for an independent contractor's failure to exercise reasonable care even if the [invitor] has himself exercised due care'") (emphasis original, citation omitted); *U.S. v. Pelfrey*, No. CIV-18-945-HE, 2019 WL 2110582, at *3 (W.D. Okla. May 14, 2019) ("Courts have generally found that property owners have a non-delegable duty to not discriminate and that they will be held vicariously liable for discriminatory actions of their rental agents" in Fair Housing Act context); *Clark v. U.S.*, No. CIV-08-462-FHS, 2009 WL 2843354, at *5 (E.D. Okla. Aug. 31, 2009) (rejecting applicability of the non-delegable duty theory to the United States under the Federal Tort Claims Act, explaining that "the non-delegable duty is the same as making the defendant strictly liable or vicariously liable"); *see also Meyer v. Holley*, 537 U.S. 280, 286, 289-91 (2003) (concluding that Fair Housing Act, which allows for traditional vicarious liability, would not permit liability premised on the more "extensive" and "nontraditional" vicarious liability theory of non-delegable duty). Colorado law also treats non-delegable duties as imposing vicarious liability. *See Reid*

*v. Berkowitz*, 315 P.3d 185, 193 (Colo. App. 2013) ("[T]he concept of nondelegable duty is a species of vicarious liability").

The Supreme Court and the Tenth Circuit expressly reject vicarious liability as a basis for municipal liability under § 1983, including in cases involving the provision of medical care to inmates. *See Canton*, 489 U.S. at 385 ("*Respondeat superior* or vicarious liability will not attach under § 1983."); *Soto for Estate of Jimenez v. Bd. of Cty. Comm'rs of Caddo Cty.*, 748 F. App'x 790, 793 (10th Cir. 2018) ("'[U]nder § 1983, local governments are responsible only for their *own* illegal acts.' 'They are not vicariously liable under § 1983 for their employees' actions.'") (emphasis original, citations omitted); *Shue v. Laramie Cty. Detention Ctr.*, 594 F. App'x 941, 944 (10th Cir. 2014) ("In suits against municipal entities, '[s]ection 1983 . . . rejects the tort principle of *respondeat superior* and does not subject [such entities] to vicarious liability for the acts of their employees.'") (alterations original).

Further, courts across the country have likewise rejected efforts to hold a municipality vicariously liable for actions of its third-party medical provider. *See, e.g., Forte v. Conway*, No. 1:17-CV-1096-SCJ, 2017 WL 6551287, at *5 (N.D. Ga. Oct. 18, 2017) (distinguishing between the policies of the medical provider and of the county, reasoning "[t]here is no indication that any policies of Gwinnett County or Sheriff Conway caused the implementation of [the third party provider's] policies," and concluding that the county "cannot be held liable on strictly '*respondeat superior* principles'" in granting county motion to dismiss); *Davis v. Roane Cty., Tennessee*, No. 3:12-CV-634-TAV-CCS, 2016 WL 125497, at *8 (E.D. Tenn. Jan. 11, 2016) (rejecting claim against county stemming solely from jail medical contract, noting "that Roane County hired Southern Health to provide healthcare to its inmates and relied upon their judgments is not an unconstitutional policy"); *McPhail v. Cty. of Macomb*, No. 12-12134, 2014 WL 172275, at *6 (E.D. Mich. Jan. 15, 2014) ("[T]he fact that County entered into the Health Services Agreement with CMS to provide health care services

21

to the MCJ inmates generally dictates a finding, as a matter of law, that the County was not deliberately indifferent to the medical needs of the MCJ inmates and is entitled to summary judgment on a claim of deliberate indifference to a medical need."); *Millmine v. Cty. of Lexington (S.C.)*, No. C/A 3:09-1644-CMC, 2011 WL 182875, at *5 (D.S.C. Jan. 20, 2011) (expressly rejecting plaintiff's argument for county liability under non-delegable duty theory where county contracted with third party to provide medical care to inmates, concluding, "This argument is an effort to hold [the] County accountable under a respondeat superior theory, which is not a viable theory of liability under § 1983"); *Fisher v. Cty. of Macomb*, No. 2:08-cv-13844, 2011 WL 2414413, at *9 (E.D. Mich. June 14, 2011) (same); *but see Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217 (D. Colo. 2016).

Here, the Estate claims that the Sheriff is liable under the non-delegable duty doctrine for VitalCore medical staff's alleged failure to provide Purdy with appropriate care," VitalCore's "defective policies, customs, and practices," and "for the selection of VitalCore to provide medical services." [ECF 1, ¶¶ 237, 242-44.] *Monell's* proscription on vicarious liability prohibits the Estate's attempt to impute liability on the Sheriff by alleging nothing more than a principal-agent relationship created by her contract with VitalCore [*id.*, ¶¶ 236-41], and this Court must reject it.

Even the rare district court cases that have entertained the non-delegable duty theory have required that the medical provider itself has some policy that violates constitutional principles – a single incident is insufficient, as are the provisions of a contract between a sheriff and a jail healthcare contractor. *Lovern,* 2019 WL 2903589, at *5. Nor, as discussed above, are allegations related to other individuals' medical issues sufficient to show that the Sheriff was or should have been on notice that Purdy's Parkinson's and dementia-related fall risk would not be identified and addressed.

C.    **The non-delegable duty is neither controlling nor persuasive.**

Although several Colorado district court cases have allowed non-delegable duty theory claims to proceed, neither the Supreme Court nor the Tenth Circuit have adopted a "non-delegable duty" theory of liability under § 1983 as advocated by Plaintiffs. To the contrary, in *Estelle v. Gamble*, the Supreme Court remanded a § 1983 action, suggesting it would not adopt a theory allowing the policies and practices of the medical provider to be imputed to prison officials. 429 U.S. 97, 104 (1976). The Tenth Circuit has likewise not adopted the non-delegable duty theory; existing caselaw suggests it would not do so. *See Strain v. Regalado*, 977 F.3d 984, 997 (10th Cir. 2020) (rejecting municipal liability absent underlying constitutional violation by municipal actor); *Carr v. El Paso Cty.*, 757 F. App'x 651 (10th Cir. 2018) (rejecting inmate's § 1983 medical care claim despite concluding that plaintiff had alleged an Eighth Amendment violation by contract medical staff, noting that county was only liable for its own officially sanctioned or ordered acts). As a result, the Court should dismiss the claims against the Sheriff founded on this theory.

## VII.    The Estate's disability discrimination claims (Claims 2-4) fail.

The Disability Claims allege violations of the ADA, the Rehabilitation Act, and CADA. Because the Complaint fails to demonstrate that the Sheriff denied Purdy the benefit of any service by reason of his disability, the Court should dismiss them.

"Because Title VII and CADA claims "rise and fall together," this Court should examine them together. *Hodgkins v. Frontier Airlines, Inc.*, No. 19-CV-03469-RM-MEH, 2021 WL 2948810, at *11 (D. Colo. July 14, 2021) (citing *Agassounon v. Jeppesen Sanderson*, Inc., 688 F. App'x 507, 509 (10th Cir. 2017) ("CADA discrimination . . . claims are subject to the same legal standards as Title VII claims.") (citing *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010)).

"The ADA and CADA prohibit discrimination by public entities based on disability. The Rehabilitation Act prohibits such discrimination by recipients of federal funding." *Anderson v. Colo. Dep't of Corr.*, 848 F. Supp. 2d 1291, 1300 (D.

Colo. 2012). To state a claim under these provisions, a "plaintiff must allege that: (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). While the Sheriff concedes that Purdy was a qualified individual with a disability, he was not denied the benefits of any service, program, or activity. Moreover, even if the Court finds that Purdy was denied a service, program, or activity, that denial was not by reason of his disability. *See, e.g., Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005).

As a result, the Court must dismiss the Estate's disability claims. Under these provisions, the Estate is obligated to show that Purdy was "otherwise qualified" for the benefits he sought and that he was denied those "by reason of disability." *Id.* (citing *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992), *cert. denied*, 507 U.S. 910 (1993)). "Further, we have held that "the term otherwise qualified cannot ordinarily be applied 'in the comparatively fluid context of medical treatment decisions without distorting its plain meaning."' *Johnson*, 971 F.2d at 1493-94. "As to whether treatment was denied . . . by reason of disability, the Second Circuit has stated: 'Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say . . . that a particular decision was discriminatory.'" *Id.* (quoting *United States v. Univ. Hosp.*, 729 F.2d 144, 157 (2nd Cir.1984)). Because "neither the ADA nor the Rehabilitation Act provide remedies for alleged medical negligence," *id.* (citing cases, including *Grzan v. Charter Hosp. of N.W. Indiana*, 104 F.3d 116, 121, 123 (7th Cir. 1997) (affirming Rule 12(b)(6) dismissal because ADA/Rehabilitation Act do not provide a "federal malpractice tort remedy" and allegations of discriminatory medical

treatment do not fit into the Rehabilitation Act's four-element framework)), the Court should dismiss the Disability Claims.

## VIII.  The family's wrongful death claim (Claim 5) is untimely as against the Sheriff and Deputies.

The Court must dismiss the family's state law wrongful death claim as against the Sheriff and Deputies as untimely under the one-year statute of limitations codified in COLO. REV. STAT. § 13-80-103(1)(c). That statute provides for a one-year statute of limitations for civil actions against "sheriffs, coroners, police officers, firefighters, national guardsmen, or any other law enforcement authority." *Accord Gallegos v. City of Monte Vista*, 976 P.2d 299, 301 (Colo. App. 1998) (citing *Delta Sales Yard v. Patten*, 892 P.2d, 297, 299-99 (Colo. 1995)); *Est. of Burgaz v. Shrader*, No. 21CA1648, 2022 WL 22923177, at *3 (Colo. App. Dec. 15, 2022) (applying one-year statute to state law wrongful death claim against sheriff).

Purdy died on July 30, 2023. The one-year statute of limitations deadline for the wrongful death claim against the Sheriff and Deputies expired on July 30, 2024, nearly 7 months before Plaintiffs initiated this action on February 20, 2025. The Court must therefore dismiss the wrongful death claim against the Sheriff and Deputies as untimely under COLO. REV. STAT. § 13-80-103(1)(c). The Court should also dismiss this claim as against Abernathy, De Wispeleare, and Mann, both because the Complaint fails to plausibly establish the elements of such a claim against them, *see Stamp v. Vail Corp.*, 172 P.3d 437, 451 (Colo. 2007) (claim requires death of a person and a wrongful act that would have entitled the decedent to maintain an action, had they survived), and because the Court should decline to exercise its supplemental jurisdiction over this claim should it dismiss the federal claims at issue here.

## Conclusion

The Sheriff Defendants respectfully request to be dismissed from this action and for any other relief this Court finds fair and just.

Respectfully submitted this 28th day of April, 2025.

JEFFERSON County Attorney's Office

*/s/ Rebecca P. Klymkowsky*

Rebecca P. Klymkowsky, No. 41673
Assistant Deputy County Attorney
Ben Longnecker, No. 55815
Assistant County Attorney
100 Jefferson County Parkway, Suite 5500
Golden, Colorado 80419
T: 303.271.8900
E: rklymkow@jeffco.us
E: bclongne@jeffco.us
*Attorneys for the Board, the Sheriff, and the
Sheriff Employees*

SKC Standing Order for Civil Cases Section C(2) Certification. I hereby certify
that no portion of this pleading was drafted using artificial intelligence (AI).

*/s/ Rebecca P. Klymkowsky*

Rebecca P. Klymkowsky
Assistant Deputy County Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2025, I filed the foregoing **SHERIFF
DEFENDANTS' MOTION TO DISMISS** via CM/ECF, which will serve a true and
correct copy upon the following:

Darold Killmer │ dkillmer@killmerlane.com
Michael Fairhurst │ mfairhurst@killmerlane.com
Maddie Lips │ mlips@killmerlane.com
KILLMER LANE, LLP
*Attorneys for Plaintiffs*

Jacqueline B. Sharuzi-Brown │ jackie@sharuzilaw.com
Stephanie Lynn Clark │ sclark@sharuzilaw.com
SHARUZI LAW GROUP, LTD.
*Attorneys for VitalCore Defendants*

*/s/ Beth Ann Jackson*

Beth Ann Jackson, Paralegal
Jefferson County Attorney's Office