EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00556-SKC-TPO

ESTATE OF JAMES PURDY, *et al.*,

    Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF JEFFERSON COUNTY, *et al.*,

    Defendants.

---

### INDIVIDUAL PLAINTIFFS' RESPONSES TO JEFFERSON COUNTY SHERIFF DEFENDANTS' WRITTEN DISCOVERY REQUESTS

---

Plaintiffs Marilyn Purdy, Scott Purdy, Brooke Grenemyer, and Matthew Purdy (the "Individual Plaintiffs"), by and through their undersigned counsel of record, hereby submit the following Responses to the Jefferson County Sheriff Defendants' First Written Discovery Requests, as follows:

### Interrogatories

1. For each Plaintiff, describe in detail your understanding of Mr. Purdy's health in the twelve (12) months leading up to his June 2023 incarceration. A full description should include the frequency, type, duration, and intent of each treatment, the name and contact information of the provider providing the treatment, and whether you believed Mr. Purdy's general health was improving or worsening as a result of such treatment.

**OBJECTION: Plaintiffs object to this interrogatory as unduly burdensome to the extent it seeks detailed and specific information regarding Mr. Purdy's extensive and complicated medical history, which is thoroughly documented in medical records previously produced and produced herewith. Plaintiffs incorporate those records pursuant to Fed.R.Civ.P. 33(d). Without waiving these objections, Plaintiffs state:**

**ANSWER OF MARILYN PURDY: Jim's health leading up to his incarceration, both physically and mentally, was deteriorating. It affected every aspect of our everyday life together. I was his caregiver nearly 24**

hours a day, 7 days a week, except on Tuesdays and Fridays when a nurse visited our home to help around the house with Jim's personal care, like bathing. It's impossible to detail all the little things I did every day for Jim. He slept poorly, had choking fits eating and drinking, wobbled unsteadily while walking, went to the bathroom frequently, and had short-term memory loss. Most evenings, he experienced "sundowning," a daily increase in confusion, disorientation, sadness, depression, restlessness, agitation, frustration, and anger. He could become obsessive and compulsive for days, and was often sorting many years of paper files in his home office or at his workbench in the garage.

Jim's physical condition deteriorated as well. His movements were slow and his body tremored. He fell often, but his medications, when taken as prescribed every 4 hours (6:00/10:00/2:00), cut the frequency down to 4-5 times a week on average. I tried to make the house as safe as possible, and installed grab bars, handrails, carpet, and kept walkers, canes, and other accessibility devices and items around the house. Jim was also prescribed a daily antibiotic called doxycycline to help prevent infections from injuries due to falling, especially on his legs.

A typical day involved Jim waking up at 2:00 a.m. to take his Parkinson's medications, after which he would go back to sleep. At 6:00 a.m., Jim's phone alarm would alert us to take his pills again. Some days he slept a bit more, but after he was up, he would get the newspaper and drink coffee. He usually ate cheerios for breakfast because they limited the possibility of choking. Many mornings he would call his brother Jeff or cousin Tom and talk for a while. After lunch, he often sorted through his business files or worked in the garage, which kept him busy and his mind occupied. Sometimes he played billiards at a senior center down the street. After dinner, Jim watched the news and sports – hockey and basketball were favorites – and would go to bed around 10:00 p.m. after he took his medication. This routine was extremely important, and nearly everything revolved around the strict schedule ordered by his doctors for the Parkinson's medications.

ANSWER OF SCOTT PURDY: My dad and Marilyn lived in Denver, so my wife Alistaire and I were not as involved with or aware of my father's health on a day-to-day basis because we live in Colorado Springs. My brother Matt, who is a doctor, had a much more present view of my father's ongoing health, often talking to my dad and Marilyn by phone.

2

In the twelve months before my father's death, I know he and Marilyn were diligent about visiting doctors at the VA for treatment and check in on his conditions, but I don't know a lot of the medical specifics. I observed that my dad could at times become confused during a conversation, sometimes losing his train of thought as he tried to engage in ordinary daily conversations.

My dad's gait and equilibrium were affected by Parkinson's disease. He had a window of time during the day when his medications allowed him to be out with us (meeting for a meal, for example), during which he could function somewhat normally, walking on his own and sometimes receiving a hand to balance himself. But he did not have unlimited hours of the day where he could be on his feet or be engaged in conversation. On occasion he used a walker (sometimes a cane) to keep himself upright.

**ANSWER OF BROOKE GRENEMYER**: My understanding of my father's health in the 12 months prior to his death was one born out of my experience as his daughter, and not as someone with anything more than a lay person's understanding of his diagnosis. In the 13 or so years since he was diagnosed with Parkinson's, and in the couple of years since his dementia diagnosis, I watched my father become increasingly frail, tired, confused, and ultimately held hostage by the constant betrayal of his body and mind.

From June 2022 to June 2023, my father was weak, increasingly tired, unable to complete what would be considered menial tasks, and often confused about many things. I know he spent a fair amount of time at doctor's appointments. My mother was his primary caretaker, but I tried to see him as much as I could. From what I understand, Parkinson's and dementia have no known cure and by nature, cause deterioration of the afflicted person, and from my perspective, he seemed to be getting worse each time I saw him.

**ANSWER OF MATTHEW PURDY**: From June 2022 to June 2023, I was temporarily living in in Honolulu, HI, over 3,000 miles (3-4 time zones) away from my family in Colorado working as an internal medicine physician at Tripler AMC. Because of the distance, I didn't see my father as much as I wanted, but also didn't know it was the last year I would get to spend with him.

About 2-3 times per month, I talked to my mother Marilyn about my father's deteriorating conditions. Usually, the phone calls and discussions centered around the management of his day-to-day care.

In the spring of 2023, I was trying to arrange my vehicle shipment from Honolulu to San Antonio (my next duty station). The title to my car was in both of our names, and I needed my father to contact the DMV and fill out some paperwork so it could be shipped. His inattention and inability to help caused me to become extremely frustrated and I lost my temper. I didn't want to be frustrated with him because I knew everything was attributable to neurodegenerative diseases impacting his executive functions, but it's something during those last six months that I remember clearly.

My mother accompanied my father to many physician appointments to visit with neurologists, psychiatrists, neuropsychologists, and primary care physicians. Of note, he had been seen by a neurosurgeon many years before and had been offered a procedure for a deep brain stimulator implant, which is the final and most invasive intervention for Parkinson's Disease patients. This illustrates how significantly the disease had progressed even many years before his death.

A specific goal of mine toward the end of my father's life was to obtain a diagnosis of Lewy Body Dementia to underscore the need for support and placement with caregivers capable of assisting with his needs. My mother had been burdened with his full-time care for several years and was clearly suffering from fatigue. My father was seen by a neuropsychologist to have an exhaustive neuropsychiatric evaluation as previous providers demurred from the title of Lewy Body Dementia given its histologic underpinning. The evaluation demonstrated findings you would expect to observe in advanced PD. It may have been a moot point anyway because my father would likely have to willingly agree to be contained in a care facility.

In response to "whether [I] believed Mr. Purdy's general health was improving or worsening as a result of such treatment," I believe the question demonstrates a complete lack of understanding of Parkinson's Disease. This is a chronic progressive neurodegenerative disorder. There are no known definitive treatments. It is expected that the treatments utilized in PD and PD+ disorders will work for a period of time and the therapeutic benefits will eventually be reduced over time as the adverse effects become more problematic. A known characteristic of PD is its

paroxysmal nature of cognitive and motor dysfunction. In other words, there are ups and downs over days and weeks, but over a period of time like a year, it will only get worse.

**PLAINTIFFS' COUNSEL FURTHER STATES**: *See also* Mr. Purdy's Veteran's Affairs medical records previously produced at Purdy 107-111 and 1211-2155, previous Lutheran Hospital records at Purdy 327-423, and Mr. Purdy's UCHealth records from 2013-2023 produced herewith at Purdy 2196-3798.

2. For each Plaintiff, describe in detail whether you attempted to post Mr. Purdy's bond in any manner, such as, for example, by communicating with a bondsman during Mr. Purdy's incarceration.

**ANSWER OF MARILYN PURDY**: I communicated shortly after Jim's incarceration on the phone and email with Tayler Made Bail Bonds but was told I could not bail Jim out through a bondsman because the court set cash only bail. The person I spoke with said I could pay $10,000 cash or ask the public defender to seek a bail reduction. *See also* my Response to Interrogatory No. 3, below.

**ANSWER OF SCOTT PURDY**: I live in Colorado Springs, and during that time, my family was on a long summer road trip (my wife and I are both teachers), and we did not hear of my father's ongoing condition or situation in Denver day-to-day. I was not aware of my dad's arrest or incarceration until Brooke texted me on June 26. I also received the news of his terrible condition in Jefferson County jail only after he was seriously hurt from repeated falls and in an unconscious state at Lutheran hospital. Based on all of this, I was not involved in anything related to the bond.

**ANSWER OF BROOKE GRENEMYER**: My son was born on June 11, 2023, seven weeks premature via emergency c-section, and spent the first four weeks of his life in the neo-natal intensive care unit. As his mother, I had no other option than to put what was happening with my father to the side and care for my infant son. Like the rest of the family, I assumed my father wasn't going to be placed in mortal danger simply by existing in the custody of Vital Core and Jefferson County. I assumed he would be safe in jail and was totally focused on my newborn son at that time. Because of that, I did not contact a bail bondsman and did not attempt to post my father's bond.

**ANSWER OF MATTHEW PURDY**: I did not attempt to contact a bail bondsman. *See* Response to Interrogatory No. 3, below.

3. For each Plaintiff, describe why you did not post Mr. Purdy's bond or contact a bondsman during his incarceration.

**ANSWER OF MARILYN PURDY**: The simple answer is I didn't have $10,000 in cash, and the bondsman I contacted couldn't help me. As a family, we tried to come up with a way to raise the money. Jim's cousin, Tom Purdy, offered to loan the money, but I was concerned that Jim might not be able to follow the strict conditions once he was released. If he left the house when he wasn't supposed to, for example, the $10,000 would be gone and Jim would be back in jail. I decided it was best to try and get the bail reduced or have Jim released in my care at the upcoming bail hearing in July. I thought he would be safe and cared for in the jail until then.

**ANSWER OF SCOTT PURDY**: *See* Response to Interrogatory No. 2, above.

**ANSWER OF BROOKE GRENEMYER**: *See* Response to Interrogatory No. 2, above.

**ANSWER OF MATTHEW PURDY**: During the time my father was incarcerated, I was in the middle of moving from Hawaii to Texas to start a rigorous medical training program and deferred to my mother on this subject. She puzzled over whether to post bond to get my father out of jail but feared he would immediately violate any terms of house arrest due to his impulsiveness, forgetfulness, confusion, and stubbornness. I agreed and told my mother to trust the jail and the medical professionals observing and treating him. I trusted that he would be safe, monitored, and properly cared for in the jail, but was clearly was mistaken.

4. For each Plaintiff, describe in detail whether you communicated with or attempted to contact a private criminal defense attorney during Mr. Purdy's incarceration or discussed doing so with any other Plaintiff or person.

**ANSWER OF MARILYN PURDY**: I contacted a lawyer named Michael Martin recommended by a friend. He needed a $5000 retainer to review the case, and we didn't have that kind of money. Another friend suggested an attorney but when I contacted him, he was in the process of retiring and declined. That lawyer recommended someone else, but I couldn't get a hold of him.

6

I also contacted Nathan Viton, the VA Justice Outreach Coordinator, who works with the VA Resource and Referral Center to try and get some help moving Jim out of jail and to a facility where he could be better cared for, but they weren't able to do anything either.

**ANSWER OF SCOTT PURDY:** I did not communicate with or attempt to communicate with a private defense attorney. *See also* my Response to Interrogatory No. 2, above.

**ANSWER OF BROOKE GRENEMYER:** I did not communicate with or attempt to contact a private criminal defense attorney. *See also* my Response to Interrogatory No. 2, above.

**ANSWER OF MATTHEW PURDY:** I deferred this concern to my mother too, but was aware that he had a lawyer. Again, I was in the middle of moving from Hawaii to Texas, and I have almost no experience with the legal system. But as a physician, I expected medical care and treatment to be conducted professionally and in a medically safe environment. As such, I felt he would be safe and well taken care of. Again, I was proven wrong.

**COUNSEL FOR PLAINTIFF FURTHER STATES:** *See also* emails from Marilyn Purdy produced herewith at Purdy 3809-3822.

5.  For Plaintiff Marilyn Purdy, describe in detail the factual context and intentions for Marilyn's Purdy's multiple communications between herself and Office of the Colorado State Public Defender during Mr. Purdy's incarceration. A full description should include frequency of Ms. Purdy's communication(s), whether they were in-person or written, reasons for Ms. Purdy's communication(s), and the Office of the Colorado State Public Defender's response communications, if any.

**ANSWER OF MARILYN PURDY:** My first interactions with the Public Defender's Office were at Jim's first court appearance on June 26, 2023. Jim's case was the last one called that day, after lunch I think, and the lawyers at the courthouse spoke with Jim and I briefly. Jim was confused about the charges and what was happening. I tried to explain to the judge that he suffered from dementia and Parkinson's and needed to be in my care, but the judge set his bond at $10,000 cash and scheduled another hearing for July 25, over a month later.

I called the Public Defender's Office several times over the next few days and learned Jim was assigned a lawyer named Lindsay Stone. I was

**told she would be available approximately 3-5 days after Jim's arrest. I called daily (from about June 27-July 9th), but her voicemail always said she was in court.**

**On July 10, on my daily visit to the jail, I was told by the officer I couldn't meet by video with Jim because he had been taken to the hospital. I was upset and wanted to talk to the nurse to find out what was happening. The nurse (I think her name was Kim) was rude and upset that the officer told me Jim was at the hospital. By chance, Ms. Stone was behind me in line, and we started talking. She confirmed she was Jim's public defender but was there to speak to another client. She told me most inmates were taken to St. Anthony's Hospital and she would check Jim's status. When I got home, I called St. Anthony's, but the hospital staff were not allowed to confirm or deny whether Jim was there.**

**I later communicated several times with Ms. Stone by email and phone and met again in person the same day she met Jim for the first time on July 14. Again, I was there to meet Jim and saw her. She had just come from her first meeting and was very upset about Jim's condition. I also talked briefly with Ms. Stone after Jim's hearing when he was released from custody but was still hospitalized. My main concern in these communications was always to get someone to understand Jim's medical conditions so he could come home.**

**COUNSEL FOR PLAINTIFF FURTHER STATES:** *See also* **Transcript of June 26[1], 2025 Hearing previously produced at Purdy 1173-1179, and documents produced herewith at Purdy 3817-3820.**

6.  Describe in detail the factual context for Marilyn Purdy's communications with the Office of the Colorado State Public Defender for the purpose of connecting Mr. Purdy with his assigned Colorado State Deputy Public Defender.

**ANSWER OF MARILYN PURDY:** *See* **my Response to Interrogatory No. 5, above.**

---

[1] Upon information and belief, the transcript of this proceeding is incorrectly dated June 23, 2023. Mr. Purdy's arrest leading to his incarceration did not occur until June 25, 2024, and his first court appearance was June 26, 2023 at 10:00 a.m. *See* body-worn camera footage of Mr. Purdy's arrest (Purdy 1009) and the first court appearance documented on his inmate file cover sheet (Purdy_CCJRA 1).

8

## Requests for Production

1. For each Plaintiff, produce all records relating to your economic damages, if any.

**OBJECTION**: Plaintiff objects to this request to the extent that it seeks to limit or offset claimed damages in this matter through collateral sources. Federal and state courts in Colorado have routinely held that collateral sources independent of the tortfeasors are inadmissible under both the common law and statutory collateral source rules, prejudicial, and would unfairly benefit defendants if considered. Plaintiffs also object to the extent further information may be evaluated, calculated, and provided pursuant to the Scheduling Order and Fed.R.Civ.P. 26(a)(2). Plaintiffs reserve the right to supplement or otherwise amend this response. Without waiving these objections, Plaintiffs state:

**ANSWER OF MARILYN PURDY**: Medical expenses to date:

| Facility | Dates | Amount | Bates No. |
|---|---|---|---|
| St. Anthony's Hospital | 7/10/23 | $29,579.71 | Purdy 188-189 |
| Lutheran Medical Center | 7/18/23-7/25/23 | $121,049.07 | Purdy 425-427 |
| Intermountain Health Collier Hospice – Denver | 7/25/23-7/30/23 | $18,489.58 | Purdy 545-546 |
| Ambulance transfer from Lutheran Hospital to Intermountain Health Hospice | 7/25/23 | $2,451.31 | Purdy 3799 |
| Bluesky Neurology | 7/20/23 | $95.23 | Purdy 3800 |
| **TOTAL** | | **$171,664.90** | |

Cremation expenses total $1,634.20. *See* Purdy 992.

I also gave donations of $200 to the VA and $100 to the people involved in the motorcycle procession at Jim's service.

At the time of his death, Jim and I were receiving a total monthly income from Social Security of $4,772 -- $2,751 for Jim and $2,021 for me. Since Jim's death, the total benefit to our household has been reduced to $3,087 per month. *See* Purdy 3801-3805.

I also paid for copies of Jim's death certificate, which was $50 per copy. I don't have a receipt for that.

**ANSWER OF SCOTT PURDY**: At this time, I have no documents responsive to this request.

**ANSWER OF BROOKE GRENEMYER**: Please *see* the Airbnb receipt for a house in Grand Junction where the family stayed for my father's service in August 2024, produced herewith at Purdy 3806. The total was $2,533.98.

**ANSWER OF MATTHEW PURDY**: Receipts for plane tickets for my wife and I to travel to Denver in July 2023 to see my father before he died and for travel in August 2024 to attend my father's service in Grand Junction are being gathered and will be produced at Purdy 3807.

2.  For each Plaintiff, produce any communications you had with any bondsman during Mr. Purdy's incarceration.

**ANSWER OF MARILYN PURDY**: I have no documents responsive to this request. My communications were by phone.

**ANSWER OF SCOTT PURDY**: None.

**ANSWER OF BROOKE GRENEMYER**: None.

**ANSWER OF MATTHEW PURDY**: None.

3.  For each Plaintiff, produce any communications you had with any employee of the Office of the Colorado State Public Defender during Mr. Purdy's incarceration.

**ANSWER OF MARILYN PURDY**: *See* documents produced herewith at Purdy 3817-3820.

**ANSWER OF SCOTT PURDY**: None.

**ANSWER OF BROOKE GRENEMYER**: None.

**ANSWER OF MATTHEW PURDY**: I did not speak with anyone at the public defender's office but think I left a couple messages seeking information about my father's case.

10

**COUNSEL FOR PLAINTIFF FURTHER STATES**: *See* voicemails from Matt Purdy with the Public Defender's Office produced herewith at Purdy 3885-3886.

4. For each Plaintiff, produce all communication in your possession between June 25, 2023, and July 30, 2023, that relate to the circumstances of Mr. Purdy's death, illnesses, or otherwise relate to the allegations in the Complaint. Your response should include all communications between individual Plaintiffs and all communications between any individual Plaintiff and any third party.

**OBJECTION**: Plaintiff objects to this request to the extent that it seeks communications protected by the attorney-client privilege or marital communications privilege. Without waiving these objections, Plaintiffs state:

**ANSWER OF MARILYN PURDY**: *See* emails produced herewith at Purdy 3809-3860.

**ANSWER OF SCOTT PURDY**: *See* text messages produced herewith at Purdy 3861-3869.

**ANSWER OF BROOKE GRENEMYER**: The only communication I have is a voicemail from my brother Matt on June 30, 2023, produced herewith at Purdy 3906.

**ANSWER OF MATTHEW PURDY**: *See* text messages produced herewith at Purdy 3887-3905. In addition, I created contact information notes in my phone related to my father's case produced herewith at Purdy 3870.

### Requests for Admission

1. To each Plaintiff, admit that you did not attempt to contact a bondsman to bond Mr. Purdy out of the Jefferson County Jail.

**ANSWER OF MARILYN PURDY**: Deny. *See* my Responses to Interrogatory Nos. 2 & 3, above.

**ANSWER OF SCOTT PURDY**: Admit. *See* my Responses to Interrogatory Nos. 2 & 3, above.

11

**ANSWER OF BROOKE GRENEMYER: Admit.** *See* **my Responses to Interrogatory Nos. 2 & 3, above.**

**ANSWER OF MATTHEW PURDY: Admit.** *See* **my Responses to Interrogatory Nos. 2 & 3, above.**

2.  To each Plaintiff, admit that you did not attempt to secure private criminal defense counsel for Mr. Purdy during his incarceration.

**ANSWER OF MARILYN PURDY: Deny.** *See* **my Response to Interrogatory No. 4, above.**

**ANSWER OF SCOTT PURDY: Admit.** *See* **my Response to Interrogatory No. 4, above.**

**ANSWER OF BROOKE GRENEMYER: Admit.** *See* **my Response to Interrogatory No. 4, above.**

**ANSWER OF MATTHEW PURDY: Admit.** *See* **my Response to Interrogatory No. 4, above.**

3.  To each Plaintiff, admit that Mr. Purdy suffered falls while living at home in the six months prior to his incarceration.

**ANSWER OF MARILYN PURDY: Admit.** *See also* **my Response to Interrogatory No. 1, above.**

**ANSWER OF SCOTT PURDY: Deny that I witnessed but admit that I was aware of my dad suffering falls while living at home in the six months prior to his incarceration.**

**ANSWER OF BROOKE GRENEMYER: Deny that I witnessed but admit that I was aware of my dad suffering falls while living at home in the six months prior to his incarceration.**

**ANSWER OF MATTHEW PURDY: Deny that I witnessed but admit that I was aware of my dad suffering falls while living at home in the six months prior to his incarceration.**

DATED this 18th day of September 2025.

As to objections:
KILLMER LANE, LLP

*s/ Darold W. Killmer*
Darold W. Killmer
Michael Fairhurst
Madison Lips
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax
dkillmer@killmerlane.com
mfairhurst@killmerlane.com
mlips@killmerlane.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2025, I filed the foregoing via CM/ECF, which will send notification to the following:

Rebecca Klymkowsky
Ben Longnecker
Assistant Deputy County Attorney
Jefferson County Attorney's Office
100 Jefferson County Parkway, Suite 5500
Golden, Colorado 80419
T: 303.271.8913
rklymkow@jeffco.us
bclongne@co.jefferson.co.us
*Attorneys for Defendants Jefferson County Sheriff Regina Marinelli; Jefferson County Board of County Commissioners; Polly Abernathy; Adele Mann; Robert Diehl; Peter Nielsen; Kaitlyn Tuey; Samuel Van Alphen; Chase Van Wyk; Richard Vargas; Alex Esparza; Tina Mindykowski; Susan Wispeleare; Allen Erdmann; Aric Meyer; Kimberly Jensen; and K'Leigh Thomas.*

Jacqueline Sharuzi
Stephanie Clark
Sharuzi Law Group, Ltd.
555 17th St Suite 975
Denver, CO 80202
(303) 226-0330
jackie@sharuzilaw.com

13

sclark@sharuzilaw.com
*Attorneys for Defendants Vitalcore Health Strategies, LLC; Esmeralda Ziegelmann; Brayden Smith; Myra Brock; Casey Castaneda; Kim Sanchez; Lavina Busby; Marshall McCurdy; Monica Jarrell; Curtis Murphy; Jerica Talcott; Cecelia Barbeite; Beverly Casarez; Angel Vargas; Lilia Fernandez; Breanna Andrews; Megan Page; Catherine Rowe; Emilsa Pereda*

John C. Matthews
Douglas W. Poling
White and Steele, P.C.
Dominion Towers, North Tower
600 17th Street, Suite 600N
Denver, CO 80202
(303) 296-2828
jmatthews@wsteele.com
dpoling@wsteele.com
*Attorneys for Defendant Anika Heng*

Nicholas A. Cottrell
Robert A Lees & Associates
5655 S. Yosemite St., Suite 350
Greenwood Village, CO 80111
(303)292-1020
ncottrell@robertalees.com
*Attorney for Defendant Tammy Pope*

          KILLMER LANE, LLP

          *s/ Jesse Askeland*
          Paralegal